# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## AT BOWLING GREEN

| | |
|---|---|
| **COMMONWEALTH BRANDS, INC.;**<br>**CONWOOD COMPANY, LLC; DISCOUNT**<br>**TOBACCO CITY & LOTTERY, INC.;**<br>**LORILLARD TOBACCO COMPANY;**<br>**NATIONAL TOBACCO, L.P.; and**<br>**R.J. REYNOLDS TOBACCO COMPANY,** | |
| **Plaintiffs,** | **Civil Action** |
| **v.** | **No. 1:09CV-117-M** |
| **UNITED STATES OF AMERICA;** | **(Electronically Filed)** |
| **UNITED STATES FOOD AND DRUG**<br>**ADMINISTRATION; MARGARET HAMBURG,**<br>**Commissioner of the United States**<br>**Food and Drug Administration; and**<br>**KATHLEEN SEBELIUS, Secretary of the**<br>**United States Department of Health**<br>**and Human Services,** | |
| **Defendants.** | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

                                                                                    **Page**

INTRODUCTION AND SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

PART ONE: HEALTH RISKS, ADDICTIVENESS, AND UNDERAGE USE

THE FAMILY SMOKING PREVENTION AND TOBACCO CONTROL
ACT ADDRESSES THE MOST SIGNIFICANT, PREVENTABLE THREAT
TO PUBLIC HEALTH IN THE UNITED STATES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

I.      Tobacco Products Present A Major Threat To The Public Health
        And Cause Massive Expenditures Of Health Care Dollars.. . . . . . . . . . . . . . . . . . . . .  6

        A.  Tobacco Use Is The Single Most Significant Threat To Public Health. . . . . . . . . . . .  6

        B.  Tobacco Use Costs Our Health Care System $96 Billion Every Year. . . . . . . . . . . .  10

II.     The Magnitude Of The Tobacco Crisis Stems From Nicotine Addiction. . . . . . . . . . . .  11

III.    Because Tobacco Products Are Lethal And Addictive,
        The Industry Depends On Recruiting New Users From
        The Underage Population Least Able To Evaluate Health Risks. . . . . . . . . . . . . . . . . .  13

        A.  Virtually All New Tobacco Users Are Underage. . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        B.  Tobacco Advertising Techniques Reflect The Industry
            Imperative To Recruit Adolescent Tobacco Users.. . . . . . . . . . . . . . . . . . . . . . . . . .  15

PART TWO: STATUTORY PROVISIONS CHALLENGED BY PLAINTIFFS

THE CHALLENGED PROVISIONS ENSURE THAT THE DECISION
WHETHER TO USE TOBACCO PRODUCTS WILL BE MADE BY
ADULTS ON THE BASIS OF ACCURATE INFORMATION. . . . . . . . . . . . . . . . . . . . . . . . . .  19

I.      The Act Properly Ensures That A Decision To Use Tobacco Is Based On
        Information That Is Accurate And Not Misleading.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

        A.      The Revisions To Tobacco Product Warnings Do Not
                Violate the First Amendment (Count 2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

B.   The Regulation Of Modified Risk Tobacco Products
     Does Not Violate The First Amendment (Count 3)... . . . . . . . . . . . . . . . . . . .  28

C.   The Preclusion Of Claims Implying FDA Approval
      Does Not Violate The First Amendment (Count 7)... . . . . . . . . . . . . . . . . . .  32

II.   The Act Properly Restricts The Advertising And Marketing
      Techniques That Are Particularly Attractive To Minors... . . . . . . . . . . . . . . . . . .  34

A.   The Restrictions On The Use Of Color And Imagery
     Do Not Violate The First Amendment (Count 1)... . . . . . . . . . . . . . . . . . . . .  34

B.   The Restrictions On Brand-Name Event Sponsorship (Count 5)
     And The Distribution Of Branded Merchandise (Count 6)
     Do Not Violate The First Amendment...... . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

      1.  Brand-Name Event Sponsorship (Count 5). . . . . . . . . . . . . . . . . . . . . . . .  40

      2.  Branded Merchandise (Count 6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

C.   The Challenge To An Outdoor-Advertising Restriction Is Unripe
     (Count 4)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... .  45

D.   Plaintiffs' Challenge To An "Authorization Of Further Restrictions"
     Rests On A Misreading Of The Act (Count 11) . . . . . . . . . . . . . . . . . . . . . . . .  46

III.   The Provisions Restricting Free Tobacco Samples, Gifts In Consideration
       For The Purchase Of Tobacco Products, and Combination Marketing
       Regulate Conduct And Do Not Implicate The First Amendment... . . . . . . . . . . . . . . . .  47

A.   Free Samples (Count 8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

B.   Gifts In Consideration For Tobacco Product Purchases (Count 10). . . . . . . . . .  49

C.   Combination Marketing (Count 9).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

IV.   This Court Lacks Jurisdiction Over Plaintiffs' Takings Claims,
      Which In Any Event Have No Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

# TABLE OF AUTHORITIES

**Page**

**Cases:**

44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996). . . . . . . . . . . . . . . . . . . . . . . .  39, 48, 49

Arcara v. Cloud Books, Inc., 478 U.S. 697 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 47, 51

Attorney General of Canada v. JTI-Macdonald Corp.,
2007 SCC 30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

Bates v. State Bar of Arizona, 433 U.S. 350 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Board of Trustees v. Fox, 492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Central Hudson Gas & Elec. Corp. v. Public Service
Comm'n of New York, 447 U.S. 557 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 29, 34, 38

Coalition for Government Procurement v. Federal Prison
Indus., Inc., 365 F.3d 435 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

Coles v. Granville, 448 F.3d 853 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

Door Systems, Inc. v. Pro-Line Door Systems, Inc.,
83 F.3d 169 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

Eastern Enter. v. Apfel, 524 U.S. 498 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

FDA v. Brown & Williamson Tobacco Corp.,
529 U.S. 120 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 7, 8, 33

Gonzales v. Raich, 545 U.S. 1 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47, 48

Hadacheck v. Sebastian, 239 U.S. 394 (1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

Henley v. FDA, 77 F.3d 616 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

In re Lorillard, 80 F.T.C. 455 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

In re Roman Cleanser, 802 F.2d 207 (6th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

<u>In re R.M.J.</u>, 455 U.S. 191 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525 (2001).. . . . . . . . . . . . . . . . . . . . . . . 34, 39, 45, 49

<u>Minn. State Bd. For Community Colleges v. Knight</u>,
465 U.S. 271 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

<u>NLRB v. Bell Aerospace</u>, 416 U.S. 267 (1974).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

<u>Pagan v. Fruchey</u>, 492 F.3d 766 (6th Cir. 2007) (<u>en banc</u>). . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Pearson v. Shalala</u>, 164 F.3d 650 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

<u>Penn Central Transp. Co. v. City of New York</u>,
438 U.S. 104 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

<u>Philip Morris USA Inc. v. City & County of San Francisco</u>,
No. 08-17649, 2009 WL 2873765 (9th Cir. Sept. 9, 2009) (unpub.).. . . . . . . . . . . . . . . . . . . 50-51

<u>Renne v. Geary</u>, 501 U.S. 312 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

<u>Rose Acre Farms, Inc. v. United States</u>, 559 F.3d 1260 (Fed. Cir. 2009). . . . . . . . . . . . . . . . . 52

<u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

<u>Tennessee Scrap Recyclers Ass'n. v. Bredesen</u>,
556 F.3d 442 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

<u>Texas v. United States</u>, 523 U.S. 296 (1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

<u>Thompson v. Western States Medical Ctr.</u>,
535 U.S. 357 (2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

<u>Turner Broadcasting System, Inc. v. FCC</u>, 520 U.S. 180 (1997).. . . . . . . . . . . . . . . . . . . . 5, 28

<u>United States v. Philip Morris USA, Inc.</u>, 449 F. Supp. 2d 1
(D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13, 16, 37, 41-43

<u>United States v. Philip Morris USA, Inc.</u>, 566 F.3d 1095
(D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12, 13, 30, 31

<u>Village of Euclid v. Ambler Realty Co.</u>, 272 U.S. 365 (1926) . . . . . . . . . . . . . . . . . . . . . . . . 53

<u>Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.</u>,
425 U.S. 748 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

<u>Whitaker v. Thompson</u>, 353 F.3d 947 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Wash. State Grange v. Wash. State Repub. Party</u>,
128 S. Ct. 1184 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Williamson County Reg'l Planning Comm'n v. Hamilton Bank</u>,
473 U.S. 172 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

<u>Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio</u>,
471 U.S. 626 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19, 24, 39

**Statutes:**

15 U.S.C. § 1333. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
15 U.S.C. § 1333(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23
15 U.S.C. § 1333(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23
15 U.S.C. § 1333(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

15 U.S.C. § 1334(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

15 U.S.C. § 4402. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22
15 U.S.C. § 4402(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
15 U.S.C. § 4402(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
15 U.S.C. § 4402(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23
15 U.S.C. § 4402(b)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
15 U.S.C. § 4402(b)(2)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
15 U.S.C. § 4402(b)(3)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 321(rr)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

21 U.S.C. § 331(tt). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

21 U.S.C. § 352(n). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

21 U.S.C. § 355(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
21 U.S.C. § 355(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

21 U.S.C. § 387 Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

21 U.S.C. § 387k(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

21 U.S.C. § 387a-1(a)(2)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
21 U.S.C. § 387a-1(a)(2)(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

21 U.S.C. § 387m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

21 U.S.C. § 387p . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

21 U.S.C. § 802(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

21 U.S.C. § 903(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 920(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


**Regulations:**

21 C.F.R. § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.57(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.314(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.325 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.66(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.66(c)(5)(ii)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.66(c)(5)(ii)(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
21 C.F.R. § 201.80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

21 C.F.R. § 202.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

21 C.F.R. § 897.30(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
21 C.F.R. § 897.32(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 38
21 C.F.R. § 897.34(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
21 C.F.R. § 897.34(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
21 C.F.R. § 897.34(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

40 C.F.R. § 156.60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

60 Fed. Reg. 41314 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

61 Fed. Reg. 44396 (1996) . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 15, 17, 18, 35-38, 40-41, 44-45, 47

74 Fed. Reg. 19385 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Legislative Materials:**

H.R. Rep. No. 111-58(I) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16, 33

H.R. 1108, Family Smoking Prevention And Tobacco Control Act:
Hearing Before the House Subcommittee on Health of the
Committee on Energy and Commerce, 110th Cong. 42 (2007)
(testimony of Richard Bonnie) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

146 Cong. Rec. H1849 (daily ed. April 5, 2000)
(statement of Rep. Ganske). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

155 Cong. Rec. S5986 (daily ed. June 3, 2009)
(statement of Sen. McConnell). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

155 Cong. Rec. S5988 (daily ed. June 3, 2009)
(statement of Sen. Lincoln). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

155 Cong. Rec S5994-02, S6007 (daily ed. June 3, 2009)
(statement of Sen. Durbin). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

155 Cong. Rec. S5994 (daily ed. June 3, 2009)
(statement of Sen. Whitehouse). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

155 Cong. Rec. S5999 (daily ed. June 3, 2009)
(statement of Sen. Merkley). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

155 Cong. Rec. S5999 (daily ed. June 3, 2009)
(reprinting 2003 statement of Surgeon General Carmona). . . . . . . . . . . . . . . . . . . . . . 8-10

155 Cong. Rec. S6232 (daily ed. June 8, 2009)
(statement of Sen. Reid). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

155 Cong. Rec. S6241 (daily ed. June 8, 2009)
(statement of Sen. Feinstein). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

155 Cong. Rec. S6408 (daily ed. June 10, 2009)
(statement of Sen. Kennedy). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## INTRODUCTION AND SUMMARY

In FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 161 (2000), the Supreme Court found that the Food and Drug Administration ("FDA"), in its 1996 rulemaking, had "amply demonstrated that tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States." The Court concluded, however, that Congress had failed to give the agency authority to regulate tobacco products as customarily marketed.

The Family Smoking Prevention and Tobacco Control Act of 2009 ("the Act") supplies that authority. The health risks and marketing practices addressed in the Act have been studied for over four decades by Congress, the executive branch, and the courts, and by countless public health organizations. The results of these decades of investigation, reflected in extensive congressional findings as well as in the legislative history, leave no doubt as to several crucial points that frame the scope of the legislation. Tobacco products are lethal and addictive. Virtually all tobacco users begin use before they are 18 years old, at an age when they are particularly unlikely to appreciate the addictive power of nicotine. And, as Congress found, tobacco companies have long been aware that they must reach potential customers while they are minors, and have targeted their marketing accordingly.

The 2009 legislation addresses these features of tobacco use and marketing in three principal ways.

First, the Act includes provisions designed to ensure that tobacco users and potential users are presented with accurate information about the health consequences of tobacco use and are not misled by unsubstantiated claims of reduced risk. To that end, the Act requires new, more prominent health warnings of the kind already adopted by other nations including Canada, and it requires pre-market

FDA review of ostensible reduced risk products. Extensive evidence before Congress demonstrated that the existing warnings required on tobacco packaging and advertising are ineffective and easily ignored. The new warnings specifications accord with the public health consensus reflected in the World Health Organization's Framework Convention on Tobacco Control, which has been signed by the United States and ratified by 167 countries.

Second, Congress directed the FDA to reissue provisions contained in its 1996 rulemaking that target the advertising practices used by the industry to recruit children and adolescents. Those provisions restrict the use of color and imagery in advertisements, the sponsorship of events in the name of a tobacco brand, and the distribution of promotional items bearing a tobacco brand name or logo.

Third, Congress restricted incentives to use or purchase tobacco, such as distributing free samples of tobacco products, offering gifts to reward the purchase of tobacco products, and marketing tobacco products in combination with other products.

These sets of provisions directly advance the paramount public interest in addressing the crisis caused by the use and marketing of tobacco products, and they do so with minimal infringement on speech. The Act does not bar the communication of information that is truthful and not misleading. Manufacturers are free to advertise the price, features, and availability of their products, and to sell reduced risk products if a reduced risk claim has been substantiated by the FDA. The restrictions on the use of color and imagery, brand-name event sponsorship, and branded merchandise do not limit the communication of information; they target the noninformational techniques used by the industry to attract children and adolescents. The restrictions on free samples, gifts, and combination marketing regulate incentives to use or purchase tobacco products – not speech.

In Part One of this memorandum, we set out the extensive evidence before Congress establishing the problems the Act is framed to address – the health risks and addictiveness of tobacco products and the extent to which the industry depends on recruiting and addicting users under the age of 18.

In Part Two, we analyze the specific statutory provisions at issue in this case. Section I addresses the provisions designed to ensure that tobacco users and potential users are accurately informed of the risks of tobacco use and not misled by unsubstantiated health claims (Counts 2, 3 & 7). Section II discusses the advertising restrictions designed to protect children and adolescents from being targeted by the industry (Counts 1, 4, 5, 6 & 11). Section III addresses the challenged provisions that regulate conduct with no significant expressive element – restrictions on free samples of tobacco products, gifts offered to reward tobacco product purchases, and combination marketing (Counts 8, 9 & 10). Finally, Section IV demonstrates that plaintiffs' challenges are no more persuasive when recast as a constitutional takings claim over which this Court does not, in any event, have jurisdiction.

For the reasons set out below, the government is entitled to judgment as a matter of law and its motion for summary judgment should be granted.[1]

---

[1] For the convenience of the Court, a glossary of sources cited in this brief is reproduced in Addendum A to this brief. Copies of imagery cited in this brief are reproduced in Addendum B.

-3-

## STANDARD OF REVIEW

This lawsuit presents a facial challenge to an Act of Congress. Facial challenges are "disfavored" and a plaintiff cannot prevail on such a claim unless it shows "that the law is unconstitutional in all of its applications" or, at a minimum, that the law has no "plainly legitimate sweep." Wash. State Grange v. Wash. State Repub. Party, 128 S. Ct. 1184, 1190, 1191 (2008).

To the extent that the challenged provisions restrict commercial speech, the restrictions are analyzed under the framework established in Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557 (1980). "The First Amendment's concern for commercial speech is based on the informational function of advertising." Id. at 563. Consequently, there is no protection for "commercial messages that do not accurately inform the public about lawful activity" or that are "related to illegal activity." Id. at 563-64. If the communication is neither misleading nor related to unlawful activity, the government may impose restrictions that directly advance a substantial government interest and are no more extensive than is necessary to serve that interest. Id. at 566. That standard does not require the legislature to employ "the least restrictive means" of regulation or to achieve a perfect fit between means and ends. Board of Trustees v. Fox, 492 U.S. 469, 480 (1989). It is sufficient that the legislature achieve a "reasonable" fit by adopting regulations "'in proportion to the interest served.'" Ibid. (quoting In re R.M.J., 455 U.S. 191, 203 (1982)); accord Pagan v. Fruchey, 492 F.3d 766, 771 (6th Cir. 2007) (en banc).

Warnings and other disclosure requirements "trench much more narrowly on an advertiser's interests than do flat prohibitions on speech" and may appropriately be required "in order to dissipate the possibility of consumer confusion or deception." Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651 (1985). Provisions that regulate conduct without a

-4-

"significant expressive element" do not implicate the First Amendment. Arcara v. Cloud Books, Inc., 478 U.S. 697, 706-07 (1986).

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The application of that standard in this case is guided by principles laid out by the Supreme Court. "The Constitution gives to Congress the role of weighing conflicting evidence in the legislative process." Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 199 (1997). Accordingly, in considering plaintiffs' constitutional challenges, the role of the Court is not to "reweigh the evidence de novo, or to replace Congress' factual predictions with [its] own." Id. at 211. "Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest [a court] infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy." Id. at 196.

Thus, the "relevant inquiry" for the Court "is not whether Congress, as an objective matter, was correct" in its determinations as to the problems to be addressed or the tailoring of the remedies. Id. at 211. "Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress." Ibid. As long as that standard is satisfied, "summary judgment for [the government] is appropriate regardless of whether the evidence is in conflict." Ibid. (emphasis added).

**PART ONE: HEALTH RISKS, ADDICTIVENESS, AND UNDERAGE USE**

**THE FAMILY SMOKING PREVENTION AND TOBACCO CONTROL ACT
ADDRESSES THE MOST SIGNIFICANT, PREVENTABLE THREAT
TO PUBLIC HEALTH IN THE UNITED STATES.**

I.    **Tobacco Products Present A Major Threat To The Public Health
      And Cause Massive Expenditures Of Health Care Dollars.**

      A.    **Tobacco Use Is The Single Most Significant Threat To Public Health.**

      **1.** Beginning with the 1964 landmark report "Smoking and Health," the Surgeon General

issued a series of reports addressing the health consequences of smoking and nicotine addiction.

Tobacco manufacturers undertook a multi-pronged campaign to undermine the credibility of these

studies, even though they had long understood the health risks associated with the use of tobacco

products.  For example, the evidence in United States v. Philip Morris USA, Inc., et al., 449 F. Supp.

2d 1, 855 (D.D.C. 2006), documented the industry's strategy of insisting that the health risks posed

by tobacco use were an "open question" long after the industry knew from its undisclosed internal

research that the risks were scientifically established.  In summarizing the evidence, the D.C. Circuit

explained that industry "executives were aware that their public relations strategy of creating the

impression of an 'open question' about the link between smoking and disease did not square with

their own knowledge about the established link between the two."  United States v. Philip Morris

USA, Inc., et al., 566 F.3d 1095, 1120 (D.C. Cir. 2009).  The court noted internal industry

correspondence "admitting that '[o]ur basic position in the cigarette controversy is subject to the

charge, and may be subject to a finding, that we are making false or misleading statements to promote

the sale of cigarettes.'"  Ibid.; see also, e.g., id. at 1121 ("28 years after Reynolds scientists declared

the presence of carcinogenic compounds in cigarettes was 'now well established,' a Reynolds press

release and newspaper advertisement declared the connection between smoking and disease 'an open controversy.'").

Despite the industry's decades-long efforts, by the mid-1990's regulators had begun to understand more fully the gravity of the health crisis caused by tobacco use. In 1996, the FDA issued comprehensive regulations that aimed to cut adolescent use of tobacco products in half within seven years. 61 Fed. Reg. 44396 (1996). The Supreme Court concluded, however, that the agency lacked authority under the Federal Food, Drug, and Cosmetic Act ("FDCA") to regulate tobacco products as customarily marketed. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000).

That ruling left no doubt as to the seriousness of the public health crisis addressed by the regulations. Indeed, the Supreme Court's reasoning turned, in large part, on the severity of the health risks documented in the FDA rulemaking. The Court explained that the FDCA "generally requires the FDA to prevent the marketing of any drug or device where the 'potential for inflicting death or physical injury is not offset by the possibility of therapeutic benefit.'" Id. at 134. The Court emphasized that "[i]n its rulemaking proceeding, the FDA quite exhaustively documented that 'tobacco products are unsafe,' 'dangerous,' and 'cause great pain and suffering from illness.'" Ibid. (quoting 61 Fed. Reg. 44412). The FDA "found that the consumption of tobacco products presents 'extraordinary health risks,' and that 'tobacco use is the single leading cause of preventable death in the United States.'" Ibid. (quoting 61 Fed. Reg. 44398). The agency determined that "'[m]ore than 400,000 people die each year from tobacco-related illnesses, such as cancer, respiratory illnesses, and heart disease, often suffering long and painful deaths,' and that '[t]obacco alone kills more people each year in the United States than acquired immunodeficiency syndrome (AIDS), car accidents, alcohol, homicides, illegal drugs, suicides, and fires, combined.'" Id. at 134-35 (quoting 61 Fed. Reg.

44421).  Indeed, the Court observed, "the FDA characterized smoking as 'a pediatric disease,'" id.

at 135 (quoting 61 Fed. Reg. 44421), "because 'one out of every three young people who become

regular smokers ... will die prematurely as a result.'"  Ibid. (quoting 61 Fed. Reg. 44399).

In light of this evidence, the Court concluded that, if tobacco products were drugs or devices

under the FDCA, "the FDA would be required to remove them from the market."  Ibid.  Because

Congress had not meant to ban sale of tobacco products, the Court reasoned, Congress could not have

intended that they be regulated as drugs or devices under the FDCA.  Id. at 137-39.

Brown & Williamson thus recognized that the FDA had "amply demonstrated that tobacco

use, particularly among children and adolescents, poses perhaps the single most significant threat to

public health in the United States,"  529 U.S. at 161, but the decision left a regulatory void that could

be filled only by comprehensive congressional action.

2.  In the years following the 1996 rulemaking, it became clear from public and private

studies, as well as from internal documents obtained from tobacco manufacturers themselves, that the

public health crisis was even greater than previously understood.  The Surgeon General testified to

Congress in 2003 that "[e]ach year, 440,000 people die of diseases caused by smoking or other form

of tobacco use – that is about 20 percent of all deaths in our nation."  Statement of Vice Admiral

Richard H. Carmona, U.S. Surgeon General, to House Subcommittee on Commerce, Trade, and

Consumer Protection, June 3, 2003, reprinted at 155 Cong. Rec. S5999, S6000 (June 3, 2009).[2]  See

also Rodu Decl. ¶31 (plaintiffs' expert) (noting that "more than 435,000 deaths each year in the

United States alone" are attributable to smoking).  In a 2007 report cited by Congress, the Institute

---

[2] All citations to the Congressional Record are to the daily editions and can be found at
http://www.gpoaccess.gov/crecord/index.html.

of Medicine echoed the observations of the Supreme Court in <u>Brown & Williamson</u>, noting that "tobacco cigarettes are inherently dangerous products that would not be allowed to enter the marketplace if their effects were known and if they were being introduced for the first time." Institute of Medicine, "Ending the Tobacco Problem: A Blueprint for the Nation," at 152 (2007) ("2007 IOM Report") (discussed in H.R. Rep. No. 111-58(I) (2009)). The Institute of Medicine explained that "the nicotine in tobacco products would meet the criteria for classification of a Schedule 1 drug under the Controlled Substances Act, tobacco smoke could be classified as a 'toxic substance' posing an 'unreasonable risk' under the Toxic Substances Control Act, and tobacco cigarettes (and perhaps other tobacco products) could be characterized as 'unreasonably dangerous products' under the Consumer Product Safety Act, if tobacco products were not exempted from regulation by the specific exclusionary language in each of these statutes." <u>Ibid</u>.

It likewise has long been clear that smokeless tobacco is not a safe alternative to cigarettes. In 1986, Surgeon General C. Everett Koop reported that smokeless tobacco represents a significant health risk; that it can cause cancer and other oral diseases; and that it can lead to nicotine addiction. Surgeon General's Report, "The Health Consequences of Using Smokeless Tobacco," at vii (1986) ("1986 Surgeon General's Report"). Moreover, the report noted that whereas cigarette smoking had declined over the previous 20 years, the use of smokeless tobacco had risen significantly. <u>Id</u>. at v. In response to the report, Congress enacted the Comprehensive Smokeless Tobacco Health Education Act, which required the placement of Surgeon General warnings on all smokeless tobacco products. <u>See</u> 21 U.S.C. § 4402(a). In 2003, Surgeon General Carmona advised Congress that "smokeless tobacco remains a known threat to public health just as it was when Congress acted in 1986" to require warnings. 155 Cong. Rec. S6000 (June 3, 2009) (reprinting testimony). The Surgeon General

-9-

noted that the National Toxicology Program of the National Institutes of Health continues to classify smokeless tobacco as a known human carcinogen, and observed that "[w]hile it may be technically feasible to someday create a reduced-harm tobacco product, the Institute of Medicine recently concluded that no such product exists today." Ibid. The World Health Organization's International Agency for Research on Cancer reported in 2007 that minors who used smokeless tobacco were significantly more likely than non-users to become smokers. See International Agency for Research on Cancer, "Smokeless tobacco and some tobacco-specific N-nitrosamines," at 149 (2007).

In short, "[a] consensus exists within the scientific and medical communities that tobacco products are inherently dangerous and cause cancer, heart disease, and other serious adverse health effects," and that "[t]he use of tobacco products by the Nation's children is a pediatric disease of considerable proportions that results in new generations of tobacco-dependent children and adults." Legislative Findings 1 & 2, codified at 21 U.S.C. § 387 Note.

## B.     Tobacco Use Costs Our Health Care System $96 Billion Every Year.

Congress recognized in enacting the 2009 legislation that the costs of tobacco use and addiction are visited not only on tobacco users and their families, but on the entire health care system. Senator Feinstein observed that "we know the high cost, the human cost of tobacco use, but I think people also do not realize my second point, and that is the tremendous financial cost. Smoking costs our health care system $96 billion every year." 155 Cong. Rec. S6241 (June 8, 2009). She explained that States pay $13.3 billion every year in Medicaid expenses and the Federal Government spends $17.6 billion; Medicare pays $27.6 billion and the Veterans Administration and other Federal programs spend an additional $9.6 billion; and the rest of this cost, about $28 billion, is borne by private payers. Ibid. Thus, "only 2 months of tobacco-related health spending could provide a year

-10-

of health insurance for every uninsured child in America," or, to "put it another way – we could provide health insurance to every uninsured child in America and still have $80 billion left over." Ibid. Senator Whitehouse noted that "[e]ven those who do not smoke still pay a price – $96 billion each year in public and private health expenditures to treat illness caused by smoking." 155 Cong. Rec. S5994 (June 3, 2009). Senator Reid stressed that the crisis caused by the marketing of tobacco products "is not just a health crisis, it is an economic crisis – one we cannot afford." 155 Cong. Rec. S6232 (June 8, 2009).

Summarizing, Congress found that "[r]educing the use of tobacco by minors by 50 percent would prevent well over 10,000,000 of today's children from becoming regular, daily smokers" and "result in approximately $75,000,000,000 in savings attributable to reduced health care costs." Legislative Finding 14.

## II.    The Magnitude Of The Tobacco Crisis Stems From Nicotine Addiction.

The magnitude of the public health crisis is inextricably linked to the fact that tobacco products are highly addictive. 2007 IOM Report, at xi. Tobacco products "are highly addictive because they contain nicotine, one of the most addictive substances used by humans." Id. at 5. The Institute of Medicine, surveying data for 2004, noted that while about 40% of smokers attempted to quit in that year, only between 3% and 5% succeeded. Id. at 82. Plaintiffs' expert opines that in "America alone, there are approximately 24 million adult smokers on whom no anti-smoking campaign or smoking cessation technique has any effect." Rodu Decl. ¶39.

The tobacco industry has long appreciated the importance of nicotine addiction, and it has designed its products and marketing strategies to foster addiction and thus expand its market. A 1972 internal Reynolds memo, quoted by Congressman Ganske in 2000, acknowledged that "[i]n a sense,

the tobacco industry may be thought of as being a specialized, highly ritualized and stylized segment of the pharmaceutical industry.  Tobacco products uniquely contain and deliver nicotine, a potent drug with a variety of physiologic effects."  146 Cong. Rec. H1849 (April 5, 2000) (quoting 1972 Reynolds memo).  The same memo concluded that "a tobacco product is, in essence, a vehicle for the delivery of nicotine designed to deliver the nicotine in a generally acceptable and attractive form," and that the "industry is then based upon the design, manufacture, and sale of attractive forms of nicotine." Ibid.; see also Philip Morris, 566 F.3d at 1120 (noting a 1991 Reynolds Research and Development report that "acknowledged that '[w]e are basically in the nicotine business'").

        Congress specifically found that the major tobacco companies "have designed their cigarettes to precisely control nicotine delivery levels and provide doses of nicotine sufficient to create and sustain addiction."  Legislative Finding 49 (citing the district court decision in United States v. Philip Morris).  Publicly, the companies "denied and distorted the truth as to the addictive nature of their products for several decades," Philip Morris, 566 F.3d at 1124, "while also concealing much of their nicotine-related research."  Legislative Finding 49.  Senator Kennedy observed in 2009 that "[n]o one can forget the parade of tobacco executives who testified under oath before Congress [in 1994] that smoking cigarettes is not addictive," even though "[o]verwhelming evidence in industry documents obtained through the discovery process proves that the companies not only knew of this addictiveness for decades, but actually relied on it as the basis for their marketing strategy."  155 Cong. Rec. S6408 (June 10, 2009).  The industry's denials came more than 20 years after Reynolds recognized internally

that the tobacco industry markets products that "contain and deliver nicotine, a potent drug with a variety of physiologic effects."[3]

**III.    Because Tobacco Products Are Lethal And Addictive, The Industry Depends On Recruiting New Users From The Underage Population Least Able To Evaluate Health Risks.**

**A.  Virtually All New Tobacco Users Are Underage.**

Precisely because tobacco use is lethal and addictive, the tobacco industry is dependent on recruiting new users from the ranks of the underaged – the population least likely to appreciate the power of nicotine addiction and thus the long-term consequences of tobacco use.  Despite laws prohibiting the sale of tobacco products to minors, Congress found that "[v]irtually all new users of tobacco products are under the minimum legal age to purchase such products." Legislative Finding 4. Moreover, the "overwhelming majority of Americans who use tobacco products begin using such products while they are minors and become addicted to the nicotine in those products before reaching the age of 18." Legislative Finding 31.  That has been the case for decades.  The Surgeon General reported in 1994 that "[s]ince most smokers try their first cigarette before age 18, young people are the chief source of new consumers for the tobacco industry, which each year must replace the many consumers who quit smoking and the many who die from smoking-related diseases." Surgeon General's Report, "Preventing Tobacco Use Among Young People," at 8 (1994) ("1994 Surgeon General's Report").

---

[3] See also Philip Morris, 566 F.3d at 1127-28 (citing examples of the industry's false denials of nicotine addiction); Philip Morris, 449 F. Supp. 2d at 274 (Finding 1168) (noting that in 1992, Reynolds employees published an article denying nicotine is addictive, a publication cited in industry submissions to Congress in 1994 and to the FDA in 1996).

Moreover, the President's Cancer Panel reported in 2007 that "[t]he younger people are when they begin to smoke, the more likely they are to be adult smokers." President's Cancer Panel, "Promoting Healthy Lifestyles," at 64 (2007) ("2007 President's Cancer Panel Report"). The report found that "[o]ver 80 percent of adult smokers became addicted to tobacco at or before the age of 18 years. Every day, approximately 4,000 children under age 18 experiment with cigarettes for the first time; another 1,500 become regular smokers. Of those who become regular smokers, about half eventually will die from a disease caused by tobacco use." Ibid.

The Institute of Medicine explained that "adolescents misperceive the magnitude of smoking harms and the addictive properties of tobacco and fail to appreciate the long-term dangers of smoking, especially when they apply the dangers to their own behavior." 2007 IOM Report, at 93. Although adolescents may overestimate certain smoking risks (such as the degree to which smoking causes cancer), they underestimate others, including the degree to which smoking can shorten a smoker's life. Id. at 89-90. Even when adolescents have a general understanding that smoking is harmful, they minimize the likelihood that these harms will befall them. Id. at 90, 93. For instance, one survey of youth smokers found that "[a]mong respondents who estimated that 60 percent or more of lifetime smokers die from smoking-related causes, 25 percent did not view their own smoking as very risky." Id. at 90.

Adolescents make such miscalculations in part because they greatly underestimate the power of nicotine addiction. They believe "that they can quit at any time and therefore avoid addiction." Id. at 89. For example, one survey showed that "nearly 60 percent of adolescents believed that they could smoke for a few years and then quit." Id. at 91. These optimistic assumptions are sadly mistaken: in one study, only 3% of twelfth grade smokers estimated that they would be smoking in

-14-

five years; in reality, 63% of them were still smoking seven to nine years later. Id. at 91. The Institute of Medicine concluded that, "although adolescents might be aware of the health and long-term risks of smoking in general, they are much less aware of the addictive nature of smoking." Ibid. The President's Cancer Panel likewise found that adolescents "typically underestimate the tenacity of nicotine addiction and overestimate their ability to stop smoking when they choose." 2007 President's Cancer Panel Report, at 64.

### B.   Tobacco Advertising Techniques Reflect The Industry Imperative To Recruit Adolescent Tobacco Users.

**1.**   Fully aware that its profits depend on the steady recruitment of new users from the underage market, "[t]he tobacco industry has a long and disturbing history of marketing its products to appeal to young people." 155 Cong. Rec. 5988 (June 3, 2009) (Sen. Lincoln). "Tobacco company documents indicate that young people are an important and often crucial segment of the tobacco market." Legislative Finding 24. A 1981 internal Philip Morris memorandum, quoted in part by Senator Durbin, explained that it was "important" for tobacco manufacturers "to know as much as possible about teenage smoking patterns and attitudes. Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens." 155 Cong. Rec. S5994-02, S6007 (June 3, 2009); see also National Cancer Institute, "The Role of the Media in Promoting and Reducing Tobacco Use," at 57 (2008) ("2008 NCI Report") (full quote).

The FDA's 1996 rulemaking amassed compelling evidence that the tobacco industry had made a concerted effort "to attract young smokers" and "presmokers" through advertising. 61 Fed. Reg. 44480. For example, internal Reynolds documents reflected "a company policy that in order to grow

-15-

and ensure a profitable future, the company must develop new brands that would appeal to and capture a share of the youth market. These young people were described as 'presmokers' and 'learners' in RJR marketing language and were identified as being 14 to 18 year olds." Ibid.

Industry documents reviewed by the court in United States v. Philip Morris confirmed that "the major United States cigarette companies continue to target and market to youth." Legislative Findings 47 & 48 (citing the district court opinion). Tobacco companies have "spent enormous resources tracking the behaviors and preferences of youth under twenty-one, and especially those under eighteen." Philip Morris, 449 F. Supp. 2d at 580 (Finding 2717); see also id. at 607-16 (Findings 2844-2891) (internal Reynolds documents); id. at 594-598 (Findings 2781-2800) (internal Lorillard documents). For example, Reynolds for decades tracked the attitudes, preferences, and smoking habits of fourteen to seventeen year olds because, as an internal marketing report explained, the "young adult market, the 14-24 age group" would constitute "a key share of the total cigarette volume – for at least the next twenty-five years." Id. at 610 (Finding 2862); see also id. at 612-13 (Findings 2870-2872) (describing a series of reports entitled "Teenage Smokers (14-17) and New Adult Smokers and Quitters," which analyzed survey data relating to "the smoking behavior of fourteen to seventeen year old smokers").

The impact of the tobacco industry's advertising on underage use is also well documented. Quoting the monograph released by the National Cancer Institute in 2008, the House Report noted that "'the evidence base indicates a causal relationship between tobacco advertising and increased levels of tobacco initiation and continued consumption' and that even brief exposure to tobacco advertising influences adolescents' attitudes and perceptions about smoking as well as their intentions to smoke." H.R. Rep. No. 111-58(I) (quoting 2008 NCI Report, at 211). The House Report also cited

several other studies, including a study published in 2006 in the Archives of Pediatrics and Adolescent Medicine that "found that tobacco marketing doubles the odds that children under 18 years of age will become tobacco users." Ibid.

**2.**   The campaign to stimulate underage tobacco use is not waged with tools of rational persuasion.  The Institute of Medicine explained that, "[f]rom the standpoint of the initiation of smoking by youth, the most important feature of tobacco advertising is its noninformational characteristics.  The most compelling data are those that link positive feelings toward smoking with exposure to tobacco advertising and to ownership of commodities with tobacco company logos and paraphernalia."  2007 IOM Report, at 322 (emphasis added).  Thus, Senator Lincoln noted, the tobacco industry "reaches our kids by saturating convenience stores, drugstores, and gas stations with tobacco advertisements, often placing ads and products near the candy and gum displays, or using other visual tricks such as bright colors and also through sponsorship of sports and entertainment events which are obviously what kids are interested in."  155 Cong. Rec. S5988 (June 3, 2009).

An earlier IOM report, discussed in the 1996 FDA rulemaking, documented the importance of distributing branded merchandise – such as t-shirts and caps – to youth recruitment.  This mechanism "is particularly effective with young people" who have little disposable income and are attracted to free items.  61 Fed. Reg. 44521.  A Gallup survey found that roughly half of all adolescent smokers, and roughly one quarter of non-smokers, owned at least one item blazoned with the brand name of a tobacco product.  Id. at 44521.  Moreover, items "used or worn by young people, also create a new advertising medium – the 'walking billboard' – which can come into schools or other locations where advertising is usually prohibited."  Ibid.  The FDA found that "the ubiquitous display of messages promoting tobacco use clearly fosters an environment in which experimentation by youth

-17-

is expected, if not implicitly encouraged." <u>Ibid</u>.  Adolescents' choice of brands reflects the extent of

brand promotion: roughly 86% of the youth market smoked the three most heavily advertised cigarette

brands.  <u>Id</u>. at 44482.  In contrast, 39% of adult customers smoke "brandless" cigarettes.  <u>Ibid</u>.; <u>see</u>

<u>also</u> Legislative Finding 23.

      Congress expressly determined that marketing to children and adolescents continues despite

the tobacco industry's repeated pledges and agreements to end such practices.  Legislative Findings

47 & 48; <u>see also</u> Krugman Aff., at 8-13, 16-21 (recent examples of image-based tobacco ads in

youth-oriented magazines) (reproduced at Addendum B9-B36).  Senator Merkley offered examples

of two new, recently introduced youth-directed smokeless tobacco products.  The first, a Reynolds

product called "Snus," is a "flavored, pouched tobacco product advertised as not requiring spitting,"

which "is advertised next to displays of candy and Peppermint Patties."  155 Cong. Rec. S5999 (June

3, 2009).  Senator Merkley noted that the original "Snus" container was round, "but teachers in school

noticed these containers in their students' pockets," so Reynolds "redesigned them so that teachers

can't recognize that these are smokeless tobacco products in their students' pockets."  <u>Ibid</u>.  The

second example cited by Senator Merkley – tobacco tablets marketed by Reynolds – come with

"candy flavoring," a "Pez-style dispenser," and "a cell phone shape," "so teachers can't tell what it

is."  <u>Ibid</u>.  Senator Merkley observed:  "A  teenager who tries one of these products – whose brain is

still being wired and, therefore, is much more susceptible to the influence of nicotine – is much more

likely to become addicted and become a lifelong customer or reliable customer.  That is why the

tobacco companies are marketing tobacco candy to our children."  <u>Ibid</u>.

      Summarizing, Congress found that "[a]dvertising, marketing, and promotion of tobacco

products have been especially directed to attract young persons to use tobacco products, and these

efforts have resulted in increased use of such products by youth." Legislative Finding 15. "In 2005, the cigarette manufacturers spent more than $13,000,000,000 to attract new users, retain current users, increase current consumption, and generate favorable long-term attitudes toward smoking and tobacco use." Legislative Finding 16 (emphasis added).

### PART TWO: STATUTORY PROVISIONS CHALLENGED BY PLAINTIFFS

### THE CHALLENGED PROVISIONS ENSURE THAT THE DECISION WHETHER TO USE TOBACCO PRODUCTS WILL BE MADE BY ADULTS ON THE BASIS OF ACCURATE INFORMATION.

I.    **The Act Properly Ensures That A Decision To Use Tobacco Is Based On Information That Is Accurate And Not Misleading.**

   A.    **The Revisions To Tobacco Product Warnings Do Not Violate the First Amendment (Count 2).**

It is well settled that warnings and other disclosures may be required "in order to dissipate the possibility of consumer confusion or deception." Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651 (1985). Congress had abundant evidence to support its decision to revise the warnings required on tobacco products and in tobacco advertising.

   **1.** Congress first mandated warnings on cigarette packs in 1965, in the wake of the Surgeon General's landmark 1964 Report. See Federal Cigarette Labeling and Advertising Act of 1965, Pub. L. 89-92, 79 Stat. 282. The 1965 statute required warnings on the sides of packs stating "Caution: Cigarette Smoking May Be Hazardous To Your Health." In 1972, the Federal Trade Commission ("FTC") and cigarette manufacturers entered into consent orders under which the companies agreed to include a warning in print and billboard ads that stated: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous To Your Health." In re Lorillard, 80 F.T.C. 455

-19-

(1972). These warnings, however, were so small as to easily escape notice, permitting twelve-point type for 8½ x 11 inch magazine ads and two-inch-high type on billboards. Id. at 461, 463.

Congress last updated the text of the cigarette warnings and modestly increased the size of warnings in cigarette advertisements in 1984. See Comprehensive Smoking Education Act of 1984, Pub. L. 98-474, 98 Stat. 2200. Even so, the warning constituted "less than 5% of the advertisement." Krugman Aff., at 29. Congress did not amend the cigarette warnings again until the 2009 legislation.

Congress required smokeless tobacco warnings on packages and advertising for the first time in 1986. See Comprehensive Smokeless Tobacco Health Education Act, Pub. L. 99-252, 100 Stat. 30. The smokeless tobacco warnings were not updated until 2009.

**2.** At least as early as 1994, it was evident that the warnings were ineffective. The Surgeon General reported that the few empirical studies dealing "with the visibility of cigarette warnings in advertising ... consistently indicate that the Surgeon General's warnings are given little attention or consideration by viewers." 1994 Surgeon General's Report, at 168; see also id. at 19 (concluding that "although the shape of the warnings in smokeless tobacco advertisements may have been novel initially, the size and color of these warnings may now have a reduced effect"). Warnings on billboard advertisements were so small that passing motorists could read them only with great difficulty. Ibid. A study of warnings in magazine ads found that "more than 40 percent of subjects did not even view the warning," and that "an additional 20 percent looked at the warning but failed to actually read it." Ibid. That study concluded that "[g]iven such strong evidence of negligible viewing and processing of warning labels ... existing warnings are unlikely to effectively counter the images of independence, romance, and fun inherent in tobacco advertising." Ibid.

-20-

In 2007, the Institute of Medicine declared that the "basic problems with the U.S. warnings are that they are unnoticed and stale, and they fail to convey relevant information in an effective way." IOM Report, at 291. In testimony to Congress, the Chair of the IOM's Committee on Reducing Tobacco Use described the warning on cigarette packs as "invisible." H.R. 1108, Family Smoking Prevention And Tobacco Control Act: Hearing Before the House Subcommittee on Health of the Committee on Energy and Commerce, 110th Cong. 42 (2007) (testimony of Richard Bonnie). The IOM Report cited several studies showing that "that the U.S. text warnings on the side of packages demonstrate low levels of salience among smokers." 2007 IOM Report, at C-3.

Scientific research summarized in the 2007 IOM Report demonstrated that clearer and more prominent warnings on packages and labels, including both text and graphics, were required. Id. at 294-295, C-2 to C-6; see also Krugman Aff., at 30 (concluding that "new, substantially larger warnings, containing effective graphics, are needed to enhance the opportunity to warn people of the dangers of cigarette use"). The report emphasized that graphical warnings "may be particularly important for communicating" with consumers with low levels of education, given evidence that such smokers "are less likely to recall health information in text-based messages than people with more education." 2007 IOM Report, at 295. Indeed, one study showed that the current warnings "require a college reading level" and thus "may be inappropriate for youth and Americans with poor reading abilities." Id. at C-3.

**3.** The 2009 legislation addresses these concerns by revising the content and format of the warnings. The Act provides that product labels and advertisements for cigarettes and smokeless tobacco must bear one of several prominent warnings describing the adverse health effects of using those products. For cigarettes, the statute requires statements regarding addictiveness and the impact

of smoking on smokers and nonsmokers, including children.  15 U.S.C. § 1333.[4]  The Act also directs

the Secretary to promulgate regulations "that require color graphics depicting the negative health

consequences of smoking to accompany" the text.  Ibid.

Smokeless tobacco labels and advertising must include disclosures regarding diseases and

addictiveness and a warning that smokeless tobacco is not a safe alternative to cigarettes.  15 U.S.C.

§ 4402.[5]  The Act does not require graphic warnings for smokeless tobacco products but authorizes

the Secretary to issue regulations requiring such graphics.  Ibid.

Warnings on cigarette packs must be "located in the upper portion of the front and rear panels

of the package, directly under the cellophane or other clear wrapping," and must "comprise the top

50 percent of the front and rear panels."  Id. § 1333(a)(2). Warnings on smokeless tobacco packs must

be "located on the 2 principal display panels of the package," and "comprise 30 percent of such

display."  Id. § 4402(a)(2).  Warnings in "press and poster advertisements" for smokeless tobacco and

cigarettes must comprise 20% of the area of the advertisement.  Id. §§ 1333(b)(2), 4402(b)(2)(B).  All

---

[4] For cigarettes, the required warnings are: WARNING: Cigarettes are addictive; WARNING: Tobacco smoke can harm your children; WARNING: Cigarettes cause fatal lung disease; WARNING: Cigarettes cause cancer; WARNING: Cigarettes cause strokes and heart disease; WARNING: Smoking during pregnancy can harm your baby; WARNING: Smoking can kill you; WARNING: Tobacco smoke causes fatal lung disease in nonsmokers; WARNING: Quitting smoking now greatly reduces serious risks to your health.  15 U.S.C. § 1333.

[5] For smokeless tobacco products, the required warnings are: WARNING: This product can cause mouth cancer; WARNING: This product can cause gum disease and tooth loss; WARNING: This product is not a safe alternative to cigarettes; WARNING: Smokeless tobacco is addictive. 15 U.S.C. § 4402.

warnings must be in black type on a white background, or the reverse, and in conspicuous and legible type of specified size.  Id. § 1333(a)(2), (b)(2); id. § 4402(a)(2), (b)(2)(D).[6]

These specifications accord with the international consensus reflected in the World Health Organization's Framework Convention on Tobacco Control, which calls for warnings that "shall be rotating," "shall be large, clear, visible and legible," "should be 50% or more of the principal display areas but shall be no less than 30% of the principal display areas," and "may be in the form of or include pictures or pictograms."  WHO Framework Convention on Tobacco Control, art. 11.1(b). The Convention has been signed by the United States and ratified by 167 countries.[7]

As Congress was aware, Canada adopted warning requirements of this type in 2001, mandating that manufacturers display prominent pictorial warnings on the fronts and backs of cigarette packages.  See 2007 IOM Report, at 291-92 (example of a Canadian package warning) (reproduced at Addendum B1); H.R. 1108, Family Smoking Prevention And Tobacco Control Act: Hearing Before the House Subcommittee on Health of the Committee on Energy and Commerce, 110th Cong. 36 (2007) (testimony of Richard Bonnie).  The Canadian warning occupies the top half of the two main panels of cigarette packs.  See, e.g., Viscusi Decl. ¶73 (plaintiffs' expert) (examples

---

[6]  The Act also contains measures to ensure that the warnings will continue to be noticed over time.  For example, warnings in advertisements must be "rotated quarterly in alternating sequence" for each tobacco product brand.  15 U.S.C. §§ 1333(c)(2), 4402(b)(3)(B).  The text of the warnings must alternate periodically between black type on white background, and white type on black background.  Id. §§ 1333(a)(2), (b)(2), 4402(a)(1)(B), (b)(2)(D).  The Act also requires that product labels (but not advertisements) include specified information, such as the amount of product the package contains.  21 U.S.C. §§ 903(a), 920(a).  The Act does not impose any size, format, or placement requirements for this non-warning label information.

[7]  See World Health Organization, Framework Convention on Tobacco Control, http://www.who.int/fctc/en/.

of Canadian warnings) (reproduced at Addendum B2).[8]  Studies of Canadian smokers have shown

that more than half "reported that the pictorial warnings have made them more likely to think about

the health risks of smoking" and that "approximately 95 percent of youth smokers and 75 percent of

adult smokers report that the pictorial warnings have been effective in providing them with important

health information."  2007 IOM Report, at 294.  "Indeed, there is no more efficient method of

reaching smokers than through the use of graphic and highly visible warning labels."  Peters, E., et

al., "The impact and acceptability of Canadian-style cigarette warning labels among U.S. smokers and

nonsmokers," Nicotine & Tobacco Research, vol. 9, no. 4, pp. 473-481, at 479 (Apr. 2007).  One

study comparing Canadian and U.S. warnings found that while "83 percent of Canadian students

mentioned health warnings in a recall test of cigarette packages," only "7 percent of U.S. students"

did the same.  2007 IOM Report, at C-3 to C-4.

    **4.**  It is well established that warnings and other disclosures may be required "in order to

dissipate the possibility of consumer confusion or deception."  Zauderer, 471 U.S. at 651.  Plaintiffs

do not question Congress's authority to revise the warnings; nor do they urge that the substance of

the warnings is inaccurate.  On the contrary, Reynolds and Lorillard, on their public websites, urge

consumers to "rely on" the views of public health officials with respect to the health effects of using

their tobacco products.[9]  Public health officials have determined that smoking causes cancer in nearly

every part of the human body, including the lungs, larynx, mouth, esophagus, pancreas, bladder,

cervix, kidney, stomach, and bone marrow; that it causes strokes, coronary heart disease,

_____

    [8] See also Health Canada, Tobacco Product Labelling (examples of Canadian warnings), http://www.hc-sc.gc.ca/hc-ps/tobac-tabac/legislation/label-etiquette/index-eng.php.

    [9] See http://www.rjrt.com/pubhealth.aspx; http://www.lorillard.com/index.php?id=32.

atherosclerosis and aortic aneurysma; that it causes fatal lung conditions like emphysema and pneumonia; that secondhand smoke causes lung cancer and heart disease; and that maternal smoking during pregnancy injures the child.[10]  They have likewise concluded that smokeless tobacco use is addictive; that it causes oral and pancreatic cancer, gum disease and tooth decay; and that it is not a safe alternative to cigarettes.[11]

Plaintiffs' argument, instead, is that the new warnings are too large and too prominent.  But they provide no doctrinal or factual basis for invalidating the specifications determined by Congress to be appropriate.  Without addressing the contrary data, plaintiffs assert that the pre-existing warnings are adequate, declaring that "consumers are already well aware of the risks of smoking." Amended Complaint ¶51; Viscusi Decl. ¶6 (plaintiffs' expert).[12]  But Congress reached the opposite conclusion and adopted specifications consistent with those set out in the World Health Organization Framework Convention on Tobacco Control.  There is no doubt that Congress' determination is supported by substantial evidence; the Institute of Medicine alone reviewed extensive studies (including those of Dr. Viscusi), see 2007 IOM Report, at 88-93, 290-96, and found compelling evidence that "Congress should require or authorize the FDA to require rotating color graphic warnings covering 50 percent of the package equivalent to those required in Canada."  Id. at 296.

---

[10] See, e.g., Surgeon General's Report, "The Health Consequences of Involuntary Exposure to Tobacco Smoke," at 400, 484 (2006); Surgeon General's Report, "The Health Consequences of Smoking," at 25-28 (2004).

[11] See, e.g., International Agency for Research on Cancer, "Smokeless tobacco and some tobacco-specific N-nitrosamines," at 363-70 (2007); National Cancer Institute, "Smokeless Tobacco or Health: An International Perspective," at xlii-xliii (1992); Surgeon General's Report, "The Health Consequences of Using Smokeless Tobacco," at xxiii-xxv (1986).

[12] Plaintiffs' expert, Dr. Viscusi, does not acknowledge the industry's efforts to undermine the Surgeon General reports he cites in his declaration.

Plaintiffs do not advance their case by asserting that warnings of the kind required in Canada leave "only a small portion of the least visible part of Plaintiffs' packaging" for their commercial speech. Amended Complaint ¶56. Under the plain terms of the Act, half of cigarette packs, and 70% of smokeless tobacco packages, remain available for a product's brand name and logo. In advertisements, warnings need comprise only 20% of the area of the ad, leaving ample room for commercial speech.[13]

Nor are extensive disclosure requirements novel. Plaintiffs' expert admits that prescription drug companies must "include all of a drug's risk information" as well as other information about the drug in print advertisements. Viscusi Decl. ¶80; see also 21 U.S.C. § 352(n); 21 C.F.R. § 202.1. Although these disclosures are collectively referred to as the "Brief Summary," the information required is so extensive that "it is usually presented on its own page of a print ad." FDA, Drug Advertising: Glossary of Terms.[14] Plaintiffs' own expert recognizes that "this summary would take many minutes to read or scroll down a TV screen." Viscusi Decl. ¶80. These extensive disclosures are required in advertising even though drugs – unlike tobacco products – have therapeutic value.

FDA reviews and approves every aspect of the labeling of new drugs during the approval process, see 21 U.S.C. § 355(b), (d), and its regulations set out the requirements for drug labeling in great detail. 21 C.F.R. Part 201. Prescription drug labeling must include precisely worded and scientifically supported information on warnings and precautions, contraindications, and adverse

---

[13] As noted above, see n.6, supra, the Act imposes no size, format, or placement requirements for the non-warning disclosure information required on tobacco product packaging. Thus, the contention that these disclosures leave inadequate room for brand names and logos, see Amended Complaint ¶¶54-55, has no basis.

[14] Available at http://www.fda.gov/Drugs/ResourcesForYou/Consumers/PrescriptionDrug Advertising/ucm072025.htm#B.

reactions, id. §§ 201.56, 201.27, 201.80, and certain drugs must also include "black box warnings" regarding particularly serious contraindications or warnings, id. § 201.57(c)(1); see also Viscusi Decl. ¶79 (plaintiffs' expert) (example of disclosures required on prescription drug packaging) (reproduced at Addendum B3).

Even for relatively less dangerous over-the-counter ("OTC") drugs, FDA regulations specify detailed labeling requirements. Id. § 201.66. The wrapper or outside container for a retail OTC package must contain a "Drug Facts" panel with information on the active ingredient, drug purpose, indications, directions, warnings, inactive ingredients, and other information. Id. § 201.66(c). The regulations contain examples of acceptable formats and typeface. Id. Part 201, Appendix A. For certain OTC drug products, FDA regulations require additional warnings on the product label and often specify type size, bold font, and highlighting for portions of the labeling. For example, aspirin container labeling must contain a warning regarding "Reyes syndrome," id. §§ 201.66(c)(5)(ii)(A), 201.314(h), and certain contraceptive products must bear labels with information regarding sexually transmitted diseases, id. §§ 201.66(c)(5)(ii)(H), 201.325. Products containing acetaminophen must contain a "Liver warning" that the product may cause severe liver damage, and products containing aspirin must contain a "Stomach bleeding warning." 74 Fed. Reg. 19385 (2009). For products such as pain relievers, certain allergy medications, and products to treat a variety of cold symptoms, the required warnings together with the other FDA-required information typically encompass more than 50% of the product packaging.[15]

---

[15] See, e.g., http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/022032s003lbl.pdf (example of packaging for OTC heartburn medication) (reproduced at Addendum B4). Prominent warnings are also routinely required on hazardous non-drug products. See, e.g., 40 C.F.R. § 156.60 (regulations implementing Federal Insecticide, Fungicide, and Rodenticide Act); EPA, Office of Pesticide Programs Label Review Manual, Chapter 3 – General Labeling Requirements, at 15-17

At bottom, plaintiffs' argument invites the Court to substitute the tobacco industry's judgment for the determinations made by Congress on the basis of overwhelming scientific evidence.  Such an approach would be impermissible even if the Court were reviewing agency regulations.  See Henley v. FDA, 77 F.3d 616, 621 (2d Cir. 1996) (noting deference owed to FDA's determination of the information required on drug labeling).  And as the Supreme Court has made clear, the reasonableness of a congressional determination is measured "by a standard more deferential than we accord to judgments of an administrative agency," lest a court "infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy."  Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 195, 196 (1997).

**B.      The Regulation Of Modified Risk Tobacco Products Does Not Violate The First Amendment (Count 3).**

The 2009 legislation requires that a tobacco manufacturer seeking to market a product as posing reduced health risks first obtain an FDA determination that the product does, in fact, present reduced risks under the criteria set out in the statute.  Plaintiffs' challenge to this requirement was addressed at length in our preliminary injunction opposition brief and this Court's preliminary injunction opinion, and we discuss it only briefly here.

The purpose of the modified risk tobacco product provision is to protect the public from the harms caused by unsubstantiated claims that a tobacco product poses reduced health risks.  Congress found that "[t]hose who use products sold or distributed as modified risk products that do not in fact reduce risk, rather than quitting or reducing their use of tobacco products, have a substantially increased likelihood of suffering disability and premature death."  Legislative Finding 37.  "The costs

---

(December 2006), available at http://www.epa.gov/oppfead1/labeling/lrm/2006-lrm-chap-03.pdf.

to society of the widespread use of products sold or distributed as modified risk products that do not in fact reduce risk or that increase risk include thousands of unnecessary deaths and injuries and huge costs to our health care system." Ibid.

The examination of promotional claims to determine whether a product is subject to pre-market FDA review is a familiar feature of drug regulation that presents no First Amendment issue. Whitaker v. Thompson, 353 F.3d 947, 952-53 (D.C. Cir. 2004). Moreover, the requirement of pre-market review is a narrowly tailored means to protect consumers from unsubstantiated or misleading claims about tobacco products. Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 566 (1980). The interest in preventing the harms cited by Congress is clearly substantial, and Congress expressly determined that "[t]he only way to effectively protect the public health from the dangers of unsubstantiated modified risk tobacco products is to empower the [FDA] to require that products that tobacco manufacturers sold or distributed for risk reduction be reviewed in advance of marketing, and to require that the evidence relied on to support claims be fully verified." Legislative Finding 43. Consumers are in no position to verify health claims made about a particular tobacco product, the accuracy of which turns on scientific evidence well beyond the reach of the ordinary consumer. See Pearson v. Shalala, 164 F.3d 650, 655 (D.C. Cir. 1999) (noting that a "consumer would have difficulty in independently verifying" health claims about dietary supplements); see also, e.g., International Agency for Research on Cancer, "Smokeless tobacco and some tobacco-specific N-nitrosamines" (2007) (553-page report analyzing carcinogenic risks associated with various forms of smokeless tobacco).

Plaintiffs contend that the government should ensure the accuracy of a manufacturer's reduced risk claims through after-the-fact enforcement rather than pre-market FDA review. But even if the

tobacco industry had no history of making false and misleading health claims, post hoc enforcement would be an ineffective means to protect consumers because tobacco products are addictive.  Action taken after an addiction has taken hold or been reinforced comes too late.  Given the industry's well documented history, see 11/5/09 Op. 18-19; Philip Morris, 566 F.3d at 1118-24, Congress plainly was not required to rely on measures "tried and found wanting."  11/5/09 Op. 18.

Plaintiffs also assert that the government's interest could be served by requiring disclaimers on products promoted as posing reduced risks.  But Congress "expressly rejected the idea that requiring disclaimers for modified risk tobacco products would be effective, citing the FTC's determination that 'consumers have misinterpreted advertisements in which one product is claimed to be less harmful than a comparable product, even in the presence of disclosures and advisories intended to provide clarification.'" 11/5/09 Op. 18-19 (citing Legislative Findings 41 & 42).  Indeed, when the D.C. Circuit concluded that disclaimers would suffice to protect consumers from inaccurate health claims about certain dietary supplements, the court stressed that those supplements did not "in any fashion threaten consumer's health and safety," and distinguished the requirements for drugs because "the potential harm [to consumer health] presumably is much greater."  Pearson, 164 F.3d at 656 & n.6 (emphasis in original).

Although plaintiffs argue that the Act proscribes truthful speech, Amended Complaint ¶67, they overlook the problem that a statement "may be absolutely true and still be misleading."  11/5/09 Op. 15; Philip Morris, 566 F.3d at 1126 ("literally true statements may nevertheless constitute fraud").  For example, it may be true that Reynolds' "Natural American Spirit" cigarettes are "100% Free Of Chemical Additives," FTC Complaint, Docket No. C-3952 (June 12, 2000), but the statement is

misleading if it implies that the cigarettes pose a reduced health risk, ibid.; see also FTC Consent

Order, Docket No. C-3952 (June 12, 2000).[16]

Claims about reduced risk are also misleading when they fail to account for nicotine addiction

and user compensation.  For example, the D.C. Circuit observed that even if a "low tar" cigarette

brand yields a reduced level of tar when tested by machine, the claim that the brand is "low tar" is

misleading because a human smoker "will subconsciously adjust his puff volume and frequency, and

smoking frequency, so as to obtain and maintain his per hour and per day requirement for nicotine."

Philip Morris, 566 F.3d at 1125.  Likewise, even assuming that a particular smokeless tobacco

product might under particular conditions be an "effective means of helping inveterate smokers quit

using cigarettes altogether," Rodu Decl. ¶6, such a claim is misleading when the use or intended use

of a smokeless tobacco product is to supplement cigarettes.  See, e.g., Foulds, J. & Furberg, H., "Is

low-nicotine Marlboro snus really snus?," Harm Reduction Journal, vol. 5:9, at 2-3 (Feb. 2008)

(noting differences between "snus" sold in Sweden and "snus" sold in the U.S. and raising the

possibility that the U.S. product "may foster persistent dual tobacco use instead of smoking

cessation"); https://snus.tobaccopleasure.com/modules/security/Login.aspx (website for Reynolds'

Camel "Snus") (declaring that "Snus can be enjoyed almost anywhere, regardless of the growing

smoking bans and restrictions"); Krugman Aff., at 17-18, 20 (recent examples of Camel "Snus" ads

---

[16] See  http://ftc.gov/os/2000/06/santafecmp.html  (complaint);  http://ftc.gov/os/2000/06/
santafe.do.html (consent order); see also http://www.ftc.gov/os/1999/08/C3892do.htm (similar 1999
consent order involving Reynolds' Winston cigarettes).

that emphasize the many venues in which Camel "Snus" can be used) (reproduced at Addendum B23-B27).[17]

In short, as this Court observed, "the determination of whether a particular claim is misleading inherently depends on many things, including scientific evidence about a product, the intended consumers' use of the product, and the ability of would-be consumers to recognize that narrowly true health or risk claims may only be narrowly true."  11/5/09 Op. 15.  It is "in just this broad sense that the MRTP provision seeks to prevent misleading claims about so-called modified risk tobacco products; it authorizes the FDA to 'review the scientific evidence that the product will, in fact, "reduce the harm or the risk of tobacco-related disease associated with commercially marketed tobacco products."'" Ibid. (quoting 21 U.S.C. § 387k(b)(1)).[18]

### C.    The Preclusion Of Claims Implying FDA Approval Does Not Violate The First Amendment (Count 7).

The 2009 legislation precludes "any express or implied statement or representation directed to consumers with respect to a tobacco product, in a label or labeling or through the media or advertising, that either conveys, or misleads or would mislead consumers into believing, that (1) the product is approved by the [FDA]; (2) the [FDA] deems the product to be safe for use by consumers; (3) the product is endorsed by the [FDA] for use by consumers; or (4) the product is safe or less

---

[17] See also Henningfield, J.E. (slides), "Smokeless Tobacco: True Risks, New Challenges, and Opportunities" (Sept 21, 2009; 5th National Summit on Smokeless and Spit Tobacco, Madison, WI) (age-restricted website for Camel "Snus") (reproduced at Addendum B5).

[18] The FDA has not yet received an application to market a modified risk tobacco product. In recent draft guidance, the FDA explained that pending further guidance or rulemaking, it intends to issue a decision on an MRTP application within 360 days of its receipt by the FDA.  See Draft Guidance for Industry and FDA Staff: Preliminary Timetable for the Review of Applications for Modified Risk Tobacco Products under the Federal Food, Drug, and Cosmetic Act (Nov. 24, 2009), http://www.fda.gov/TobaccoProducts/GuidanceComplianceRegulatoryInformation/ucm191911.htm.

harmful by virtue of – (A) its regulation or inspection by the [FDA]; or (B) its compliance with regulatory requirements set by" the FDA. 21 U.S.C. § 331(tt).

This provision is intended to prevent consumer confusion about the role of the FDA with respect to tobacco products, which differs in significant ways from the FDA's role in regulating drugs and devices. In the drug and device context, FDA approval generally represents a determination that a product is "safe and effective" for its intended use. By contrast, tobacco products cannot meet this standard because they are "'dangerous to health' when used in the manner prescribed." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 135 (2000); see also H.R. Rep. No. 111-58(I) (2009) (dissenting views) ("We are also concerned that effectively giving the FDA stamp of approval on cigarettes will improperly lead people to believe these products are safer than they truly are."); 155 Cong. Rec. S5986 (June 3, 2009) (Sen. McConnell) ("When the FDA approves a product, Americans expect the product to be safe, but as we all know, there is no such thing as a safe cigarette.").

Plaintiffs protest that this prohibition extends to "the truthful fact that the FDA regulates tobacco products." Amended Complaint ¶85. But as discussed above, a statement may be accurate yet still misleading. A tobacco company cannot circumvent the evidentiary showing required under the modified risk tobacco products provision by stating or implying that FDA oversight renders a product less harmful or safe.

Plaintiffs also contend that the provision applies to "any speaker in any medium, including, for example, statements or representations made in the course of a scientific, political, or public policy debate over the costs and benefits of FDA regulation of tobacco products." Id. ¶84. But by its terms, the provision does not apply unless plaintiffs' statements are "directed to consumers with respect to a tobacco product." 21 U.S.C. § 331(tt). Statements directed to consumers with respect to a product

-33-

are commercial speech for the reasons discussed by this Court, 11/5/09 Op. 11-12, 19, and the challenged provision is a narrowly tailored means to prevent consumer confusion about the nature and effect of FDA regulation.

## II. The Act Properly Restricts The Advertising And Marketing Techniques That Are Particularly Attractive To Minors.

The Act's restrictions on tobacco advertising do not bar the communication of information, and they are narrowly tailored to address the "particular advertising and promotion practices that appeal to youth." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 563 (2001).

### A. The Restrictions On The Use Of Color And Imagery Do Not Violate The First Amendment (Count 1).

The Act directs the FDA to reissue regulations requiring that advertisements for tobacco products appear in black-and-white, text-only format, subject to exceptions for adult-oriented publications and in adult-only venues. Act § 102(a); 21 C.F.R. § 897.32(a) (1997). This provision restricts the noninformational aspects of tobacco advertising that lure adolescents into beginning tobacco use, without restricting the communication of information about tobacco products. It thus relates to unlawful activity (sales to minors) and also constitutes a narrowly tailored means of reducing underage tobacco use. Central Hudson, 447 U.S. at 564, 566.

**1.** "Virtually all new users of tobacco products are under the minimum legal age to purchase such products," and an "overwhelming majority of Americans who use tobacco products begin using such products while they are minors and become addicted to the nicotine in those products before reaching the age of 18." Legislative Findings 4 & 31. "[D]ecades of experience in tracking tobacco use show that if people do not begin to use tobacco as youngsters, they are highly unlikely to initiate use as adults." Institute of Medicine, "Growing Up Tobacco Free: Preventing Nicotine Addiction in

Children and Youths," at 5 (1994) ("1994 IOM Report").  Moreover, "[s]mokers are also known to be extremely brand loyal, so the brand choice of consumers during the early stages of their smoking 'careers' becomes critical."  2008 NCI Report, at 57.  Reynolds acknowledged internally that "[t]he brand loyalty of 18-year-old smokers far outweighs any tendency to switch with age."  61 Fed. Reg. 44481 (quoting Diane Burrows, R.J. Reynolds Tobacco Company, Younger Adult Smokers: Strategies and Opportunities (1984)).

The industry tailors its advertising to attract this underage population.  Congress specifically found that "[c]hildren are more influenced by tobacco marketing than adults," and that the "[a]dvertising, marketing, and promotion of tobacco products have been especially directed to attract young persons to use tobacco products" Legislative Findings 15 & 23.  In its 1996 rulemaking, the FDA explained that children are "more susceptible to influence from peripheral cues such as color and imagery" because they have less "motivation and ability to 'elaborate' upon the arguments (pay attention to and think about the factual information)."  61 Fed. Reg. 44468.  The 1994 IOM report discussed in the rulemaking explained that "smoking experimentation commonly occurs at transition points in adolescence when there is a threat to a teen's emerging self-concept: Teenagers are typically less secure in their identities than most groups in the population, and their age-appropriate task is in part to experiment with different adult identities.  They are more subject to social pressure and more attuned to advertising than most groups in the population."  1994 IOM Report, at 119 (internal quotation marks omitted).  Accordingly, "teens who admire the attributes depicted by smokers in ads are also more likely to intend to smoke in the future," and "[i]n order to acquire selected attributes of model smokers, adolescents may be motivated to use tobacco, even when they view smoking as negative."  Id.

The tobacco industry has for decades relied on the recruitment of adolescents and children as the source of new consumers. Its marketing strategies reflect its appreciation for the fact that the decision to take up tobacco is irrational. In 1972, Reynolds acknowledged internally that a person will "start to smoke for purely psychological reasons – to emulate a valued image, to conform, to experiment, to defy, to be daring, to have something to do with his hands, and the like." 61 Fed. Reg. 44480 (quoting Teague, C., Research Planning Memorandum on the Nature of the Tobacco Business and the Crucial Role of Nicotine Therein 4-5 (1972)). Thus, Reynolds' assistant director of research explained that the aim of the manufacturer should be to "convince him with wholly irrational reasons that he should try smoking." Ibid. (emphasis added).

In its 2007 report, the Institute of Medicine emphasized that "[f]rom the standpoint of the initiation of smoking by youth, the most important feature of tobacco advertising is its noninformational characteristics." 2007 IOM Report, at 322. The Institute explained that the "very purpose of noninformational tobacco advertising is to associate smoking with positive attributes and consequences and to create a positive affect toward smoking and people who smoke." Ibid. "The images used in tobacco marketing associate smoking with lifestyles and experiences that appeal to young people, and these positive associations tend to displace or override risk information in adolescent decision making." Ibid.; see also 2008 NCI Report, at 280 (reviewing recent scientific literature and finding that exposure to advertising causes adolescents to begin smoking or move to smoking on a regular basis and that even brief exposure to cigarette advertising influences adolescents' intentions to smoke).

The district court in Philip Morris found "overwhelming" evidence that the industry "exploits adolescents' vulnerability to imagery" through advertisements placed in magazines, on billboards,

at retail points of sale, and "in other venues that historically and currently reach millions of teens." Philip Morris, 449 F. Supp. 2d at 571 (Finding 2674).  "The central purpose of the tobacco companies' image advertising is motivating adolescents to smoke."  Id. at 572 (Finding 2680); see also Krugman Aff., at 9-13; 17-21 (recent examples of tobacco companies' image based advertising in youth magazines) (reproduced at Addendum B9-B36); Lindsley Decl., Exhibit C (example of tobacco advertising in retail stores) (reproduced at Addendum B6); Hinton Decl. ¶¶9-10 (examples of tobacco advertising in tobacco specialty store) (reproduced at Addendum B7-B8).  Plaintiffs' expert, in reporting survey data on imagery in cigarette ads, acknowledges that, "[w]hen asked to indicate what they thought the advertiser was trying to communicate with the image in the ad, respondents generally suggested 'fun' and 'relaxation.'  For one of the three cigarette ads examined a number of respondents also mentioned 'sex' (37%)."  Faber Decl. ¶70; see also Legislative Finding 17 ("Tobacco product advertising often misleadingly portrays the use of tobacco as socially acceptable and healthful to minors.").

Tobacco companies use color much as they use imagery.  Colors invoke particular feelings – such as red for passion, gold for money, green for nature – that can be used to convey an image, particularly for those who, like adolescents, are disinclined to engage significantly with an advertisement's text.  61 Fed. Reg. 44467; 2008 NCI Report, at 64-65.  By associating a color with a brand, companies also can circumvent other restrictions on tobacco advertising.  2008 NCI Report, at 85.  For example, colors have replaced terms such as "light" and "low tar" in jurisdictions that have banned the use of these misleading descriptors.  See 2007 IOM Report, at 297 (noting that in Brazil and the U.K., "manufacturers openly provided translation guides for this substitution"); see also 2008 NCI Report, at 65.  Indeed, recent studies reveal that U.S. manufacturers are substituting color and

imagery for their "light" and "low tar" descriptors in anticipation of restrictions that will take effect in June 2010. <u>See</u> "Taste the Rainbow: Cigarette Makers' Colorful Answer to FDA Packaging Regs," FastCompany.com (Oct. 22, 2009).[19] "[T]erms like 'light' and 'ultra light' have been dropped for words like 'gold' and 'silver,' which many smokers perceive to be healthier and easier to kick, studies show." <u>Ibid</u>. Reynolds' "Salem Ultra Lights are now Salem Silvers." <u>Ibid</u>.

**2.** The 2009 legislation focuses on the noninformational advertising that lures adolescents into beginning tobacco use "for purely psychological reasons," such as "to emulate a valued image," "to conform," "to experiment," or "to defy." 1972 Reynolds memo, <u>supra</u>. In the Act, Congress directed the FDA to reissue regulations requiring that advertisements for tobacco products appear in black-and-white, text-only format, subject to exceptions for adult-oriented publications and in adult-only venues. Act § 102(a); 21 C.F.R. § 897.32(a) (1997).

Congress found that "[t]ext only requirements ... will help reduce underage use of tobacco products while preserving the informational function of advertising." Legislative Finding 28. As the FDA explained in the rulemaking, "any information that firms wish to communicate to adults may still be communicated by use of words." 61 Fed. Reg. 44497. Moreover, the restrictions on use of color and imagery do not apply to adult-oriented magazines or adult-only venues as specified in the statute.

"The First Amendment's concern for commercial speech is based on the informational function of advertising." <u>Central Hudson</u>, 447 U.S. at 563. The Supreme Court has explained that at its core, advertising serves to "'disseminat[e] ... information as to who is producing and selling

---

[19] Available at http://www.fastcompany.com/blog/lucas-conley/advertising-branding-and-marketing/smoke-and-mirrors-smoke-signals-tobacco-two-ste

what product, for what reason, and at what price.'"  44 Liquormart, Inc. v. Rhode Island, 517 U.S.

484, 496 (1996) (quoting Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,

Inc., 425 U.S. 748, 765 (1976)).  Because advertising "inform[s] the public of the availability, nature,

and prices of products and services," it "serves individual and societal interests in assuring informed

and reliable decisionmaking." Bates v. State Bar of Arizona, 433 U.S. 350, 364 (1977).

     In some contexts, an image may be necessary to convey information about "the availability,

nature, and prices of products and services." Ibid.  For example, in Zauderer v. Office of Disciplinary

Counsel of Supreme Court of Ohio, 471 U.S. 626, 647 (1985), a picture of a defective medical device

allowed readers to understand which device was at issue.  That is not the case "[f]or a product

category like cigarettes in which most brands have similar features." Faber Decl. ¶27 (plaintiffs'

expert).  Imagery in recent tobacco ads like the ones set out in Dr. Krugman's affidavit (reproduced

at Addendum B9-B36) are not designed to convey significant product information.  As plaintiffs'

expert admits, imagery in tobacco ads is used to associate tobacco use with "positive themes" such

as "fun," "relaxation," and "sex."  Faber Decl. ¶70.

     In short, the black-and-white text requirement does not infringe on the "interests in assuring

informed and reliable decisionmaking," Bates, 433 U.S. at 364, and it is carefully tailored to address

the "particular advertising and promotion practices that appeal to youth."  Lorillard Tobacco Co. v.

Reilly, 533 U.S. 525, 563 (2001).[20]

---

[20] Plaintiffs also cite a statutory provision that directs the FDA to "issue regulations to require
that retail establishments for which the predominant business is the sale of tobacco products comply
with any advertising restrictions applicable to retail establishments accessible to individuals under
the age of 18." 21 U.S.C. § 387m; Amended Complaint ¶¶45, 118.  There is no live controversy
over this provision, which will not take effect until its contours have been determined through
implementing regulations.  Nor have plaintiffs established standing to challenge this provision.
Their declarants do not identify any adult-only specialty tobacco retailer in which plaintiffs advertise,

B.    **The Restrictions On Brand-Name Event Sponsorship (Count 5)
And The Distribution Of Branded Merchandise (Count 6)
Do Not Violate The First Amendment.**

Plaintiffs' challenges to the restrictions on brand-name event sponsorship and the distribution of branded merchandise fail for largely the same reasons. Both provisions target practices with little or no informational content that are especially attractive to children and adolescents. Restrictions on these practices are thus narrowly tailored means to reduce underage use.

1.    **Brand-Name Event Sponsorship (Count 5)**

Congress directed the FDA to reissue regulations that prohibit the sponsorship of athletic, social, and cultural events "in the brand name" of a tobacco product. Act § 102(a)(2); 21 C.F.R. § 897.34(c) (1997). As plaintiffs' expert recognizes, brand-name sponsorship is used "to creat[e] an association with an event people care about." Faber Decl. ¶43. The tobacco industry has used sponsorships as a means of "associat[ing] tobacco use with exciting, glamorous, or fun events such as car racing and rodeos," 61 Fed. Reg. 44527, an associative technique that "is particularly effective with young people," id. at 44521. "The very purpose of noninformational tobacco advertising is to associate smoking ... with lifestyles and experiences that appeal to young people," "positive associations [that] tend to displace or override risk information in adolescent decision making." 2007 IOM Report, at 322. The Supreme Court of Canada observed in upholding a similar ban that "sponsorship promotion is essentially lifestyle advertising in disguise." Attorney General of Canada v. JTI-Macdonald Corp., 2007 SCC 30, ¶120.

_____

and represent that "the only locations that readily come to mind that sell cigarettes and restrict access to persons 18+ are some bars and nightclubs, and such locations account for a very small percentage of cigarette sales (much less than 1%)." Dunham Decl. ¶23; see also Lindsley Decl. ¶50 (Lorillard); Jones Decl. ¶25 (Commonwealth); Jennette Decl. ¶14 (Conwood); Terry Decl. ¶22 (National Tobacco); Hinton Decl. ¶8-9 (Discount Tobacco City and Lottery).

The NCI explained in its 2008 report that the impact that such sponsorships have on children and adolescents is magnified by the television exposure that the events receive. "Even though cigarette advertising is not permitted on television in the United States, tobacco companies continue to receive millions of dollars' worth of national television exposure for their brands through sponsoring sports events such as auto racing." 2008 NCI Report, at 83. Moreover, the Surgeon General has emphasized that sponsorship is "an efficient way for an advertiser to have its brand name and logo achieve the equivalent effect of broadcast advertising without having to include any government-mandated warnings." 1994 Surgeon General's Report, at 185. Even if events are attended primarily by adults, "the exposure (which includes television broadcasts) of young people to sponsored events is substantial." 61 Fed. Reg. 44529.

Tobacco company sponsorship of racing events illustrates the success achieved by the industry in reaching a broad underage audience. Sponsors understand that NASCAR "'is a great kids' business,'" 61 Fed. Reg. 44528 (quoting statement of Hanna-Barbera, Inc.), and Reynolds "has a long history of having brands sponsor events" such as "NASCAR's Winston Cup Series." Dunham Decl. ¶34 (Reynolds' Senior Vice President). At the time of the 1996 FDA rulemaking, it was estimated that more than 64 million children each year were exposed to tobacco-related advertising on television through auto-racing sponsorship. Id. at 44528; see also Philip Morris, 449 F. Supp. 2d at 664 ("millions of youth watching [televised racing] events are exposed to ... cigarette marketing imagery"). In 1999, "the tobacco industry received over $120 million of television exposure in the United States alone" by promoting the NASCAR Winston Cup, the CART FedEx Championship (which is heavily sponsored by Marlboro and Kool), and the NHRA Winston Drag Racing. Philip Morris, 449 F. Supp. 2d at 665; see also id. at 666 ("the total exposure received by RJR of its cigarette

-41-

brands at televised racing events during 2002 [produced an estimated value of] $1.2 billion"); 2008 NCI Report, at 158 ("[s]ports sponsorship in communities and on television has permitted Winston, Marlboro, Copenhagen, and Skoal to reach large numbers of youth and young adults in settings that facilitate sampling and promotions and to associate the brands with the allure of racing and rodeo heroes").

Moreover, the district court in <u>Philip Morris</u> explained that "[c]igarette brand names are reinforced not only on the race cars themselves, but also on drivers' uniforms, team uniforms, hats, and the large transporters used to move cars from event to event. The events themselves offer marketing opportunities for trackside billboards, sampling, hospitality tents, and promotional giveaways, like hats, sunglasses, and programs."  449 F. Supp. 2d at 665.  Brand-name event sponsorship also provides the opportunity for retail spinoffs.  For instance, in 1996 Reynolds displayed at retail locations such as grocery and convenience stores the Winston Motorsports simulator, the Winston or Camel show car, the "well known Winston Cup or Smokin' Joe driver, surrounded by a small army of fans ... complete with autograph session," extensive signage, and an inflatable Winston or Camel cigarette pack that was "an awe inspiring 15 feet tall."  <u>Id</u>. at 666 (internal quotation omitted).

Restrictions on brand-name event sponsorship in the Master Settlement Agreement reflect the concern that such sponsorships encourage underage tobacco use.  Non-signatories, however, like plaintiff Conwood, are unaffected by the MSA's restrictions, and Conwood has "a long history of brand name sponsorship of events, including Kodiak's sponsorship of a car in NASCAR." Jennette Decl. ¶49.  Moreover, even signatories to the MSA are allowed one "brand name sponsorship" each

year, MSA, § III(c)(2)(A), a phrase that is broadly defined to include "a single or multi-state series or tour (for example, NASCAR (including any number of NASCAR races))." Id. § II(j).

Thus, a 2001 study of the MSA correctly predicted that "the tobacco settlement is unlikely to have any major effect on the marketing of cigarettes through motor sports sponsorship." Siegel, M., "Counteracting Tobacco Motor Sports Sponsorship as a Promotional Tool: Is the Tobacco Settlement Enough?," 91 Am. J. Pub. Health 1100, 1102-03 (2001). Indeed, the district court in Philip Morris found that the tobacco companies "increased their sponsorship budgets [after] signing the MSA." 449 F. Supp. 2d at 664. In 2001, three years after the MSA was signed, "tobacco sponsorship included Winston's association with [NASCAR], Skoal racing teams at National Hot Rod Association (NHRA) events; the Players, Kool, and Marlboro teams at Championship Auto Racing; and Copenhagen booths at PRCA and professional bull-riding events." 2008 NCI Report, at 154-55. Annual viewership of tobacco-sponsored races swelled to 513 million in 2001, leading one study to conclude that "cigarette manufacturers have used auto racing sponsorships to successfully circumvent both the ban on televised cigarette advertising and the intent of the [MSA] not to target youth." Morrison, M.A., et al., "Inhaling and Accelerating: Tobacco Motor Sports Sponsorship In Televised Auto Races, 2000-2002," 15 Sports Marketing Quarterly 7, 12 (2006). Congress expressly determined that "the major United States cigarette companies dramatically increased their advertising and promotional spending in ways that encourage youth to start smoking subsequent to the signing of the Master Settlement Agreement in 1998." Legislative Finding 48.

## 2.    Branded Merchandise (Count 6)

For similar reasons, Congress directed the FDA to reissue regulations that preclude a tobacco manufacturer from distributing items such as caps, t-shirts, and sporting goods that bear the name or

logo of a tobacco brand.  Act § 102(a); 21 C.F.R. § 897.34(a) (1997).  Plaintiffs' expert admits that

such items are used to "promote brand awareness and serve as a frequent reminder of the brand."

Faber Decl. ¶45.  The FDA explained that even if such items were "distributed to adults only, this

would not prevent the wearers from becoming walking advertisements that would continue to display

the attractive imagery." 61 Fed. Reg. 44526.

In reality, "[t]here is no way to limit the distribution of these items to adults only." Id. at

44525.  In the FDA rulemaking, the industry claimed that "it already [was] taking sufficient action

to ensure that only adults get these items." Ibid.  Nonetheless, the evidence showed that "a substantial

number of young people" had them. Id. at 44525-26.  For example, a 1992 Gallup poll found that

nearly half of adolescent smokers – and more than a quarter of adolescent non-smokers – owned at

least one tobacco-related promotional item. Id. at 44525.  A study of 8,000 children in New York

State made similar findings.  See 1994 IOM Report, at 110 (discussing the study).  The FDA

determined that "[t]he appeal of something for nothing items for youngsters is great, and the extent

of the appeal makes it virtually impossible to distinguish among items." 61 Fed. Reg. 44525.  The

Institute of Medicine explained that the "ubiquity of such specialty items" is particularly pernicious

because it "conveys the impression that tobacco use is the norm," 1994 IOM Report, at 110, which

in turn "fosters experimentation with tobacco and smokeless products by young people," 61 Fed. Reg.

44525 (citing 1994 IOM Report, at 110).  Moreover, the IOM noted, "these items, when worn or used

by children, are capable of penetrating areas of a child's world that might be off-limits to other forms

of advertising." 61 Fed. Reg. 44525.  "Because they penetrate the young persons' world, they are very

effective in creating the sense that tobacco use is widely accepted, which ... is extremely important

to children and adolescents." Ibid.  Studies have confirmed that obtaining branded merchandise

-44-

"precedes, and reliably predicts, smoking initiation, even when controlling for other factors that have been shown to influence smoking uptake." National Cancer Institute, "Changing Adolescent Smoking Prevalence," at 206 (2001); see also Biener, L. & Siegel, M., "Tobacco Marketing and Adolescent Smoking: More Support for a Causal Inference," 90 Am. J. Pub. Health 407, 409 (2000) (intensive longitudinal study showing that brand-name merchandise influences smoking receptivity). As Congress found, "persons under the age of 18 are regularly exposed to tobacco product promotional efforts," Legislative Finding 18, and this exposure "increases the number of young people who begin to use tobacco." Legislative Finding 20.

**C.    The Challenge To An Outdoor-Advertising Restriction Is Unripe (Count 4).**

The rule issued by FDA in 1996 prohibited advertising for tobacco products in outdoor areas within 1,000 feet of a public playground, public park, or school. 21 C.F.R. § 897.30(b) (1997). The 2009 legislation instructs the FDA to reissue the rule with "such modifications" to the outdoor-advertising restriction "that the Secretary determines are appropriate in light of governing First Amendment case law, including the decision of the Supreme Court of the United States in Lorillard Tobacco Co. v. Reilly (533 U.S. 525 (2001))." 21 U.S.C. § 387a-1(a)(2)(E).

Plaintiffs' assertion that the outdoor-advertising restriction, if reissued, would violate the First Amendment, does not present a live case or controversy. The FDA has not yet determined whether to issue such a restriction in any form. Plaintiffs cannot properly ask the Court to pre-judge the merits of a regulation that may never be issued. See Texas v. United States, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."); Renne v. Geary, 501 U.S. 312, 320 (1991) (plaintiff

alleging First Amendment violation must "demonstrate a live dispute involving the actual or threatened application of [a statute or policy] to bar particular speech").

Plaintiffs alternatively contend that the delegation of authority to the FDA to reconsider the outdoor-advertising restriction violates their due process rights because it does not require notice-and-comment rulemaking.  Plaintiffs do not have standing to challenge this delegation, which may never cause them injury.  In any event, there is no constitutional right to notice-and-comment rulemaking. "The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy."  Minn. State Bd. for Community Colleges v. Knight, 465 U.S. 271, 283 (1984).  "When the government makes general policy, it is under no greater constitutional obligation to listen to any specially affected class than it is to listen to the public at large."  Id. at 287. Indeed, it is well established that a federal agency may announce new principles applicable to an industry in the course of an adjudication.  NLRB v Bell Aerospace, 416 U.S. 267, 294 (1974).

**D.      Plaintiffs' Challenge To An "Authorization Of Further Restrictions" Rests On A Misreading Of The Act (Count 11).**

Plaintiffs challenge a pair of provisions that, they mistakenly allege, authorize federal agencies and other governments to enact additional restrictions on cigarette advertising and promotion. Amended Complaint ¶¶41-42.

The first provision, 21 U.S.C. § 387p, provides that "nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority" of federal, state, local, and tribal governments to enact further restrictions relating to tobacco products.  The second provision, 15 U.S.C. § 1334(c), provides an "Exception" to the preemption provision in another federal statute.  Neither provision is a delegation of new authority to federal agencies or other

-46-

governments to issue further restrictions. Instead, by their plain terms, these provisions simply limit the preemptive scope of federal law.

III.  **The Provisions Restricting Free Tobacco Samples, Gifts In Consideration For The Purchase Of Tobacco Products, and Combination Marketing Regulate Conduct And Do Not Implicate The First Amendment.**

Plaintiffs challenge a series of provisions that complement the Act's advertising restrictions by curtailing commercial practices that stimulate underage demand. These provisions regulate commercial conduct with no "significant expressive element" and thus do not implicate the First Amendment. Arcara v. Cloud Books, Inc., 478 U.S. 697, 706-07 (1986).

A.  **Free Samples (Count 8)**

The Act generally bars the distribution of free samples of tobacco products. See 21 U.S.C. § 387a-1(a)(2)(G). The FDA determined that free samples "are an inexpensive and easily accessible source of these products to young people," 61 Fed. Reg. 44460, who have been able to "obtain free samples easily" notwithstanding "industry-developed, voluntary codes that supposedly restrict distribution of free samples to underage persons." Ibid.; see also 1994 IOM Report, at 216-21; 61 Fed. Reg. 45244-45 & nn.1206-1208.

The First Amendment does not confer a right to distribute free samples of a lethal and addictive product. Indeed, the distribution of drugs is strictly controlled under the Controlled Substances Act of 1970 ("CSA"), which established a "closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." Gonzales v. Raich, 545 U.S. 1, 13 (2005). Under the CSA, drugs are categorized based on factors including effects on the body and potential for abuse, and each schedule "is associated with a distinct set of controls regarding the manufacture, distribution, and use of the

-47-

substances listed therein." <u>Id</u>. at 13-14. "The CSA and its implementing regulations set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping." <u>Id</u>. at 14. Tobacco products are excluded from this scheme because of a specific statutory exemption, <u>see</u> 21 U.S.C. § 802(6) – not for want of congressional power.

Even apart from the CSA's longstanding restrictions on the distribution of drugs, it is clear that the government may regulate the supply and demand for a product by regulating the product's price. The Supreme Court has repeatedly contrasted advertising restrictions with measures that reduce consumption through price regulation. For example, in <u>44 Liquormart, Inc. v. Rhode Island</u>, 517 U.S. 484 (1996), the Court invalidated a measure that prohibited vendors from advertising the price of alcoholic beverages but emphasized that "higher prices can be maintained either by direct regulation or by increased taxation." <u>Id</u>. at 507. The Court described such price regulation as an "alternative form[] of regulation that would not involve any restriction on speech" and concluded that price regulation would be "more likely [than the advertising ban] to achieve the State's goal of promoting temperance." <u>Ibid</u>. Similarly, in <u>Thompson v. Western States Medical Center</u>, 535 U.S. 357 (2002), the Court invalidated a ban on advertising the availability of drugs compounded by pharmacists but stressed that there were "non-speech-related means" of achieving the government's objectives, such as by capping the "gross revenue, or profit that a pharmacist or pharmacy may make or sell in a given period of time." <u>Id</u>. at 372.

Like the "non-speech-related" alternatives cited in <u>44 Liquormart</u> and <u>Thompson</u>, the free samples prohibition reduces tobacco consumption without restricting speech. Plaintiffs allege that a "free sample promotion is one method by which manufacturers speak to, and communicate information regarding their products with, adult tobacco consumers." Amended Complaint ¶ 87. But

-48-

the free sampling provision does not restrict their communications; it restricts their <u>distribution</u> of tobacco products for free. Any impact on advertising is at most incidental. Indeed, in <u>Lorillard</u>, the tobacco companies abandoned their First Amendment challenge to restrictions on "sampling and free giveaways," <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 570 (2001), presumably recognizing that such restrictions do not implicate the First Amendment.

**B.      Gifts In Consideration For Tobacco Product Purchases (Count 10)**

Congress directed the FDA to reissue the rule that generally bars gifts offered in consideration for the purchase of tobacco products. Act § 102(a); 21 C.F.R. § 897.34(b) (1997). Plaintiffs allege that they offer "prizes, such as MP3 players, digital cameras, and prepaid gift cards from the Discover Network" to reward purchases of tobacco products, Amended Complaint ¶95, and urge that the restriction on such incentives violates the First Amendment, <u>id</u>. ¶158.

Again, plaintiffs' premise is wrong. There is no First Amendment right to give away free MP3 players or other prizes to reward the purchase of tobacco. Just as the government may discourage tobacco or alcohol consumption by maintaining high prices, <u>44 Liquormart</u>, 517 U.S. at 507, so may it bar companies from rewarding tobacco purchases with free gifts.

Any effect on plaintiffs' communications is at most incidental and plainly warranted to reduce underage tobacco use. The Institute of Medicine found that these rewards are particularly effective with young people, who have "relatively little disposable income" and who are particularly attracted to ways of "'getting something for nothing.'" 60 Fed. Reg. 41314, 41336 (1995) (citing 1994 IOM Report, at 108). "Although the tobacco industry states that these items are meant for individuals over the age of 20, many teens report participating in promotional activities." <u>Ibid</u>. One study "found that

-49-

25.6 percent of 12 to 13 year olds and 42.7 percent of 16 to 17 year olds participate in promotional programs such as Camel Cash and Marlboro miles." Ibid.

### C.    Combination Marketing (Count 9)

As we explained in our opposition to the motion for a preliminary injunction, plaintiffs' challenge to the combination marketing provision rests on a misunderstanding of what that provision regulates.  Properly understood, the provision does not implicate the First Amendment.

The combination marketing provision prohibits the marketing of a tobacco product "in combination with any other article or product regulated under [the FDCA] (including a drug, biologic, food, cosmetic, medical device, or a dietary supplement)."  21 U.S.C. § 321(rr)(4).  The provision prohibits the physical combination of a tobacco product with an FDA-regulated non-tobacco product (such as a soda that contains nicotine derived from tobacco); the physical packaging of a tobacco product together with a regulated non-tobacco product (such as soda and cigarettes packaged together in a shrink-wrapped container); or a "package deal" in which discounts for regulated non-tobacco products are conditioned on the purchase of tobacco products.  See Draft Guidance for Industry and FDA Staff: The Scope of the Prohibition Against Marketing a Tobacco Product in Combination with Another Article or Product Regulated under the Federal Food, Drug, and Cosmetic Act, Section II.A (Sept. 30, 2009).[21]

The provision thus regulates commercial conduct, not speech.  Any effect on communications is at most incidental and thus consistent with the First Amendment.  See Philip Morris USA Inc. v. City & County of San Francisco, No. 08-17649, 2009 WL 2873765, at *1 (9th Cir. Sept. 9, 2009)

---

[21] See http://www.fda.gov/TobaccoProducts/GuidanceComplianceRegulatoryInformation/ucm184283.htm.

(unpub.) (upholding ordinance banning cigarette sales in retail stores that operate pharmacies because the restriction did not "involve conduct with a 'significant expressive element'") (quoting <u>Arcara v. Cloud Books, Inc.</u>, 478 U.S. 697, 701-702, 706 (1986)).

## IV.    This Court Lacks Jurisdiction Over Plaintiffs' Takings Claims, Which In Any Event Have No Merit.

Plaintiffs allege that the Act "deprives Plaintiffs of their trademarks, trade dress, packaging, and advertising without just compensation." Amended Complaint ¶¶66, 119. Even if this claim had merit, it would not provide a basis for invalidating the Act. "The Takings Clause does not prohibit the government from taking private property; it prohibits the government from taking private property without just compensation." <u>Coles v. Granville</u>, 448 F.3d 853, 860 (6th Cir. 2006) (citing <u>Williamson County Regional Planning Commission v. Hamilton Bank</u>, 473 U.S. 172, 194 (1985)). Thus, "[a] takings claim is not ripe for review unless a property owner is denied just compensation," <u>id</u>. at 860 (citing <u>Williamson County</u>), and equitable relief to enjoin an alleged taking is generally unavailable "when a suit for compensation can be brought against the sovereign subsequent to the taking." <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1016 (1984).

Compensation for an alleged taking by the United States must be sought in the Court of Federal Claims under the Tucker Act and, "[r]egardless of the nature of relief sought, the availability of the Tucker Act remedy renders premature any takings claim in federal district court.'" <u>Coalition for Government Procurement v. Federal Prison Indus., Inc.</u>, 365 F.3d 435, 479 (6th Cir. 2004) (quoting <u>Eastern Enterprises v. Apfel</u>, 524 U.S. 498, 521 (1998) (plurality opinion)). Plaintiffs' takings claims thus should be dismissed for lack of jurisdiction.[22]

_____

[22]    This is not a case in which the challenged statute "requires a direct transfer of funds mandated by the Government," and where a claim for compensation therefore would be "utterly

In any event, if the Court were to reach the merits of the takings claims, plaintiffs' contentions plainly lack merit. It is fundamental that a plaintiff in a takings case must identify a specific, concrete property interest that has been invaded or destroyed by the government, Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 125 (1978), and the plaintiff "bears a substantial burden" in establishing that a taking has occurred. Coalition for Government Procurement, 365 F.3d at 478-79. Plaintiffs' complaint fails to identify any such specific property interest. Generic references to "trademarks," "packaging," and "advertising" do not suffice. Indeed, "a trademark, even a registered one, is not a property right, like a copyright or a patent, but merely an identifier of source." Door Systems, Inc. v. Pro-Line Door Systems, Inc., 83 F.3d 169, 173 (7th Cir. 1996) (Posner, J.). The purpose of trademark law is merely to prevent consumer confusion regarding the source of the marked products. In re Roman Cleanser, 802 F.2d 207, 208-09 (6th Cir. 1986).

Moreover, in asserting a regulatory taking, it is not sufficient to identify a property interest adversely affected by government action. A court must undertake "an ad hoc, factual inquiry" into "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." Ruckelshaus, 467 U.S. at 1005; Tennessee Scrap Recyclers Assoc. v. Bredesen, 556 F.3d 442, 455-57 (6th Cir. 2009). Where, as here, the government has acted for "the protection of public health and safety," the government is "given the greatest leeway to act without the need to compensate those affected by their actions." Rose Acre Farms, Inc. v. United States, 559 F.3d 1260, 1281 (Fed. Cir. 2009). Indeed, the Supreme Court has rejected takings claims arising out of health and safety legislation even where a property interest has been destroyed. See Penn Central, 438 U.S. at 125-27 (citing cases).

---

pointless." Eastern Enterprises v. Apfel, 524 U.S. 498, 521 (1998) (plurality opinion).

Nor could plaintiffs show that the economic impact of the Act on one or more of their trademarks is so severe as to "approximate [a] traditional physical taking[]." <u>Tennessee Scrap Recyclers</u>, 556 F.3d at 456 (explaining that "diminution in the value of property or other financial injury because of regulatory action by itself does not generally constitute a taking"); <u>see also</u> <u>Village of Euclid v. Ambler Realty Co.</u>, 272 U.S. 365, 384 (1926) (75% diminution in value insufficient to prove taking); <u>Hadacheck v. Sebastian</u>, 239 U.S. 394, 405 (1915) (92.5% diminution insufficient to prove taking).  Vague statements about the utility of trademarks and logos, <u>see</u>, <u>e.g.</u>, Dunham Decl. ¶22; Jones Decl. ¶24, cannot substitute for proof.

The suggestion that the Act disrupts plaintiffs' "reasonable investment-backed expectations" is similarly unpersuasive.  Plaintiffs manufacture and distribute products that are lethal and addictive – features the industry masked for decades while stimulating underage demand.  Any expectation that the tobacco industry would escape comprehensive regulation indefinitely was eminently unreasonable.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be granted.

Respectfully submitted,

CANDACE G. HILL
 United States Attorney

ANN M. RAVEL
 Deputy Assistant Attorney General

BETH S. BRINKMANN
 Deputy Assistant Attorney General

EUGENE M. THIROLF
 Director, Office of Consumer Litigation

WILLIAM F. CAMPBELL
MICHAEL D. EKMAN
 Assistant U.S. Attorney
 510 W. Broadway, 10th Floor
 Louisville, KY 40202


 Telephone:  (502) 625-7102
 Fax:  (502) 625-7110

MARK B. STERN
ALISA B. KLEIN
MARK R. FREEMAN
SARANG V. DAMLE
SAMANTHA L. CHAIFETZ
NICHOLAS J. BAGLEY
DANIEL TENNY
BENJAMIN S. KINGSLEY
 /s/ Alisa B. Klein
Appellate Staff, Civil Division
Department of Justice
950 Pennsylvania Ave., N.W., Room 7235
Washington, D.C. 20530
Telephone: (202) 514-1597
Fax:  (202) 514-8151

ANDREW E. CLARK
DANIEL K. CRANE-HIRSCH
JESSICA R. GUNDER
JAMES T.  NELSON
JOEL D. SCHWARTZ
Office of Consumer Litigation
Department of Justice, Civil Division
P.O. Box 386
Washington, D.C.  20044
Telephone: (202) 307-0067
Fax: (202) 514-8742

ATTORNEYS FOR THE DEFENDANTS

OF COUNSEL:

DAVID S. CADE
 Acting General Counsel

MICHAEL M. LANDA
 Acting Associate General Counsel
 Food and Drug Division

ERIC M. BLUMBERG
 Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
 Associate Chief Counsel, Litigation
 Department of Health & Human Services
 Office of the General Counsel
 5600 Fishers Lane
 Rockville, MD  20857

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2009, the foregoing document was served electronically upon the Court and upon the following:

Charles E. English, Sr. – charles@elpolaw.com, mmcgrath@elpolaw.com

Charles E. English, Jr. – buzz@elpolaw.com, melissa@elpolaw.com

D. Gaines Penn – gaines@elpolaw.com, JBM@elpolaw.com

Jennifer A. Moore – JMoore@gminjurylaw.com

E. Kenly Ames – kames@elpolaw.com, jmckinney@elpolaw.com

Donald B. Ayer – dbayer@jonesday.com

Geoffrey K. Beach – gkbeach@jonesday.com

Leon F. DeJulius, Jr. – lfdejulius@jonesday.com

Noel J. Francisco – njfrancisco@jonesday.com

Floyd Abrams – fabrams@cahill.com

Joel Kurtzberg – jkurtzberg@cahill.com

Philip J. Perry – philip.perry@lw.com

LeAnne Moore – leanne@crunet.com

Allison M. Zieve – azieve@citizen.org

Joe Bill Campbell – campbelljoebill@bellsouth.net, heather_jbc@bellsouth.net


/s/ Alisa B. Klein
ALISA B. KLEIN
Attorney for the Defendants