**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

_____

COMMONWEALTH BRANDS, INC.;               *
CONWOOD COMPANY, LLC; DISCOUNT           *
TOBACCO CITY & LOTTERY, INC.;            *
LORILLARD TOBACCO COMPANY;               *
NATIONAL TOBACCO COMPANY, L.P.; and      *
R. J. REYNOLDS TOBACCO COMPANY,          *
                                         *
                Plaintiffs,              *        CIVIL ACTION
                                         *        NO. 1:09-cv-0117-M
        v.                               *        (Electronically Filed)
                                         *
UNITED STATES OF AMERICA; UNITED         *
STATES FOOD AND DRUG                     *
ADMINISTRATION; MARGARET                 *
HAMBURG, Commissioner of the United States *
Food and Drug Administration; and KATHLEEN *
SEBELIUS, Secretary of the United States *
Department of Health and Human Services, *
                                         *
                Defendants.              *
_____  *


**MEMORANDUM IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT OF PLAINTIFFS COMMONWEALTH BRANDS, INC.,**
**CONWOOD COMPANY, LLC, DISCOUNT TOBACCO CITY & LOTTERY, INC.,**
**LORILLARD TOBACCO COMPANY, NATIONAL TOBACCO COMPANY, L.P., AND**
**R.J. REYNOLDS TOBACCO COMPANY**

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

TABLE OF ABBREVIATIONS................................................................................. viii

FACTUAL BACKGROUND ........................................................................................3

    A.    The Act's Ban On Color Or Graphics And Mandated "Warnings" ...........................3

        1.    The Ban On Color Or Graphics In Advertising ...............................4

            a.    The Ban Covers Virtually All Forms Of Advertising ........................4

            b.    The Ban Eviscerates Plaintiffs' Ability To Communicate With Adult Consumers.................................................................................6

        2.    The Mandated "Warnings" On Packaging And Advertising .........................9

    B.    The Act's Myriad Other Restrictions On Plaintiffs' Speech....................................11

ARGUMENT ...............................................................................................................13

I.    THE ACT'S MYRIAD COMMERCIAL SPEECH PROHIBITIONS VIOLATE THE FIRST AMENDMENT ...................................................................................14

    A.    The Act's Commercial Speech Prohibitions Are Not Narrowly Tailored To Reduce Youth Tobacco Use ...................................................................................15

        1.    Congress Ignored Many Obvious Non-Speech-Restrictive Alternatives ....................................................................................................16

            a.    Preventing Unlawful Retail Sales To Youth ...................................19

            b.    Requiring States To Devote To Tobacco Control Programs The CDC-Recommended Levels Of Funds From Tobacco Revenues ........................................................................................21

            c.    Comprehensive Tobacco Intervention Programs Advocated By Public Health Organizations..........................................................23

        2.    Congress Failed To Carefully Calculate The Costs And Benefits Associated With The Burden On Speech Imposed .....................................26

            a.    The Ban On Color Or Graphics In Advertising ...............................27

            b.    The Ban On Outdoor Advertising ....................................................31

             c.    The Bans On Brand Name Sponsorships And Merchandise, Sampling And Continuity Programs, And Co-Marketing.................32

            d.    The Ban On Referring To The Efficacy Of FDA Regulation ..........34

            e.    The Cumulative Impact Of The Act's Bans .....................................35

    B.    The Act's Commercial Speech Prohibitions Do Not Directly And Materially Advance The Government's Interest In Reducing Youth Tobacco Use ..................37

# TABLE OF CONTENTS
### (continued)

**Page**

C.    The Act's Commercial Speech Prohibitions Cannot Be Defended As A Means Of Preventing Consumer Confusion.................................................................42

II.    THE ACT'S MANDATED "WARNINGS" ARE UNCONSTITUTIONAL ......................44

A.    The Mandated "Warnings" Unjustifiably And Unduly Burden Plaintiffs' Commercial Speech...............................................................................................44

B.    The "Warnings" Unconstitutionally Compel Plaintiffs To Disseminate The Government's Anti-Tobacco Message .....................................................................49

C.    The Mandated "Warnings" Violate The Takings Clause .........................................51

III.    THE MRTP REQUIREMENT IS UNCONSTITUTIONAL...............................................52

IV.    THE ACT'S AUTHORIZATION OF FURTHER RESTRICTIONS IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER ...........................55

CONCLUSION .............................................................................................................................55

# <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ...................................................................*passim*

*Armstrong v. Manzo,*
    380 U.S. 545 (1965) ........................................................................ 32

*Bates v. State Bar of Ariz.,*
    433 U.S. 350 (1977) .......................................................................... 9

*Bd. of Trs. of SUNY v. Fox,*
    492 U.S. 469 (1989) .................................................................. 35, 54

*BellSouth Telecommunications, Inc. v. Farris,*
    542 F.3d 499 (6th Cir. 2008) ........................................................*passim*

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ........................................................................... 51

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,*
    447 U. S. 557 (1980) .....................................................................*passim*

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) .................................................................... 2, 16

*City of Littleton v. Z.J. Gifts,*
    541 U.S. 774 (2004) ........................................................................ 53

*Edenfield v. Fane,*
    507 U.S. 761 (1993) .....................................................................*passim*

*Entertainment Software Ass'n v. Blagojevich,*
    469 F.3d 641 (7th Cir. 2006) ........................................................*passim*

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................................ 25

*Florida Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995) .......................................................................... 2

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990) ........................................................................ 53

*Garcia v. San Antonio Metropolitan Transit Auth.,*
    469 U.S. 528 (1985) ........................................................................ 34

*Greater New Orleans Broadcasting Ass'n v. United States,*
 527 U.S. 173 (1999) ............................................................................................ 2, 37

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,*
 240 U.S. 251 (1916) .................................................................................................. 52

*Ibanez v. Fl. Dep't of Bus. & Prof'l Reg.,*
 512 U.S. 136 (1994) ............................................................................................*passim*

*Lingle v. Chevron U.S.A. Inc.,*
 544 U.S. 528 (2005) .................................................................................................. 51

*Linmark Assocs. v. Twp. of Willingboro,*
 431 U.S. 85 (1977) .............................................................................................. 35, 36

*Loretto v. Teleprompter Manhattan CATV Corp.,*
 458 U.S. 419 (1982) .......................................................................................... 14, 51

*Lorillard Tobacco Co. v. Reilly,*
 533 U.S. 525 (2001) ............................................................................................*passim*

*Memphis Light, Gas & Water Div. v. Craft,*
 436 U.S. 1 (1978) ...................................................................................................... 32

*Nutritional Health Alliance v. Shalala,*
 144 F.3d 220 (2d Cir. 1998) ............................................................................... 52, 53

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
 475 U.S. 1 (1986) ...................................................................................................... 49

*R.A.V. v. City of St. Paul,*
 505 U.S. 377 (1992) .......................................................................................... 54, 55

*Reno v. ACLU,*
 521 U.S. 844 (1997) .............................................................................................. 1, 29

*Riley v. Nat'l Fed'n of the Blind,*
 487 U.S. 781 (1988) .......................................................................................... 49, 54

*Rubin v. Coors Brewing Co.,*
 514 U.S. 476 (1995) ............................................................................................*passim*

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,*
 535 U.S. 302 (2002) .......................................................................................... 51, 52

*Teitel Film Corp. v. Cusack,*
 390 U.S. 139 (1968) (per curiam) ............................................................................ 53

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992) ................................................................. 51

*United Food & Commercial Workers Union v. Sw. Ohio Reg'l Transit Auth.*,
163 F.3d 341 (6th Cir. 1998) .................................................... 53

*United States v. Edge Broadcasting Co.*,
509 U.S. 418 (1993) ................................................................... 2

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ............................................... 54

*United States v. Playboy Entm't Group, Inc.*,
529 U.S. 803 (2000) ................................................................. 35

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......................................................... 14, 55

*Wooley v. Maynard*,
430 U.S. 705 (1977) ................................................................. 49

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985) ......................................................... *passim*

## STATUTES

15 U.S.C. § 1335 ........................................................................ 3

15 U.S.C. § 4402 ........................................................................ 3

Pub. L. No. 102-321, § 1926 .................................................... 20

Pub. L. No. 111-31, § 2(6) ........................................................ 1

Pub. L. No. 111-31, § 2(31) ................................................. 25, 42

Pub. L. No. 111-31, § 2(32) ...................................................... 37

Pub. L. No. 111-31, § 3(2) ........................................................ 1

Pub. L. No. 111-31, § 3(7) ........................................................ 1

Pub. L. No. 111-31, § 6(c)(1) ................................................... 31

Pub. L. No. 111-31, § 101(a) (adding 21 U.S.C. § 321(rr)(4)) ...... 12

Pub. L. No. 111-31, § 101(b)(3) (adding 21 U.S.C. § 387c(a)(2)) .... 9

Pub. L. No. 111-31, § 101(b)(3) (adding 21 U.S.C. § 387g(a)(3)) ........................ 12, 34

Pub. L. No. 111-31, § 101(b)(3) (adding 21 U.S.C. § 387k(b)(2)(A)(iii)) ............................ 53, 54

Pub. L. No. 111-31, § 101(b)(3) (adding 21 U.S.C § 387k(g)(1)) ................................ 53

Pub. L. No. 111-31, § 101(b)(3) (adding 21 U.S.C. § 387m ........................................ 6

Pub. L. No. 111-31, § 101(b)(3) (adding 21 U.S.C. § 387p(a)(1)) ........................ 13, 55

Pub. L. No. 111-31, § 102(a)(1) ........................................................................ 31

Pub. L. No. 111-31, § 102(a)(2) (adopting 21 C.F.R. § 897.16(c)) ........................ 5, 11

Pub. L. No. 111-31, § 102(a)(2) (adopting 21 C.F.R. § 897.30(b)) ........................ 11, 31

Pub. L. No. 111-31, § 102(a)(2) (adopting 21 C.F.R. § 897.32(a)) ........................ 3, 4, 5

Pub. L. No. 111-31, § 102(a)(2) (adopting 21 C.F.R. § 897.34(a)) ........................ 12

Pub. L. No. 111-31, § 102(a)(2) (adopting 21 C.F.R. § 897.34(b)) ........................ 12

Pub. L. No. 111-31, § 102(a)(2) (adopting 21 C.F.R. § 897.34(c)) ........................ 11

Pub. L. No. 111-31, § 102(a)(2)(E) ........................................................................ 31

Pub. L. No. 111-31, § 102(a)(2)(F) ........................................................................ 31

Pub. L. No. 111-31, § 102(a)(2)(G) (adopting and amending 21 C.F.R. § 897.16(d)) ................ 12

Pub. L. No. 111-31, § 103(b) (adding 21 U.S.C. § 331(tt)) ............................ 12, 34, 35

Pub. L. No. 111-31, § 201(a) ........................................................................ 3, 9

Pub. L. No. 111-31, § 201(d) ........................................................................ 3, 9

Pub. L. No. 111-31, § 203 (adding 15 U.S.C. § 1334(c)) ........................ 13, 55

Pub. L. No. 111-31, § 204(a) ........................................................................ 3, 9

Pub. L. No. 111-31, § 205(a) ........................................................................ 3, 9

## OTHER AUTHORITIES

155 Cong. Rec. D404-01 (Apr. 2, 2009) ........................................................ 22

155 Cong. Rec. H4310 (Apr. 1, 2009) ........................................................ 22

155 Cong. Rec. S6075-S6076 (June 3, 2009) ........................................................ 22

155 Cong. Rec. S6099 (June 3, 2009) ............................................................ 22

155 Cong. Rec. S6347 (June 9, 2009) ............................................................ 22

H.R. 1108, 110th Cong., Serial No. 110-69 (Oct. 3, 2007) ............................ 21

H.R. 1261, 111th Cong. (Mar. 3, 2009) ......................................................... 22

H.R. Rep. No. 111-58 (Mar. 26, 2009) .................................................... 20, 39

## <u>TABLE OF ABBREVIATIONS</u>

| <u>Term</u> | <u>Description</u> |
|---|---|
| Act | Family Smoking Prevention and Tobacco Control Act, Public Law No. 111-31 (2009) |
| APA | Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* |
| CDC | Centers for Disease Control and Prevention |
| FCLAA | Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331 *et seq.* |
| FDA | United States Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* |
| GAO | United States Government Accountability Office |
| MRTP | Modified Risk Tobacco Product |
| MSA | The November 1998 Master Settlement Agreement between certain tobacco companies and certain state Attorneys General |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| Secretary | Secretary of Health and Human Services |

The Family Smoking Prevention and Tobacco Control Act, Pub. Law No. 111-31 (2009) (the "Act"), is the most comprehensive regulation of the speech of a lawful industry in American history. It blocks or impedes virtually every avenue that Plaintiffs have to communicate effectively with adult tobacco consumers, wholly without regard to whether that communication is directed to adults or youth. In doing so, Congress failed to achieve the principal purpose of the Act's myriad restrictions on Plaintiffs' "advertising and marketing," which was "to curb tobacco use by adolescents," §§ 2(6), 3(2), while "continu[ing] to permit the sale of tobacco products to adults," *id.* § 3(7). More importantly, Congress failed to heed the Supreme Court's repeated admonitions that, "so long as the sale and use of tobacco is lawful for adults, the tobacco industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information," *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 571 (2001), and that "regardless of the strength of the Government's interest in protecting children, the level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox," *Reno v. ACLU*, 521 U.S. 844, 875 (1997) (internal quotation marks omitted). In short, "'the governmental interest in protecting children from harmful materials … does not justify an unnecessarily broad suppression of speech addressed to adults.'" *Lorillard*, 533 U.S. at 564.

Here, the Act's numerous commercial speech restrictions fail First Amendment scrutiny because the Government cannot overcome the following facts:

1. Virtually all tobacco products in this country are consumed by adults (98+%);

2. The Act significantly impairs Plaintiffs' ability to communicate truthfully and non-misleadingly with those adult consumers;

3. There is no evidence that any of the Act's specific speech restrictions will significantly reduce youth tobacco use; and

4. There are literally dozens of widely accepted non-speech-restrictive alternatives that would reduce youth tobacco use.

Indeed, for similar reasons, the Supreme Court has struck down eight of the last ten restrictions on

commercial speech that it has considered.[1]

The Court's cases make clear that restrictions on speech, including commercial speech, must be narrowly tailored and based on *genuine* evidence, not speculation or conjecture. But here, the evidence shows that, instead of carefully considering what types of laws are currently necessary, Congress lifted most of the challenged provisions virtually verbatim from speech restrictions that the FDA first proposed over a decade ago in 1995, when youth tobacco use was much higher and *increasing*. But in the intervening fourteen years, the industry, the public health community, the states, and the federal government have employed a variety of non-speech-restrictive strategies to reduce youth tobacco use, and those strategies have proven effective. Youth tobacco use is now at an all-time low and *decreasing*. In fact, as discussed below, according to the Institute of Medicine, if no new regulations were adopted at all, by 2025, tobacco use would *still* drop by another 25%. Yet the Act accounts for none of this, adopting 14-year-old speech restrictions that were addressed to an issue that has since changed dramatically, without considering how these restrictions compare to the *proven* non-speech-restrictive strategies that have been used in the interim and that, there is every reason to believe, would achieve still greater success if continued and expanded.

For these reasons and others explained below, Plaintiffs move for summary judgment on Counts 1-12 and 14 of the Amended Complaint.[2]

---

[1] *Compare Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360 (2002), *Lorillard*, 533 U.S. at 566, *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173, 176 (1999), *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996), *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 478 (1995), *Ibanez v. Fl. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 138-39 (1994), *Edenfield v. Fane*, 507 U.S. 761, 777 (1993), *and City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 412 (1993), *with Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 620 (1995), *and United States v. Edge Broadcasting Co.*, 509 U.S. 418, 425 (1993).

[2] Given the expedited briefing schedule entered by this Court, Plaintiffs do not anticipate the need for preliminary injunctive relief beyond the interim relief previously requested. However, should this Court conclude that Count 1, Count 2 insofar as it applies to smokeless tobacco products, or Count 4 cannot be resolved on summary judgment, or otherwise cannot be resolved on an expedited basis, Plaintiffs hereby move for entry of a preliminary injunction on those counts. *See* Dunham Decl. ¶¶ 60-63; Hinton Decl. ¶ 17; Jennette Decl. ¶¶ 63-67; Jones Decl. ¶¶ 43-46; Lindsley Aff. ¶¶ 88-92; Terry Decl. ¶¶ 50-51.

**FACTUAL BACKGROUND**

Adults consume more than 98% of all tobacco products sold in this country.  Reynolds Decl. ¶ 5.  Youth tobacco use, in contrast, has been steadily decreasing and now stands at an all-time low.  *Id*. ¶¶ 20, 23.  Even before the Act, a web of federal, state, and local laws, as well as the Master Settlement Agreement ("MSA") between certain tobacco companies and state attorneys general, severely restricted tobacco marketing, banning, for example, advertisements on television or radio, on billboards, and in numerous other fora.  *See, e.g.*, 15 U.S.C. §§ 1335, 4402; Lindsley Aff. Ex. A (MSA § III).  The MSA, moreover, expressly prohibits marketing that "target[s]" youth.  Lindsley Aff. Ex. A (MSA § III(a)).  Thus, prior to the Act, the only meaningful avenues Plaintiffs had for communicating with adult tobacco consumers was through direct mail, magazine advertisements, signage at the point of sale, packaging, and, to a lesser extent, at adult-only establishments and events.  Now, however, the Act effectively forecloses these few remaining avenues of speech, going well beyond even those speech restrictions to which some—but not all—Plaintiffs voluntarily agreed in the MSA, without any regard for Plaintiffs' right to communicate with *adult* consumers.  Never before has any industry in America been subject to such a comprehensive restriction on truthful speech—commercial or otherwise—about its lawful products.

A.    **The Act's Ban On Color Or Graphics And Mandated "Warnings"**

Subject to limited exceptions, the Act requires that "each manufacturer, distributor, and retailer advertising or causing to be advertised, disseminating or causing to be disseminated, any labeling or advertising for cigarettes or smokeless tobacco shall use only black text on a white background."  § 102(a)(2) (adopting 21 C.F.R. § 897.32(a)).  In the only remaining venue where Plaintiffs can realistically use color or graphics—product packaging—the Act's new "warnings" overwhelm Plaintiffs' commercial message.  §§ 201(a), (d), 204(a), 205(a).

1.      **The Ban On Color Or Graphics In Advertising**

a.      **The Ban Covers Virtually All Forms Of Advertising**

This black-and-white-text requirement undermines the principal means Plaintiffs use to reach large numbers of adult customers, even where, as here, they take great care to ensure that their advertising is directed at adults.  It thus prohibits the use of any color or imagery in:

- <u>Direct-Mail Advertising</u>, even where, as here, Plaintiffs' direct-mail advertising is "directed to individual consumers who have certified … that [they are] (i) … existing tobacco consumer[s], (ii) of legal age, and (iii) interested in receiving communications," and Plaintiffs "verify that the individual[s] [are] in fact of legal age with either proprietary third-party databases … and/or by reviewing a valid government-issued identification card," Dunham Decl. ¶ 11; *see also* Lindsley Aff. ¶¶ 25-30; Jones Decl. ¶ 13; Jennette Decl. ¶ 11.

- <u>Magazine Advertisements</u>, even where, as here, Plaintiffs limit such advertising to publications "primarily directed to persons 21 years of age and older," Dunham Decl. ¶ 12; *see also* Jones Decl. ¶ 14-15; Jennette Decl. ¶ 12.  As explained below, the black-and-white-text-only requirement applies unless reliable survey evidence exists demonstrating that a publication has less than 15% under-18 readership *and* fewer than 2 million such readers—there is, however, *no* under-18 survey evidence for 99% of magazines.  Williard Decl. ¶ 3.

- <u>Point-of-Sale Advertisements at Retail Establishments</u>, even though store clerks may sell tobacco products only to a person with valid identification establishing legal age.

To be sure, there are two limited "exceptions" to the Act's broad prohibition on the use of any color or imagery in advertising.  But these purported exceptions illustrate the Act's overbreadth.  *First*, the primary exemption applies to magazine advertising only if the publication has an under-18 readership of less than 85% and 2 million overall, as demonstrated by "competent and reliable survey evidence."  § 102(a)(2) (adopting 21 C.F.R. § 897.32(a)(2)).

These thresholds, however, exclude some of the most widely distributed magazines aimed at adults—like *People Magazine*, which has under-18 readership of just 7.73% but more than 2 million readers under 18.  Williard Decl. ¶ 27; Dunham Decl. ¶¶ 23-24; Lindsley Aff. ¶ 22.  Moreover, there is currently *no under-18 survey evidence for 99%* of all magazines published in America.  The two companies that conduct such surveys—MediaMark Research, Inc. ("MRI") and

Experian Simmons—only conducted under-18 surveys for 95 of the 7,383 consumer magazines published in 2008. Williard Decl. ¶¶ 16-23. Notably, these two surveys *exclude* regional publications, as well as "magazines with indisputably adult editorial content, such as *Army Times, Cigar Aficionado, Playboy, Parenting, Fortune, Food & Wine,* or *Architectural Digest*." *Id.* ¶¶ 19-20. Thus, for example: Conwood will be barred from continuing to use color-and-imagery advertisements in "*The Arkansas Trooper*, the official publication of the Arkansas State Police Association," Jennette Decl. ¶ 24; and Lorillard will be barred from continuing to use such advertisements in *Playboy* and in limited "'select distribution' magazines" that are "only delivered to subscribers who are 21 or older," Lindsley Aff. ¶¶ 17, 45.

Nor can Plaintiffs realistically commission their own readership surveys of these publications. "To fund a private readership survey for a single large national magazine … could cost approximately $50,000-$100,000." Dunham Decl. ¶ 23. Indeed, the typical cost of such a survey could exceed the cost of the advertisement itself by multiple orders of magnitude, Williard Decl. ¶ 22; Dunham Decl. ¶ 23, making individualized surveys for specific publications "commercially unreasonable," Jennette Decl. ¶ 24. Consequently, "[t]he Act … effectively prohibits color or graphic advertising in 99% of all publications." Williard Decl. ¶ 23.

*Second*, the Act's exemption for certain adult-only facilities is equally illusory. It allows color or imagery in retail establishments only if (1) the retailer "ensures" that no person under 18 "is present, or permitted to enter, at any time," (2) the advertisement is "affixed to a wall or fixture in the facility," and (3) the advertisement is not "visible from outside the facility." § 102(a)(2) (adopting 21 C.F.R. §§ 897.16(c)(2)(ii), 897.32(a)(1)). Yet "virtually all retailers of … tobacco products permit underage persons to enter their stores (e.g., convenience and grocery stores) and thus would not qualify for the exemption. In fact, the only locations that readily come to mind … are some bars and nightclubs, and such locations account for … less than 1%" of cigarette sales.

Dunham Decl. ¶ 23.  In addition, "the exemption excludes the most common indoor point-of-sale tobacco advertising, counter-top or table-top displays," because such advertising is not "intended to have the kind of permanence necessary to be 'affixed to a wall or fixture in the facility.'"  Jennette Decl. ¶ 23.  Indeed, the retailers most likely to seek to take advantage of this exception—specialty tobacco retailers like Plaintiff Discount Tobacco—are categorically barred from doing so even if they *absolutely* bar entry by minors, because the Act separately mandates "that retail establishments for which the predominant business is the sale of tobacco products comply with any advertising restrictions applicable to retail establishments accessible to individuals under the age of 18." § 101(b)(3) (adding 21 U.S.C. § 387m).

In short, the Act bans color or imagery *in 100% of direct mail to age-verified adult consumers, 99% of magazines, and 99% of retail point-of-sale locations*.  Dunham Decl. ¶¶ 11, 23; Williard ¶ 24.  Thus, the so-called "exceptions" to this broad prohibition are "so narrow in scope and effect as to be virtually meaningless."  Dunham Decl. ¶ 23.

> **b.** **The Ban Eviscerates Plaintiffs' Ability To Communicate With Adult Consumers**

The primary purpose of advertising, particularly in a well-established market such as that for tobacco products, is to convince existing consumers to use a particular brand.  As Plaintiffs' expert, Dr. Ronald J. Faber, explains, "almost all brand advertising is either to help develop an understanding of how that brand is different from competition in the minds of consumers, or to remind consumers of both this point of differentiation and the existence of the brand.  This is done in the hopes of promoting and reinforcing brand loyalty or to encourage consumers who may alternate between different brands, to select the given manufacturer's brand over other brands the next time they purchase the product."  Faber Decl. ¶ 30.

Color and graphics are integral components of effective brand marketing.  *First*, "[a]dvertising and promotions operate within a very cluttered informational environment."  *Id.* ¶ 15.

The use of "color, visual images, novelty and distinctiveness" is how advertisers break through this clutter and "try to get their ads noticed." *Id.* ¶¶ 12-17. For example, "[t]he potential importance" of color and imagery "can be seen in how quickly people can recognize the brand in the figure below:"



Faber Decl. ¶ 34. As this simple illustration shows, color and imagery make this brand "instantly recognizable" even though only a tiny portion of the product is visible. *Id.* ¶ 35. In contrast, if virtually all "advertising is restricted to black text on a white background, the simple fact is that it will be difficult to distinguish [one manufacturer's] brands from those of [its] competitors. All tobacco ads will virtually look the same … [and a particular manufacturer's] messages will be rendered bland, uninteresting and unattractive. Consequently, it will be much more difficult to communicate because ads will be less likely to be noticed and therefore less effective in communicating ideas." Dunham Decl. ¶ 22.

For example, Commonwealth Brands, a relatively small cigarette manufacturer, must compete against much larger competitors, including Philip Morris, Reynolds, and Lorillard. Jones Decl. ¶ 10, 20. The use of color and imagery in point-of-sale advertising at retail establishments "is the main tool [Commonwealth] ha[s] … to make [its] products visible to adult tobacco consumers in stores where the products of [its] larger competitors typically occupy most of the prime shelf space." *Id.* ¶ 20. The black-and-white-text requirement "would make it virtually impossible to differentiate [Commonwealth's] products from [its] competitors' products," and thus "to compete with larger manufacturers." *Id.* ¶¶ 19, 23. This is particularly so for point-of-sale advertising

accompanying merchandise display cases, which are several feet behind a sales counter in most retail establishments. *See infra* at 11.

*Second*, an important function of advertising is to "reinforce" a consumer's "decision to buy a particular brand they already like or to select one of the brands they like over the others." Faber Decl. ¶ 31. "One of the best ways to remind consumers about their prior experience with a brand and that they should repurchase it is by simply showing the package." *Id.* ¶ 34. Indeed, having distinctive colors and imagery "that appear[] on every point of contact with consumers is critical to helping them link all of the separate[] bits of information in memory." *Id.* ¶ 37. Depicting the package in advertising is particularly important given the crowded nature of many retail displays, *see, e.g.*, Hinton Decl. ¶ 9 (photograph of retail display), since it informs the consumer what the product "looks like at retail," Dunham Decl. ¶ 20. For example, Reynolds' *Camel* packaging has its distinctive *Camel* "beast," *id.* ¶ 28, Conwood's packaging displays its trademarked "Grizzly" bear, Jennette Decl. ¶ 21, and the packaging of Lorillard's Newport brand of menthol cigarettes uses its distinctive green box with a white top, Lindsley Aff. ¶ 5. Under the Act, however, Plaintiffs cannot even show their packaging in advertisements, because such packaging itself constitutes an image *and* includes *other* color and imagery.

*Finally*, "colors and visuals are an integral part of the communication of ideas like quality, heritage, and taste" that are used to differentiate brands and introduce new products. Dunham Decl. ¶ 19. For example, "Newport has developed an association between its menthol cigarettes and the color green." Lindsley Aff. ¶ 6. Thus, because "Newport's green box is instantly recognizable as a pack of menthol cigarettes[] and the green background of [its] marketing materials helps to convey this association," "the specific color of Newport's packaging and marketing materials conveys … information relating to the physical attributes of [its] product." *Id.* Likewise, Reynolds' new *Camel Crush* menthol product "permit[s] the consumer to change the product taste by pinching a flavor

pellet embedded in the filter." Dunham Decl. ¶ 19. Reynolds' advertisements for that new brand vividly illustrate the point that "[g]raphics are … important for simplifying communication … [and] increasing [consumers'] comprehension" of that novel product function. *See id.* (picture).

In short, the ban on color or imagery in advertising ensures that Plaintiffs' advertisements will be grim, dull, visually uninteresting, and virtually indistinguishable from one another. As the Supreme Court has said in an analogous context, "an advertising diet limited to such spartan fare would provide scant nourishment." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 367 (1977). By leaving Plaintiffs unable to break through the visual clutter, catch consumers' attention, or distinguish one brand from another, the Act severely undermines their ability to communicate an effective marketing message to adult tobacco consumers.

### 2.     The Mandated "Warnings" On Packaging And Advertising

In light of the black-and-white-text requirement, the only remaining place the Act realistically permits Plaintiffs to use color or graphics to communicate with adult consumers is on their product packaging. But the Act also eviscerates the effectiveness of tobacco packaging as a communication tool with consumers by drastically increasing the size and substance of the Congressionally-mandated warnings.

For cigarette packages, the new "warnings" must occupy the *top 50%* of the front and rear panels of packaging and include "color graphics depicting the negative health consequences of smoking to accompany the label statements." § 201(a), (d). For smokeless packages, the new "warnings" must similarly occupy 30% of each of the two principal display panels and the Secretary may require the same types of color graphics required for cigarettes. §§ 204(a), 205(a). The new "warnings" must also occupy 20% of *all* tobacco product advertising. §§ 201(a), 204(a).[3]

---

[3] The Act further displaces and burdens Plaintiffs' speech on its packaging by requiring that package labels also contain: (1) the name and address of the manufacturer, packer, or distributor; (2) a net quantity statement; and (3) the percentage of tobacco that is foreign versus domestic. § 101(b)(3) (adding 21 U.S.C. § 387c(a)(2)).

Because "the risks of tobacco have been disseminated to and absorbed by an overwhelmingly high percentage of the population," Viscusi Decl. ¶¶ 28-29, there is no need for the bigger and more graphic warnings prescribed by the Act. With the percentage of people aware of the health risks of tobacco use reaching as high as 99% in some surveys, "fewer people are aware that George Washington was the first U.S. President, [or] that the Earth revolves around the Sun." *Id.* ¶¶ 20, 28-29. In fact, as Plaintiffs' expert, Dr. Kip Viscusi, explains, Americans substantially *overestimate* the health risks of tobacco use—for example, by as much as 400% in the case of lung cancer. *Id.* ¶¶ 36-44. Thus, as Dr. Viscusi systematically demonstrates, the public—both youth and adult—is well aware of each and every one of the various topics addressed in the Act's "warnings." *Id.* ¶¶ 59-68. Given the public's complete saturation with information about the risks of tobacco use, the only conceivable effect of commandeering Plaintiffs' packaging and advertising for these "warnings" is not an improved public awareness, but instead, the conveyance of a prominent Government-drafted anti-tobacco message that overwhelms Plaintiffs' commercial messages.

And that, in fact, will be the effect of these new and vastly expanded "warnings." They will ensure that the *only* message consumers are likely to receive from Plaintiffs' packaging and advertising is the Government-drafted anti-tobacco message. *First*, as explained above, Plaintiffs' advertisements must be limited to black-and-white-only-text. In contrast, the mandated warnings will cover 20% of all advertisements and, "in the case of cigarette advertisements," must include "shocking color graphics." Lindsley Aff. ¶ 70. This one-two punch ensures that all of Plaintiffs' advertisements "will be dominated by the mandated warnings." *Id.*

*Second*, on packaging, the only place where color or imagery may be used, the "warnings" confiscate the *top 50%* of cigarette packaging (including shocking color graphics) and *30%* of smokeless packaging. *See, e.g.*, Viscusi Decl. ¶¶ 73-75 (depicting similar warnings required in foreign countries). This is particularly onerous given that the Act imposes a nationwide ban on all

self-service displays.  § 102(a)(2) (adopting 21 C.F.R. § 897.16(c)).  As a result of this and similar restrictions adopted by the states, "[m]erchandising fixtures are typically several feet behind a sales counter."  Dunham Decl. ¶ 29.  Consequently, the Act's "relegation of [Plaintiffs'] trademarks and other information to the *bottom half*" of the pack renders Plaintiffs' trademarks, imagery, and other information "illegible, and hence, invisible."  *Id.* (emphasis added); *see also* Jones Decl. ¶ 31.

*Finally*, "[g]iven the dramatically reduced amount of physical space available" on packaging due to the Government's oversized message, "the amount of information [Plaintiffs] are able to include on the[ir] packaging is adversely affected."  Dunham Decl. ¶ 28.  For example, the back of a pack of *Camel* filter cigarettes currently states that "[a] master-crafted blend of only the finest hand-picked Samsun & Izmir Turkish tobaccos with a robust domestic tobacco blend creates Camel's distinctive flavor and world-class smoothness."  *Id.*  Likewise, "the back of the package for [National Tobacco's] Stoker's 24C chewing tobacco … tell[s] the story of the Stoker family tradition of producing quality chewing tobacco and providing good value … since 1940."  Terry Decl. ¶ 29.  It obviously will be impossible for Plaintiffs to convey these messages if 30-50% of every package must be "taken up by a government-mandated message."  *Id.*

B.    **The Act's Myriad Other Restrictions On Plaintiffs' Speech**

Having thus closed off the primary avenues of commercial speech, the Act systematically shuts down the other means Plaintiffs have to communicate effectively with adult customers:

- <u>Outdoor Advertising.</u>  The Act bans all "outdoor advertising for cigarettes or smokeless tobacco, including billboards, posters, or placards, … within 1,000 feet of the perimeter of any public playground or playground area in a public park …, elementary school, or secondary school."  § 102(a)(2) (adopting 21 C.F.R. § 897.30(b)).  This ban is particularly onerous on retailers who have "stores that are located on highways on the outskirts of towns …. [W]here traffic passes by quickly, signage on the outside of [their] stores is critical to informing adult consumers about [their] products."  Hinton Decl. ¶ 11.

- <u>Brand Name Sponsorships.</u>  The Act prohibits Plaintiffs from marketing their products by sponsoring *any* "athletic, musical, artistic, or other social or cultural event."  § 102(a)(2) (adopting 21 C.F.R. § 897.34(c)).  It thus prohibits Lorillard's Newport Pleasure Draw blackjack tournament, which is "restricted to adult smokers" and held in an "adult-only

facility" into which "minors are not allowed to enter." Lindsley Aff. ¶¶ 60-63.

- Brand Name Merchandise. The Act prohibits Plaintiffs from marketing their products by placing their brand-name on any promotional items—including items given solely to adult consumers in adult-only venues or to Plaintiffs' adult employees. § 102(a)(2) (adopting 21 C.F.R. § 897.34(a)). Thus, Conwood will be barred from using the Grizzly name or logo on "poker chips" even though such merchandise is given *solely* to adult tobacco consumers "in connection with a legal purchase." Jennette Decl. ¶ 51; *see also* Dunham Decl. ¶ 37.

- Sampling. The Act prohibits marketing cigarettes through the distribution of free samples. It also effectively bars such marketing for smokeless products, allowing sampling *only* in an "adult-only facility" defined so narrowly as, among other things, to *exclude* facilities that sell alcohol. § 102(a)(2)(G) (adopting and amending 21 C.F.R. § 897.16(d)); *see also* Dunham Decl. ¶¶ 46-50; Jennette Decl. ¶ 46. This eliminates "one of the most effective means of communicating" a product's qualities to a consumer of a competitor's product, because consumers are unlikely to spend money on a new brand that "may or may not be better than the product with which the consumer is already satisfied." Dunham Decl. ¶ 48; *see also* Jennette Decl. ¶ 35; Jones Decl. ¶ 39; Terry Decl. ¶ 33; Lindsley Aff. ¶ 87.

- Continuity Programs. The Act prohibits Plaintiffs from marketing using continuity programs, pursuant to which they distribute, to existing age-verified adult consumers of their products, non-branded, non-tobacco merchandise in exchange for purchases of their tobacco products. § 102(a)(2) (adopting 21 C.F.R. § 897.34(b)). Like frequent flyer programs, such "[c]ontinuity programs are designed to maintain the loyalty of existing customers, not to attract new ones, … [by] offer[ing] … [an] added benefit for existing customers that may help prevent brand-switching." Lindsley Aff. ¶ 54; Dunham Decl. ¶ 53.

- Co-Marketing. The Act prohibits Plaintiffs from "market[ing]" "[a] tobacco product" "in combination with any other article or product" that the FDA regulates—including in direct mail to age-verified adult consumers. § 101(a) (adding 21 U.S.C. § 321(rr)(4)). At a minimum, this bars direct mail communications that "have made receipt of the retailer's discount contingent upon the purchase of a [particular manufacturer's] tobacco brand." Dunham Decl. ¶ 53.[4]

- References to Efficacy of FDA Regulation. The Act bars Plaintiffs from making any "express or implied" statement "directed to consumers" in "media or advertising" that a tobacco product is rendered "safe or less harmful by virtue of … its regulation or inspection by the [FDA] … or … its compliance with regulatory requirements set by the [FDA]." § 103(b) (adding 21 U.S.C. § 331(tt)(4)). Thus, the Act prohibits any public comment on the FDA's "tobacco product standards," the express purpose of which is to make tobacco products less "harmful," § 101(b)(3) (adding 21 U.S.C. § 387g(a)(3)), because such comment could be construed as an "implied" statement that the FDA's regulation has achieved its expressly stated purpose.

---

[4] The FDA's proposed draft guidance, *see* PI Opp. Br. at 36-40, is not final and so not legally binding and, in any event, prohibits making the discount on a food item contingent on purchase of a tobacco product.

- **MRTP.** "[T]he MRTP provision operates as a prior restraint by holding [Plaintiffs'] speech captive and effectively 'compel[ling] [Plaintiffs'] silence' until the FDA completes its review" of an MRTP application.  PI Order at 19.  On its face and by its very design, this prohibits truthful *and non-misleading* speech.  *See infra* at 53-54.  It even covers speech made pursuant to the policy debate about tobacco harm reduction, as confirmed by Reynolds' Director of Communications, who, as a result of the capacious scope of the MRTP requirement and the expansive interpretation advanced by the Government, *see* PI Order at 11-12, was forced to refuse participation in a *60 Minutes* program on smokeless tobacco products and the debate on tobacco harm reduction.  Howard Decl. ¶ 2.

- **Further Restrictions.** The Act completes its evisceration of Plaintiffs' free speech rights by authorizing federal agencies, state and local governments, and/or Indian tribes to enact even "more stringent" regulations, § 101(b)(3) (adding 21 U.S.C. § 387p(a)(1)), and additional "specific bans or restrictions on the time, place, and manner" of cigarette advertising and promotion, § 203 (adding 15 U.S.C. § 1334(c)).

## ARGUMENT

The summary judgment record before this Court amply demonstrates that the Act's challenged provisions are unconstitutional.

*First*, under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), the Government bears the burden of proving that the Act's myriad commercial speech bans are narrowly tailored to directly and materially advance a substantial government interest. Here, notwithstanding the unprecedented breadth of the Act's bans on the marketing of a lawful product, the Government has provided no evidence why its asserted interest in reducing youth tobacco use could not be met through the numerous non-speech-restrictive alternatives that have proven effective and been championed by the public health community, including the Government's own agencies and *amici*.  Nor has the Government adduced any evidence that the Act's speech bans will significantly reduce youth tobacco use.  Thus, although Plaintiffs expressly preserve their contention that *Central Hudson* should be overruled and strict scrutiny applied to commercial speech restrictions, *see Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001), this Court need not address that issue, because the Government has not met its burden even under *Central Hudson*.

*Second*, the new "warnings" imposed by the Act likewise violate Plaintiffs' First and Fifth

Amendment rights.  These "warnings" take up *fifty percent* of all cigarette packaging, *thirty percent* of all smokeless tobacco packaging, *20 percent* of all advertisements, and, for cigarettes, must include shocking color graphics—all purportedly to communicate a health message that, due to the decades-old Surgeon General's Warning and other sources of public information, is extremely well-known.  As a result, the *only* message that the public is likely to receive from Plaintiffs' packaging and advertising is *the Government's anti-tobacco message*.  The Government has failed to introduce any evidence refuting the conclusion that these "warnings" unjustifiably and unduly burden Plaintiffs' commercial speech, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), as well as unconstitutionally compel Plaintiffs to disseminate the Government's anti-tobacco message, *Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). And in physically commandeering Plaintiffs' property to disseminate that message, they violate the Takings Clause *per se*.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).

*Third*, the MRTP requirement is also unconstitutional.  This Court has already held that it is an unconstitutional prior restraint.  PI Order at 23.  That is but one of the numerous reasons why it runs afoul of core constitutional principles.

*Finally*, the Act's unconstrained authorization of further restrictions on Plaintiffs' speech by other federal, state, and tribal government entities constitutes an unconstitutional delegation of legislative power.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001).

Accordingly, as detailed below, Plaintiffs are entitled to summary judgment on Counts 1-12 and 14 of the Amended Complaint.

## I.    THE ACT'S MYRIAD COMMERCIAL SPEECH PROHIBITIONS VIOLATE THE FIRST AMENDMENT

The Act enacts the most sweeping prohibitions on commercial speech concerning a lawful product in American history.  In addition to the massive new mandated "warnings" on all packaging and advertising, the Act bans virtually all color or graphics in advertising, all outdoor advertising

within 1,000 feet of a school or public playground area, all brand-name sponsorships or merchandise, virtually all tobacco sampling and continuity programs, co-marketing of tobacco products in combination with other FDA-regulated products, speech referencing the efficacy of FDA regulation, and, to top it off, authorizes other federal agencies, state and local governments, and Indian tribes to promulgate even *stricter* speech bans. These new bans go well beyond even those that were struck down in *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 534-36, 571 (2001).

These prohibitions cannot be reconciled with Plaintiffs' rights secured by the First Amendment. The Supreme Court's commercial speech jurisprudence is "grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 646 (1985). At a minimum, therefore, the Act's commercial speech prohibitions on the types of truthful and non-misleading speech outlined above must satisfy the "three-part test" articulated in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980). PI Order at 13; *see also Lorillard*, 533 U.S. at 554. Under that test, the Government, as "[t]he party seeking to uphold a restriction on commercial speech[,] carries the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). Thus, it must prove that: (1) "the asserted governmental interest is substantial"; (2) "the challenged provision[s] 'directly and materially advanc[e] the asserted governmental interest'"; and (3) the provisions are not "'more extensive than necessary' or, put differently, [that] there is 'a reasonable fit between the means and ends of the regulatory scheme.'" PI Order at 13-16. Here, the Government has not remotely carried its burden.

### A. The Act's Commercial Speech Prohibitions Are Not Narrowly Tailored To Reduce Youth Tobacco Use

The simplest and most obvious reason why the Act's speech prohibitions are unconstitutional is their utter failure to satisfy *Central Hudson*'s narrow tailoring prong, which

requires the Government to prove "a reasonable fit between the legislature's ends and the means chosen to accomplish those ends." *Lorillard*, 533 U.S. at 556 (internal quotation marks omitted and omission in original). This analysis focuses on two related elements. *First*, it assesses the degree to which the Government ignored the availability of "numerous and obvious less-burdensome alternatives to the restriction on commercial speech." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993). *Second*, it asks whether the Government "carefully calculat[ed] the costs and benefits associated with the burden on speech imposed." *Lorillard*, 533 U.S. at 561. Here, the Government has not met its burden on either element.

### 1. Congress Ignored Many Obvious Non-Speech-Restrictive Alternatives

Although narrow tailoring does not require Congress to adopt the least restrictive means available, PI Order at 16 n.3 (citing *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007) (en banc)), this Court must consider whether "there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech," *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 509 (6th Cir. 2008) (quoting *Discovery Network*, 507 U.S. at 417 n.13). Indeed, the Supreme Court and Sixth Circuit repeatedly have *invalidated* commercial speech restrictions precisely because the government failed to prove that "less-burdensome alternatives" would *not* advance the government's interest at least as well. This aspect of narrow tailoring embodies the Supreme Court and Sixth Circuit's repeated admonition that, "[i]f the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *BellSouth*, 542 F.3d at 508 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)).

*W. States Med. Ctr.*, the Supreme Court's most recent commercial speech case, illustrates the heavy burden placed on the Government when potentially viable non-speech-restrictive alternatives are posited. There, the Court invalidated a law that allowed pharmacists to manufacture and sell compounded drugs, but prohibited them from advertising such services. 535 U.S. at 360.

The purported purpose of this speech restriction was to distinguish between small-scale drug-compounding that warranted an exemption from the FDA's "new drug" pre-approval process and large-scale manufacturing that did not. *Id.* at 368-71. The Court rejected this line, however, because its "previous cases ... ha[d] made clear" that if there are obvious alternative ways "that ... the Government could achieve its interests ... that do[] not restrict speech, or that restrict[] less speech, the Government *must*" adopt those alternatives. *Id.* at 371 (emphasis added). The Court viewed as dispositive that "[s]everal non-speech-related means of drawing a line between compounding and large-scale manufacturing might be possible here":

> For example, the Government could ban the use of commercial scale manufacturing or testing equipment for compounding drug products. It could prohibit pharmacists from compounding more drugs in anticipation of receiving prescriptions than in response to prescriptions already received. It could prohibit pharmacists from offering compounded drug products at wholesale to other state licensed persons or commercial entities for resale.... [I]t could limit the amount of compounded drugs, either by volume or by numbers of prescriptions, that a given pharmacist or pharmacy sells out of state. Another possibility ... would be capping the amount of any particular compounded drug, either by drug volume, number of prescriptions, gross revenue, or profit that a pharmacist or pharmacy may make or sell in a given period of time. It might even be sufficient to rely solely on the non-speech-related provisions of the [law at issue], such as the requirement that compounding only be conducted in response to a prescription or a history of receiving a prescription, and the limitation on the percentage of a pharmacy's total sales that out-of-state sales of compounded drugs may represent.

*Id.* (internal quotation marks and citations omitted). Given the Government's failure to "offer[] any reason why these possibilities, alone or in combination, would be insufficient to" address the issue, the speech restriction could not stand. *Id.* at 373. Indeed, the speech restriction was constitutionally indefensible precisely because it "seem[ed] to have been the first strategy the Government thought to try"—a "convenient means of achieving its interests" "as opposed to" "a necessary" one. *Id.*

The Court's approach in *W. States Med. Ctr.* was entirely consistent with its reasoning in its "previous cases" upon which it relied, *id.* at 371—namely, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), and *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995). For example, in *44 Liquormart*, the Court invalidated a ban on referencing prices in liquor advertising. 517 U.S. at

490-92, 516.  The "prohibition against price advertising" was assertedly intended to "reduc[e] alcohol consumption" by "mitigat[ing] competition and maintain[ing] prices at a higher level than would prevail in a completely free market," which would in turn "lower" "demand."  *Id.* at 504-05 (plurality opinion).  But the availability of numerous "alternative forms of regulation that would not involve any restriction on speech" demonstrated that the state had not "satisf[ied] the requirement that its restriction on speech be no more extensive than necessary."  *Id.* at 507.  The plurality opinion explained that "higher prices [could] be maintained either by direct regulation or by increased taxation," "[p]er capita purchases could be limited as is the case with prescription drugs," and "educational campaigns focused on the problems of excessive, or even moderate, drinking might prove to be more effective."  *Id.*  As Justice O'Connor similarly observed in her concurring opinion, "[t]he State has other methods at its disposal—methods that would more directly accomplish [its] stated goal without intruding on sellers' ability to provide truthful, nonmisleading information to customers," and "[t]he ready availability of such alternatives … demonstrates that the fit between ends and means is not narrowly tailored."  *Id.* at 530.  Likewise, in *Coors*, the Court invalidated a beer-labeling law that prohibited the display of alcohol content, because the "availability of" "several" "less intrusive" alternatives to prevent alcohol-strength competition "indicate[d] that [the ban] [was] more extensive than necessary" and thus lacked "sufficient 'fit'" with the Government's asserted interest.  514 U.S. at 490-91.

The Sixth Circuit has faithfully followed the Supreme Court's repeated example.  In *BellSouth*, it recently held that a state law prohibiting telecommunications providers from informing consumers about a state tax was not narrowly tailored to prevent consumer confusion, *solely* on the ground that the state failed to prove that numerous and obvious non-speech-restrictive alternatives could not have achieved its asserted interest.  542 F.3d at 508-09.  As the court explained: "Before a government may resort to suppressing speech to address a policy problem, it must show that

regulating conduct has not done the trick or that as a matter of common sense it could not do the trick. 'If the First Amendment means anything, it means that regulating speech must be a last—not first—resort.'" *Id.* at 508 (quoting *W. States Med. Ctr.*, 535 U.S. at 373). There, the state had available to it a "full arsenal of options short of restricting speech," including "enforc[ing] existing state law" that prohibited false and misleading trade practices, "rely[ing] on enforcement of federal regulations already on the books," "requir[ing] a disclaimer," and "add[ing] an award of costs and fees to litigants who successfully challeng[ed] a misleading line item." *Id.* In light of these "numerous and obvious less-burdensome alternatives to the restriction on commercial speech," the court held that the state law was "precisely the kind of blunderbuss legislation that [could] not satisfy the First Amendment's preference for resolving policy problems by regulating conduct rather than speech." *Id.* at 509.

Here, as in *W. States Med. Ctr.*, *44 Liquormart*, *Coors*, and *BellSouth*, the Government has failed to carry its burden of proving that the "numerous and obvious less-burdensome alternatives" to the Act, *BellSouth*, 542 F.3d at 509, either "alone or in combination," *W. States Med. Ctr.*, 535 U.S. at 373, would not have been just as effective as the Act's bans on speech. Indeed, as explained below, Congress was well aware of many such alternatives that, according to the public health community—including the very government agencies tasked with regulating in this area and the very *amici* devoted to the same—would dramatically advance the Act's interest in reducing tobacco use; yet Congress bypassed these alternatives and, instead, went straight to Plaintiffs' speech. This, in and of itself, requires invalidating the Act's myriad bans on commercial speech.

### a.    Preventing Unlawful Retail Sales To Youth

The most obvious method of reducing youth tobacco use is to prevent the unlawful sale of tobacco products to youth. Indeed, as Plaintiffs' expert, Dr. Cecil Reynolds, explains, this has proven in the past to be an effective means of reducing youth tobacco use. Reynolds Decl. ¶ 52.

Yet Congress had before it, and rejected without explanation, a legislative proposal that would have increased enforcement of laws prohibiting tobacco sales to minors without restricting speech.

In particular, in 1992, Congress enacted the Synar Amendment, which, as implemented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), required states to (1) enact and enforce laws prohibiting tobacco sales to youth and achieve a retail violation rate of less than 20% by 2003, or (2) risk losing 40% of certain federal block grant funding. *See* Pub. L. No. 102-321, § 1926; Reynolds Decl. ¶ 61. This law proved extraordinarily effective. Prior to the Synar Amendment, violation rates were as high as 60-90%. Reynolds Decl. ¶ 61. But by 2006, all states had met the 20% threshold. *Id.* And they did so even though SAMHSA declined to impose the statutorily authorized block-grant penalties when states were not in compliance. *Id.*

In light of this, one obvious alternative to the Act's speech prohibitions would have been to increase the compliance rate required by Synar, such that states would lose federal block grants if they failed to achieve a violation rate of less than, say, 5%, and to *require* that non-compliant states lose block grants rather than leaving that determination to SAMHSA's discretion. And, in fact, numerous Members of Congress advanced just such an alternative.

For example, several members of the House Committee on Energy and Commerce urged Congress to "strengthen[] the Synar Amendment on the underage purchasing of cigarettes" rather than "impos[e] clearly unconstitutional restrictions of First Amendment rights." H.R. Rep. No. 111-58, at 130 (Mar. 26, 2009) (dissenting views). Rep. Marsha Blackburn (R-TN), a former "president of the Middle Tennessee Board of the American Lung Association," explained that the result of the Synar Amendment "approach has been to prevent youth usage, and those rates have declined," and urged that "[w]e should be working with our States, with manufacturers, producers, packagers, distributors, and retailers on new initiatives versus implementing an unworkable Federal layer that has no proven track record." *Hearing Before the Subcommittee on Health of the*

*Committee on Energy and Commerce on H.R. 1108*, 110th Cong., Serial No. 110-69 (Oct. 3, 2007) ("*Hearing*") at 29.  Likewise, Rep. Edolphus Towns (D-NY) urged that, "[u]nder the 1992 Synar amendment, States have the authority to conduct unannounced inspections and over the past 10 years all States and the District of Columbia have reached the goal of achieving retailer violation rates of no more than 20 percent—that's sales of cigarettes to minors.  *That's not enough*."  *Id.* at 31 (emphasis added).  This approach was even supported by the National Association of Convenience Stores, whose CEO testified that "Congress should be looking at ways to improve upon the successes we have gained through the Synar Amendment's incentive to states" by, among other things, "making Synar's requirements tougher."  *Id.* at 101, 103.

Congress, however, rejected this approach in favor of the Act's speech prohibitions.  And it did this without even considering whether such approach would have been as effective at reducing youth tobacco use as the contested speech prohibitions that it ultimately chose to adopt, let alone proving—as the First Amendment required it to do—that such non-speech alternatives would *not* have been effective.  This real-world example vividly demonstrates that Congress failed to adhere to the Constitution's mandate to regulate speech as a last resort.  *BellSouth*, 547 F.3d at 508 (citing *W. States Med. Ctr.*, 535 U.S. at 373).

### b. Requiring States To Devote To Tobacco Control Programs The CDC-Recommended Levels Of Funds From Tobacco Revenues

Strengthening the Synar Amendment is certainly not the only obvious non-speech-restrictive alternative that Congress ignored.  Each year, the states collect billions of dollars from tobacco companies as part of the MSA and collect billions more in tobacco taxes.  "[T]he U.S. [GAO] has reported to Congress that from 2002-2006, the States received $46,700,000,000 in MSA[-related] payments" alone.  Reynolds Decl. ¶ 60.  As Dr. Reynolds explains, "the level of funding [for state tobacco programs] that the CDC considers necessary for *effective prevention* [is] annually 15% of a state's tobacco revenue (i.e., state excise tax revenue and MSA payments)."  *Id.* ¶ 58 (emphasis

added).  But from 2002 to 2006, the GAO reported that the states spent only "3-6% of those funds on tobacco control programs."  *Id.* ¶ 60.  Congress thus could have required the states to devote the CDC-recommended levels of their tobacco revenues to tobacco-control programs.

Members of Congress proposed this very course.  Rep. Stephen Buyer (R-IN) and a bipartisan group of Congressmen proposed requiring the states to spend at least 20% of their MSA funds on tobacco control programs, on pain of having certain federal grants reduced.  H.R. 1261, 111th Cong. (Mar. 3, 2009), § 601.  As Rep. Buyer argued on the floor of the House:

> This substitute also goes further … in protecting children because we require States to spend a larger percentage of their master settlement agreement for tobacco education, prevention and cessation efforts.  In the last 10 years, States have spent just 3.2 percent of their total tobacco-generated revenue on prevention and cessation programs, and in the current fiscal year, no State is funding tobacco prevention programs at the level recommended by CDC.

155 Cong. Rec. H4310, H4312 (Apr. 1, 2009).  Rep. Buyer supported this approach in part because he believed that the Act's "advertising restrictions" "violate the first amendment."  *Id.*  He thus argued that "[t]his substitute protects our children … while protecting our Constitution."  *Id.*  Rep. Buyer's non-speech-restrictive approach was also pressed in the Senate, where two proposed substitute bills each contained provisions requiring states to spend at least 20% of their MSA funds on tobacco control programs.  S.A. 1244, 111th Cong., § 601, 155 Cong. Rec. S6075-S6076 (June 3, 2009); S.A. 1246, 111th Cong., § 601, 155 Cong. Rec. S6099 (June 3, 2009).  Congress, however, voted down this approach, without adducing *any* evidence that it would not be at least as effective at reducing youth tobacco use as the Act's speech prohibitions.  155 Cong. Rec. D404-01 (Apr. 2, 2009); 155 Cong. Rec. S6347 (June 9, 2009).

Indeed, the irrefutable record evidence here establishes that it would have been more effective.  Dr. Reynolds, for example, explains how "[i]ncreasing funding requirements to the [CDC] recommended levels would have a positive impact on the reduction of underage smoking initiation."  Reynolds Decl. ¶ 58.  As Dr. Reynolds explains, this is the same view held by the

Campaign for Tobacco-Free Kids ("CTFK"), one of the *amici* supporting the Government in this case. In particular, in 2008, CTFK issued a widely publicized report on the ten-year anniversary of the MSA that concluded that no state was going to meet the CDC's recommended funding levels in 2009 and that only *nine* states would even be at *half* those levels. *Id.* ¶ 59. Like Dr. Reynolds, CFTK concluded that state tobacco control programs funded at CDC-recommended levels would be "effective in reducing youth smoking." *Id.* ¶ 59.

> ### c.      Comprehensive Tobacco Intervention Programs Advocated By Public Health Organizations

Nor are the two examples above the only non-speech-restrictive alternatives that Congress ignored. To the contrary, as Dr. Reynolds' declaration makes clear, the obvious and available alternatives are almost too many to number—alternatives that, unlike the Act's contested speech prohibitions, *have proven effective* in reducing youth tobacco use.

Dr. Reynolds, for example, lists a veritable plethora of non-speech-restrictive alternatives that, in his expert opinion, would be successful in reducing youth tobacco use, including:

- Raising the legal age to purchase, possess, or consume tobacco products to 19 years, which, among other things, would remove the majority of legal age tobacco users from the secondary public and private school environment, thus reducing modeling behavior;

- Increasing the price of tobacco products, which has been shown to decrease consumption;

- Increasing support for interventions that address the personal and social factors that influence tobacco use (e.g., programs training young people to avoid peer influence);

- Enhancing penalties for underage tobacco use, and, in particular, identifying penalties that will be motivational and meaningful to adolescents (such as loss of their driver's license);

- Enforcing strict, prohibitive policies regarding tobacco possession or use by anyone (students, faculty, or staff) at schools;

- Increasing penalties for adults who unlawfully provide tobacco products to minors; and

- Prohibiting smoking in all workplaces with employees below the legal smoking age.

Reynolds Decl. ¶ 51. Numerous other alternatives abound. *See id.*

Dr. Reynolds' approach, moreover, mirrors that of the CDC.  As Dr. Reynolds explains, the CDC's 2007 *Best Practices* report concluded that "'evidence-based, statewide tobacco control programs that are comprehensive, sustained, and accountable have been shown to reduce smoking rates, tobacco-related deaths, and diseases caused by smoking.'"  Reynolds Decl. ¶ 54.  The report "endorses the following specific approaches to reduce incidence and prevalence of tobacco use":

- "'Increasing the unit price of tobacco products'";

- "'Conducting mass media education campaigns when combined with other community interventions'";

- "'Mobilizing the community to restrict minors' access to tobacco products when combined with additional interventions (stronger local laws directed at retailers, active enforcement of retailer sales laws, retailer education with reinforcement)'"; and

- "'Implementing school-based interventions in combination with mass media campaigns and additional community efforts.'"

*Id.* ¶ 56.  Notably *absent* from the CDC's report is any "endorse[ment] of the marketing restrictions in the Act," or any "assert[ion] that those restrictions would reduce underage tobacco use."   *Id.* ¶ 57.  Indeed, the Surgeon General's 1994 report on youth smoking concluded that "*only* the social influence approaches have been scientifically demonstrated (through replicated research studies) to reduce or delay adolescent smoking."  Viscusi Decl. ¶ 34 (emphasis added).

Nor would Congress have had to look far to identify specific "evidence-based" tobacco programs of the type promoted by Dr. Reynolds, the CDC, and the Surgeon General.  To the contrary, it need only have turned to SAMHSA's National Registry of Evidence-based Programs and Practices ("NREPP"), which, as Dr. Reynolds explains, "collects evidence-based, scientifically proven, and reliable curricula for drug and alcohol youth interventions, including tobacco use."  Reynolds Decl. ¶ 51(o).  In order to appear on this registry, a program must undergo "rigorous scientific and academic review, which includes an examination of a variety of the intervention's characteristics including reliability, validity, and utility."  *Id.* ¶ 51(o).  And "[t]here are currently

*thirty-seven interventions* in SAMHSA's NREPP that address tobacco use." *Id.* ¶ 63 (emphasis added); *see id.* ¶ 51(o)(i)-(xxxvii) (listing SAMHSA-endorsed interventions).  In Dr. Reynolds's unrefuted expert opinion, these programs "are especially likely to be successful in achieving a reduction in underage tobacco use because they correctly focus on the interpersonal factors that are strongly associated with, and that distinguish between, youth who use tobacco and those who do not." *Id.* ¶ 51; *see also id.* ¶¶ 28-30; *infra* at 39-41.

　　In fact, these non-speech-restrictive alternatives have proven highly effective.  For example:

● "In 2002 NYC passed an effective prohibition on smoking in the workplace, an increase in cigarette taxes, initiated a public education campaign, and initiated the provision of free nicotine patches for smoking cessation."  Reynolds Decl. ¶ 66.  "These four actions were followed by a 50% reduction in teen smoking and a 21% decline in overall smoking rates over a period of the subsequent 6 years." *Id.*

● Researchers in Florida have "attribute[d] the decrease[s] in overall rates of underage smoking … to similar factors:  national anti-smoking ad campaigns aimed at youth, price increases, and decreased availability of cigarettes to minors." *Id.*

● In light of "widespread experience from as early as 1970," the CDC has "'documented that an intensive mass media campaign can produce significant declines in smoking rates among both adults and youth,'" noting that, in just 1 year, such a campaign "produced significant declines in tobacco use among Florida middle and high school students.'" *Id.*

　　In sum, there are literally dozens of obvious non-speech-restrictive alternatives that have a proven track record of success and that were well-known to Congress.  Congress could have promoted any of these alternatives, either by mandating or funding them directly, or by conditioning the receipt of federal funds on their promulgation.  Instead, Congress went straight to Plaintiffs' speech, adopting almost verbatim the very speech bans that, twelve years before, the Supreme Court had invalidated as beyond the FDA's regulatory authority.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).  This overwhelming evidence utterly refutes the Act's *ipse dixit* finding that "[l]ess restrictive … approaches have not and will not be effective."  § 2(31). And, of course, the Government cannot rely on such *ipse dixit* assertions to meet its evidentiary "burden" under the First Amendment of proving that these alternatives, or others like them, would

not advance its asserted interest. *Edenfield*, 507 U.S. at 770. Accordingly, far more so than in *W. States Med. Ctr.*, *44 Liquormart*, *Coors*, and *BellSouth*, the Act is "precisely the kind of blunderbuss legislation that cannot [possibly] satisfy the First Amendment's preference for resolving policy problems by regulating conduct rather than speech." *BellSouth*, 542 F.3d at 508. This, on its own, requires invalidation of the Act's myriad prohibitions on Plaintiffs' commercial speech.

> ### 2.    Congress Failed To Carefully Calculate The Costs And Benefits Associated With The Burden On Speech Imposed

Even apart from the existence of non-speech-restrictive alternatives, a commercial speech restriction is unconstitutional if the Government fails to prove that it "carefully calculat[ed] the costs and benefits associated with the burden on speech imposed." *Lorillard*, 533 U.S. at 561. Indeed, that is precisely why, in *Lorillard*, the Supreme Court invalidated a state regulation prohibiting outdoor advertising of tobacco products within 1,000 feet of a school or playground. More specifically, the Court concluded that the regulation suffered from three fatal defects:

- <u>Uniformly Broad Sweep:</u>  The Court first observed that "[t]he uniformly broad sweep of the geographical limitation demonstrate[d] a lack of tailoring," because "the impact of a restriction on speech will undoubtedly vary from place to place." *Id.* at 563. The Court emphasized that "[t]he degree to which speech is suppressed—or alternative avenues for speech remain available—under a particular regulatory scheme tends to be case specific." *Id.* Thus, a uniformly broad law fails to "demonstrate a careful calculation of the speech interests involved." *Id.* at 562.

- <u>Unduly Broad and Overinclusive:</u>  The Court also found that "the range of communications restricted seem[ed] unduly broad," because the regulations prohibited speech that was not "necessary to further the State's interest" in reducing youth tobacco use. *Id.* Whereas "tailoring would involve targeting those practices" "that appeal to youth" "while permitting others," "[a]s crafted, the regulations ma[de] no distinction among practices on this basis." *Id.* As the Sixth Circuit likewise has held, "the reasonable-fit requirement generally guards against overinclusive laws (those that do too much)." *BellSouth*, 542 F.3d at 508.

- <u>Unduly Onerous Burden:</u>  Finally, the Court emphasized that, "[i]n some instances, [the] outdoor advertising regulations would impose particularly onerous burdens on speech." *Lorillard*, 533 U.S. at 564. For example, retailers "may have [had] no means of communicating to passersby on the street that [they] sell[] tobacco products because alternative forms of advertisement, like newspapers, do not allow [them] to propose an instant transaction in the way that onsite advertising does." *Id.* at 565. Yet the state "failed to incorporate … into the regulatory scheme" "these sorts of considerations." *Id.* at 565.

The Court in *Lorillard* emphasized that consideration of factors such as these was essential because "the governmental interest in protecting children from harmful materials … does not justify an unnecessarily broad suppression of speech addressed to adults." *Id.* at 564 (omission in original). "As the [Government] protects children from tobacco advertisements, tobacco manufacturers and retailers and their adult consumers still have a protected interest in communication." *Id.* Here, as in *Lorillard*, the Act's myriad commercial speech bans run roughshod over that protected interest and suffer from the same three fatal defects identified there.

### a.    The Ban On Color Or Graphics In Advertising

As explained above, the Act's black-and-white-text requirement bans the use of color or imagery in virtually every form of advertisement that could conceivably reach large groups of adult tobacco consumers, *including in 100% of direct mail sent to age-verified adult consumers, 99% of magazines, and 99% of retail point-of-sale locations*. *See supra* at 6.

This "blunderbuss" prohibition, *BellSouth*, 542 F.3d at 509, is not only irreconcilable with *Lorillard*, but, indeed, is indistinguishable from the restriction the Supreme Court invalidated in *Zauderer*. There, applying *Central Hudson*, the Court invalidated a rule that prohibited attorneys from using "drawings, illustrations … [or] pictures" in attorney advertisements. 471 U.S at 632-33 & n.4. The Court rejected the State's argument that "[t]he use of illustrations in advertising by attorneys … creates unacceptable risks that the public will be misled, manipulated, or confused" by "subtle uses of illustrations [that] play on the emotions of [the] audience and convey false impressions," holding that it was "not persuaded that identifying deceptive or manipulative uses of visual media in advertising is so intrinsically burdensome that the State is entitled to forego that task in favor of the more convenient but far more restrictive alternative of a blanket ban on the use of illustrations." *Id.* at 648-49. "The use of illustrations or pictures in advertisements," the Court explained, "serves important communicative functions:  it attracts the attention of the audience to

the advertiser's message, and it may also serve to impart important information directly." *Id.* at 647. Yet the State failed to "cite any evidence or authority of any kind for its contention that the potential abuses associated with the use of illustrations in attorneys' advertising [could]not be combated by any means short of a blanket ban." *Id.* at 648. In short, "[g]iven the possibility of policing the use of illustrations in advertisements on a case-by-case basis, the prophylactic approach taken by [the State] [could]not stand." *Id.* at 649.

As *Zauderer* makes clear, the Act's blanket ban on color or imagery in almost all tobacco advertising cannot possibly survive *Central Hudson* review. To the contrary, this provision suffers from the same defects identified in *Lorillard*. *First*, the black-and-white-text requirement has a "uniformly broad sweep … demonstrat[ing] a lack of tailoring." *Lorillard*, 533 U.S. at 563. As in *Zauderer*, the Act imposes a blanket ban on *all* uses of imagery and *all* uses of color, in virtually *all* tobacco advertisements. *See supra* at 4-6.[5] Thus, the Act bars images that cannot be said to have any special appeal to youth, such as the sketch of Conwood's original Levi Garrett tobacco factory and Reynolds' depiction of how its new Camel Crush menthol product works:

   

Jennette Decl. ¶ 21(4); Dunham Decl. ¶ 19; *see also* Terry Decl. ¶ 18; Hinton Decl. ¶¶ 9-11.

The Government cannot cite any evidence that such a blanket ban is necessary, or why

---

[5] Although the Government's expert identifies a handful of publications that he asserts, *in 2002*, had a youth readership of less than 15% and 2 million overall, Krugman Decl. at 7-8, 14-16, 21, he does not identify how many publications are *currently available* to Plaintiffs, let alone dispute the testimony of Plaintiffs' expert, JoAn Williard, that the Act effectively relegates Plaintiffs' color-and-graphics advertising to *only 1%* of consumer magazines.

Congress could not have limited its restriction to the types of imagery, colors, and advertisements that are allegedly particularly likely to induce youth to use tobacco products.  This stands in stark contrast to the MSA, which prohibits advertising that "directly or indirectly … targets Youth" or uses "Cartoons," Lindsley Aff. Ex. A (MSA § III(a), (b)), rather than imposing a blanket ban on color or imagery.  Although the Government's expert may well be correct that it is "more straightforward" to require virtually all advertising to have black-and-white text rather than carefully "categorizing [advertising] based on [its] reach and/or frequency to youth," Krugman Decl. at 14, the Constitution forbids such short-cuts when free speech is at stake.

The Government cannot claim that such distinctions are "too hard" to make.  Not only does the MSA belie such a claim, but, in *Zauderer*, the Supreme Court rejected this very argument. There, the Ohio State Bar asserted that its prophylactic ban on certain attorney advertising was necessary because "the indeterminacy of statements about law makes it impractical if not impossible to weed out accurate statements from those that are false or misleading." *Zauderer*, 471 U.S. at 644.  But, as the Court explained, the same is true in "virtually any field of commerce." *Id.* at 645.  "Were [the Court] to accept the State's argument in this case, [it] would have little basis for preventing the government from suppressing other forms of truthful and nondeceptive advertising simply to spare itself the trouble of distinguishing such advertising from false or deceptive advertising." *Id.* at 646.  The Court squarely rejected this approach, explaining that its commercial speech jurisprudence is "grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful." *Id.*; *see also id.* at 649.  To hold otherwise here would fail to take seriously the Court's repeated admonition that, "regardless of the strength of the Government's interest in protecting children, the level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox." *Reno*

*v. ACLU*, 521 U.S. 844, 875 (1997) (internal quotation marks omitted).

*Second*, and relatedly, the Act's black-and-white-text requirement is "unduly broad," *Lorillard*, 533 U.S. at 563, and "overinclusive," *BellSouth*, 542 F.3d at 508. As in *Zauderer*, the ban ensnares copious amounts of speech that do not implicate the Government's interest—here, uses of color or graphics that cannot possibly affect youth tobacco use. For example, the Act bans the use of color or graphics in tobacco-specialty shops *even if* youth are excluded from such shops and cannot possibly see the advertisements inside. *See supra* at 5-6. Similarly, it applies to direct-mail advertising even if limited to age-verified existing adult consumers. *See supra* at 4, 6. Likewise, the Act effectively bans the use of color or graphics in publications whose subject-matter could have no conceivable interest to youth (such as *The Arkansas Trooper*) but that lack formal survey evidence as to youth readership. *See supra* at 4-5. And the Act even bans Plaintiffs from depicting the mere image of their own products' packaging in their advertising. *See supra* at 4-6, 8.

*Third*, the black-and-white-text requirement imposes "particularly onerous burdens on speech." *Lorillard*, 533 U.S. at 564. As the Court recognized in *Zauderer*, "[t]he use of illustrations or pictures in advertisements serves important communicative functions: it attracts the attention of the audience to the advertiser's message, and it may also serve to impart information directly." 471 U.S. at 647. Here, the burden is even greater than in *Zauderer*, since the Act bans, not only the use of graphics, but also the use of color. This prohibition will particularly harm retailers who depend, as Plaintiff Discount Tobacco does, *see supra* at 11, on the use of visually attractive advertising to attract the attention of "passersby" on busy roads and highways. *Lorillard*, 533 U.S. at 565. And more broadly, as discussed above at length, it will cause Plaintiffs' advertisements to be visually uninteresting and depressing, virtually indistinguishable from one another, and thus completely incapable of catching consumers' attention and/or informing them about Plaintiffs' products. *See supra* at 6-9. Indeed, even the Government's expert recognizes the

importance of the use of color and imagery to "create[] brand image and brand equity," Krugman Decl. at 22, as does the Act itself, which mandates that the new cigarette "warnings" contain *color graphics* in addition to oversized text, *see supra* at 9-10. In short, in attempting to "protect[] children from tobacco advertisements," Congress has simply eviscerated the "protected interest in communication" between "tobacco manufacturers and retailers and their adult consumers." *Lorillard*, 533 U.S. at 564.

### b.      The Ban On Outdoor Advertising

The Act's nationwide ban on outdoor advertising within 1,000 feet of a school or playground is materially indistinguishable from the one invalidated in *Lorillard* and so is plainly unconstitutional. *Compare* § 102(a)(2) (adopting 21 C.F.R. § 897.30(b)), *with Lorillard*, 533 U.S. at 556. Nor is this defect cured because the Secretary may "include such modifications [to the outdoor advertising ban], if any, that the Secretary determines are appropriate in light of governing First Amendment case law." § 102(a)(2)(E). To be sure, Congress provided the Secretary with unfettered discretion to issue a modified "final" regulation on March 22, 2010, §§ 6(c)(1), 102(a)(1), which will go into effect on June 22, 2010, § 102(a)(2)(F), and will be conclusively "deemed to be in compliance" with the APA without any process or right for Plaintiffs to be heard, § 102(a)(1)(B). Plaintiffs thus will have just 3 months to bring themselves into compliance with any modified regulation. But several Plaintiffs must plan their advertising—and particularly outdoor point-of-sale advertising at retail locations—at least 9 months in advance. *See* Dunham Decl. ¶ 61; Lindsley Aff. ¶ 91. Thus, they must either surrender their constitutional rights and cease all outdoor advertising within 1,000 feet of a school or public playground area or guess at what the FDA will ultimately do and risk violating the regulation if, as is eminently likely, they guess wrong. Consequently, the unmodified outdoor advertising ban violates the First Amendment, and any modifications to that ban would violate the Due Process Clause of the Fifth Amendment due to the

complete absence of fair notice or procedural safeguards, *see, e.g.*, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 20 (1978); *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965).

### c.    The Bans On Brand Name Sponsorships And Merchandise, Sampling And Continuity Programs, And Co-Marketing

The tailoring defects identified in *Lorillard* also plague the Act's bans on *all* brand name sponsorships of events, *any* marketing through the distribution of product samples (save for an impracticable exception for smokeless products), *all* continuity programs, and *any* marketing of tobacco products in combination with other FDA-regulated products.  The Act goes well beyond the restrictions embodied in the MSA, which the states found more than sufficient to address their identical interest in reducing youth tobacco use.  For example, the MSA permits:  specified types of brand name sponsorships, including those in adult-only facilities like bars and nightclubs; limited distribution of brand name merchandise; the distribution of free samples of cigarettes and smokeless tobacco in bars and nightclubs; continuity programs; and co-marketing.  Lindsley Aff. Ex. A (MSA § III).  The Act's inflexible prohibitions, in contrast, do not even *attempt* to differentiate between marketing practices directed at adults and those directed at youth.

*First*, as in *Lorillard*, these bans have a uniformly broad sweep that demonstrates a lack of narrow tailoring and, consequently, are also unduly broad and overinclusive:

- Brand Name Sponsorship Ban:  Applies not just to events that are youth oriented, or even age-neutral, but also to *exclusively* adult-only events involving existing tobacco consumers, such as Lorillard's Newport Pleasure Draw blackjack tournament.  *See supra* at 11-12.

- Brand Name Merchandise Ban:   Applies to products given *exclusively* to adult tobacco consumers in conjunction with a lawful purchase of a tobacco product, including the poker chips that Conwood distributes with its Grizzly smokeless tobacco.  *See supra* at 12.

- Sampling Ban:  Prohibits the distribution of *any* cigarette samples in locations such as bars and nightclubs that, by law, prohibit underage entry.  Although there is a narrow exception for sampling of smokeless products in "adult-only facilities," that exception inexplicably *excludes* any establishment that sells alcohol.  *See supra* at 12.

- Continuity Programs Ban:  Covers all continuity programs, even those in which participation is restricted to age-verified, existing adult tobacco consumers who express a desire to

communicate with the manufacturer. *See supra* at 12.

- <u>Co-Marketing Ban:</u>  Prohibits a promotion as innocuous as giving an adult consumer a discounted cup of coffee in conjunction with the *lawful* purchase of a tobacco product at a 7-Eleven. *See supra* at 12.

As the foregoing demonstrates, these provisions prohibit the marketing practices at issue across the board without any serious consideration—such as was at least attempted in the MSA—as to which specific applications of these practices are allegedly particularly likely to affect youth tobacco use. They are thus irreconcilable with *Lorillard*'s admonition that "[t]he degree to which speech is suppressed—or alternative avenues for speech remain available—under a particular regulatory scheme tends to be case specific." *Lorillard*, 533 U.S. at 563.  And, as a direct result, they are also "overinclusive," *BellSouth*, 542 F.3d at 508, failing to "permit[]" numerous "advertising and promotion practices that [do not] appeal to youth," *Lorillard*, 533 U.S. at 563.

*Second*, these prohibitions impose particularly onerous burdens on Plaintiffs.  To take just one example, sampling is "one of the most effective means of communicating" a product's superior qualities to a consumer of a competitor's product, because a consumer is unlikely to spend money on a new brand that "may or may not be better than the product with which the consumer is already satisfied."  Dunham Decl. ¶ 48.  Thus, the sampling ban deprives smaller manufacturers of "one of the most effective means" of competing against their much larger competitors.  Indeed, as the Supreme Court explained in *Lorillard*, for companies that "have relatively small advertising budgets," restrictions like those imposed in the Act "place a greater, not lesser, burden," precisely because these smaller companies already have available to them "few avenues of communication." 535 U.S. at 564-65.  The ban will also have a serious impact on new products, for which sampling is particularly important "to educate smokers about why, when, and how they might use the new product."  Lindsley Aff. ¶ 87.  More generally, because the Act eviscerates the primary means of marketing—through advertisements in magazines, direct mail, at retail points of sale, and on

- 33 -

packaging—by prohibiting color or imagery in advertising while mandating obtrusive "warnings," the "few[] avenues of communication" that remain, *id.* at 565, are all the more important. Yet the Act systematically shuts down these few remaining avenues of effective communication.

### d. The Ban On Referring To The Efficacy Of FDA Regulation

The Act even goes so far as to ban Plaintiffs from commenting on the efficacy of the FDA's regulations. The FDA, for example, is expressly charged with promulgating "product standards," the explicit purpose of which is the "elimination of a[] … component of a tobacco product because the Secretary has found that the … component is … harmful." § 101(b)(3) (adding 21 U.S.C. § 387g(a)(3)). But the Act bars virtually *any* public comment on these standards. In particular, the Act bars any "representation" "directed to consumers" "through the media or advertising" that tobacco products are "less harmful" as a result of the FDA's regulations. § 103(b) (adding 21 U.S.C. § 331(tt)(4)). And almost any public comment on these "product standards," other than perhaps a comment *denigrating* them, could be construed as an "implied" statement that they made Plaintiffs' products "less harmful," since that is, after all, their express purpose.

This ban's uniform breadth again reveals a lack of narrow tailoring and is overinclusive. Congress could have limited the ban to the *other* portions of this provision, which Plaintiffs do not challenge and which prohibit suggesting that a product "is approved by the [FDA]," that "the [FDA] deems the product to be safe," or that the product is "endorsed by the [FDA]." § 103(b) (adding 21 U.S.C. § 331(tt)(1)-(3)). Instead, Congress again demonstrated its "underdeveloped capacity for self-restraint," *Garcia v. San Antonio Metropolitan Transit Auth.*, 469 U.S. 528, 588 (1985) (O'Connor, J., dissenting), imposing a blanket ban on *any* statement "directed to consumers" "through the media" about the efficacy of FDA regulation, no matter how non-misleading.

Indeed, the breadth of this prohibition is underscored by the fact that it reaches numerous types of *political* speech. *First*, it applies to any statement "directed to consumers" "through the

- 34 -

media *or* advertising." § 103(b) (adding 21 U.S.C. § 331(tt)) (emphasis added). Thus, like the MRTP requirement, both on its face and as interpreted by the Government, it covers Plaintiffs' core political speech—including in press releases, booklets, and television appearances. *See infra* at 54. *Second*, regardless of whether *Plaintiffs'* speech is political speech, the ban is not limited to speech by tobacco manufacturers and retailers: it applies to *anyone* and in *any forum*, including news organizations, doctors, scientists, and politicians, since the provision contains *no limit* on its substantive reach, so long as it is "directed to consumers" "through the media." § 103(b) (adding 21 U.S.C. § 331(tt)). Consequently, it is plainly subject to strict scrutiny, *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000), and Plaintiffs may challenge it on this ground *even if* this Court deems Plaintiffs' *own* speech to be commercial, *see Bd. of Trs. of SUNY v. Fox*, 492 U.S. 469, 481-82 (1989) (commercial speakers may seek to facially invalidate a speech restriction based on its application to the non-commercial speech of others). And the Act's outright ban on referring to the efficacy of FDA regulation cannot possibly survive strict scrutiny.

### e.    The Cumulative Impact Of The Act's Bans

Finally, the burdens of the Act's commercial speech bans are magnified when considered cumulatively and in the context of the pre-existing restrictions on Plaintiffs' speech. As the Supreme Court explained in *Lorillard*, "[t]he degree to which … alternative avenues for speech remain available" is an important part of the cost-benefit calculation required under the narrow tailoring analysis. 533 U.S. at 563. Accordingly, the Court deemed it important that "a retailer in Massachusetts may have no means of communicating to passersby on the street that it sells tobacco products because alternative forms of advertisement … do not allow that retailer to propose an instant transaction in the way that onsite advertising does." *Id.* at 565.

Of particular importance here, in *Linmark Assocs. v. Twp. of Willingboro*, 431 U.S. 85 (1977), the Supreme Court rejected so-called alternative avenues of speech that existed only "in

theory." *Id.* at 93.  There, "a municipality [had] prohibit[ed] the posting of 'For Sale' or 'Sold' signs … to stem what it perceive[d] as the flight of white homeowners from a racially integrated community."  *Id.* at 86.  The town argued that "First Amendment concerns [were] less directly implicated … because it [had] restrict[ed] only one method of communication."  *Id.* at 93.  The Court rejected the town's premise, reasoning that, "[a]lthough in theory sellers remain free to employ a number of different alternatives," the alternatives that were available "in practice" and "realistically"—such as "newspaper advertising and listing with real estate agents"—were "far from satisfactory" given that they "involve[d] more cost and less autonomy," were "less likely to reach persons not deliberately seeking sales information," and "may be less effective media." *Id*. at 93.

These defects with the "alternatives" in *Linmark* perfectly capture the situation facing Plaintiffs given the cumulative effect of the Act's speech prohibitions.  The combined effect of the Act's black-and-white-text requirement and its so-called "warnings" is to drown out Plaintiffs' messages in favor of the Government's large-text, color-graphic exhortation not to use tobacco products.  *See supra* at 9-11.  And the Act then systematically eliminates the remaining avenues of speech that Plaintiffs "realistically" have "in practice," *Linmark*, 431 U.S. at 93, by banning outdoor advertising, brand-name sponsorships and merchandise, sampling and continuity programs, co-marketing, and even any reference to the efficacy of the FDA's regulations.  *See supra* at 11-12.  To the extent any narrow channels of speech remain, the Act authorizes federal agencies, state and local governments, and Indian tribes to enact even "more stringent" prohibitions on the marketing and sale of tobacco products.  *See supra* at 13.

In sum, the Act's broad and sweeping speech bans seriously impair Plaintiffs' ability to effectively communicate with adult tobacco consumers.  And thus, notwithstanding the Act's unsubstantiated finding that it was "narrowly tailored to restrict those … practices which are most likely to be seen or heard by youth …, while affording tobacco manufacturers and sellers ample

opportunity to convey information about their products to adult consumers," § 2(32), it is readily apparent that Congress failed to "carefully calculat[e] the costs and benefits associated with the burden on speech imposed." *Lorillard*, 533 U.S. at 561. Accordingly, for this independent reason, the Government cannot possibly meet its burden of proving "a reasonable fit between the means and ends of the regulatory scheme" under *Central Hudson*'s narrow tailoring prong. *Id.*

**B.    The Act's Commercial Speech Prohibitions Do Not Directly And Materially Advance The Government's Interest In Reducing Youth Tobacco Use**

The Act's commercial speech prohibitions also fail *Central Hudson* because the Government has no proof that they, alone or in combination, will "directly and materially advance[] the asserted governmental interest" of reducing youth tobacco use. *Greater New Orleans Broadcast Ass'n v. United States*, 527 U.S. 173, 188 (1999) ("*GNOBA*"). "[T]he directly advance prong seeks to ferret out whether a law ostensibly premised on legitimate public policy objectives in truth serves those objectives." *BellSouth*, 542 F.3d at 507. "Without this requirement, [the Government] could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Edenfield*, 507 U.S at 771. Accordingly, for a "governmental body" to meet its "burden" under this prong, it must, based upon more than "mere speculation or conjecture," "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them *to a material degree.*" *Id.* at 770-71 (emphasis added). "Consequently, the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *GNOBA*, 527 U.S. at 188 (internal quotation marks omitted).

The Supreme Court's decision in *44 Liquormart* demonstrates the rigorous evidentiary showing demanded. There, as discussed above, the Court invalidated a ban on referencing prices in liquor advertising that was purportedly designed to reduce alcohol consumption. 517 U.S. at 492-93, 516. The plurality acknowledged that "the record suggests that the price advertising ban may have *some* impact on the purchasing patterns of temperate drinkers of modest means," but

emphasized that "the State has presented no evidence to suggest that its speech prohibition will *significantly* reduce marketwide consumption." *Id.* at 506. Instead, "any conclusion that elimination of the ban would significantly increase alcohol consumption would require … the sort of 'speculation or conjecture' that is an unacceptable means of demonstrating that a restriction on commercial speech directly advances the State's asserted interest." *Id.* at 507.

Here, as in *44 Liquormart*, the Government has failed to meet its burden of showing that the Act's commercial speech prohibitions will "*significantly* reduce" youth tobacco use. *Id.* at 506. These prohibitions were originally suggested by the FDA in 1995, when youth tobacco use was substantially higher than it is today and was *increasing*. Reynolds Decl. ¶¶ 20, 23. Today, the opposite is true—rates are at all-time historic lows and *decreasing*. *Id.* Yet Congress, without any consideration of the changed circumstances in the intervening fourteen years, simply enacted proposals that were an attempt to address the situation that existed in the mid-90s. For instance, in the release that originally accompanied the FDA's regulations in 1996, the FDA justified its advertising restrictions by claiming that "'the very size of the [tobacco advertising] campaign, and the resultant ubiquity and unavoidability of the advertising in all media, created a climate that influences young people's decisions about tobacco use … [and] saturates potential consumers with information and imagery.'" Lindsley Aff. ¶ 13. Such a statement, regardless of its accuracy in 1996, is certainly not true today. *Id.* ¶¶ 12-20. Many forms of tobacco advertising and marketing that were prevalent in 1996 effectively no longer exist, including, for example, billboard and transit advertisements. *Id.* ¶ 14. In addition, many of the largest retail chains, including Wal-Mart, Walgreens, and CVS, have entered into agreements with a group of state attorneys general to limit youth access to tobacco by requiring that tobacco displays and advertising be limited to one area of the store and that the retailer undertake numerous other measures to ensure that tobacco is not accessible to minors. *Id.* ¶ 19. Indeed, Dr. Reynolds describes how, according to the Institute of

Medicine, "'even if tobacco control activities remain at present levels, smoking prevalence is likely to decline from about 21 percent in 2005 to a little less than 16 percent in 2025,' representing a decline of nearly 25 percent."  Reynolds Decl. ¶ 8.  In nonetheless adopting the 1996 regulations verbatim, Congress had before it *no evidence*—and the Government has produced none—that any of these prohibitions, alone or in combination, will directly produce *further* reductions in youth tobacco use that are "significant."  And that is why certain Members of Congress cautioned that it was "poor public policy not to revisit the [1996] regulations and take the time to better understand the current regulations [governing tobacco marketing] … and then update the language [of the 1996 regulations] as necessary."  H.R. Rep. No. 111-58, at 129 (Mar. 26, 2009) (dissenting views).

In fact, Plaintiffs' experts demonstrated that these prohibitions will *not* achieve further significant reductions in youth tobacco use.  As Dr. Reynolds explains, "[s]ocial science researchers have, for decades, studied the factors that appear to be associated with underage tobacco use."  *Id.* ¶ 28.  These studies and research consistently have demonstrated that interpersonal and psychological factors account for youth smoking initiation and prevalence.  *Id.* ¶¶ 5-7.  In particular, the following risk factors have been specifically identified as determinants of youth smoking:

- *Parental Influence*: An adolescent is at a higher risk for smoking if one or more parents smoke, particularly if cigarettes are available in the home.

- *Peer Influence*: Smoking initiation and prevalence increases for youth whose friends, boyfriends, and/or girlfriends smoke.

- *Sibling Influence*: Adolescents are more likely to smoke if their siblings do, particularly where siblings make cigarettes available.

- *School Environment*: Several aspects of the school environment can be relevant to the likelihood of youth tobacco use, including lack of enforcement of tobacco use policies and use of tobacco products by students, teachers, and other school personnel.

- *Nature of Adolescence*: The fact that adolescence is a time for experimentation and risk taking also is a factor in youth smoking initiation and prevalence.

- *Personality Factors*: A risk-taking or rebellious personality is a factor in youth smoking initiation and prevalence.

*Id.* ¶¶ 29-30.  As Dr. Faber explains, "[n]umerous studies over the past 50 years . . . consistently show that it is the behaviors and opinions of interpersonal sources such as peers, friends, parents, and older siblings, and not advertising, that influence young people to start smoking (or to decide not to smoke)."  Faber Decl. ¶ 57.

In contrast, there is no evidence that tobacco advertising is a direct cause of youth tobacco use.  For example, Gallup conducted an open-ended poll of adult and youth smokers in 1994 that asked respondents why they began smoking.  The poll data illustrate that the vast majority of smokers—74% of adult smokers and 84% of youth smokers—began smoking because of peer or family influence.  Reynolds Decl. ¶¶ 34-35.  Other common answers included stress, curiosity, or a desire to fit in.  *Id.*  But *not a single respondent identified tobacco advertising as the reason.  Id.*; *see also* Faber Decl. ¶¶ 58-64.  Even in polls where respondents are required to calibrate the influence of specific factors on their decision to smoke, and advertising is listed as a suggested factor, respondents "still do not view advertising as the reason they started smoking."  Faber Decl ¶ 61.  Thus, FDA focus group research conducted in 1995 in connection with its first attempt to restrict tobacco advertising "apparently specifically prompted the participants about the role of cigarette marketing and reported:  'Most of the participants indicated that they did not believe that they were influenced by cigarette advertisements.'"  Reynolds Decl. ¶ 36.  Further confirmation is provided by "[a]nalysis of aggregate spending by the cigarette industry and trends in tobacco use," which "illustrates that there is no positive or direct correlation between aggregate industry spending and prevalence of cigarette use among smokers—youth or adult."  *Id.* ¶ 48.

Indeed, even the Surgeon General and the Government's expert in this case agree that advertising is not a "direct" cause of youth tobacco use.  The Surgeon General's 1994 report considered tobacco advertising only 1 of 23 psychosocial risk factors for youth smoking initiation and prevalence, and one that was a "distal or *indirect*" factor rather than a "proximal or direct"

factor. *Id.* ¶ 31 (emphasis added). Likewise, Prof. Krugman asserts only that advertising is an "environmental risk factor[]." Krugman Decl. at 5; *see also id.* at 14. Notably, Prof. Krugman does *not* describe the advertising prohibited by the Act as a "risk factor" whose elimination is actually likely to achieve a significant reduction in youth tobacco use, but merely as "a *needless* environment risk to people under the age of 18." *Id.* at 7 (emphasis added).

Given that tobacco marketing is not even arguably a direct cause of youth tobacco use, it is unsurprising that Plaintiffs' experts unanimously opined that the Act's speech prohibitions will not reduce youth tobacco use. Reynolds Decl. ¶ 7 ("There is no scientific evidence in the peer-reviewed literature that the bans on marketing contained in the Act will reduce underage tobacco use."); Faber Decl. ¶ 5 ("Based on my expertise in advertising, marketing, mass communication and consumer behavior, I conclude that [the Act] will not reduce tobacco initiation or use."). For example, there is no "published, peer-reviewed scientific research finding that the use (or absence) of color, graphics, or the like causes underage tobacco use," and "[t]he same is true with respect to each of the additional restrictions contained in the Act." Reynolds Decl. ¶ 46. Even if such evidence existed, it likely would not show a link between the Act's marketing bans and a significant reduction in youth tobacco use, because those bans "do not address the root interpersonal factors (familial and peer influence) or personality factors (sensation-seeking and risk taking) that are the key correlates with underage tobacco use." *Id.* ¶ 45. That is why, as discussed above, the programs promoted by the CDC and approved by SAHMSA do *not* endorse marketing restrictions, but rather, "address the root … factors" that actually *do* contribute to youth tobacco use. *Id.* ¶¶ 45, 50-51.

In light of the foregoing, the Act's speech prohibitions cannot possibly survive the second prong of *Central Hudson*. *First*, they do not "directly" advance the Act's interest in reducing youth tobacco use. Indeed, as the Surgeon General's 1994 report attested, tobacco marketing is, *at most*, a "distal or *indirect*" factor of youth tobacco use. *Id.* ¶ 31 (emphasis added). *Second*, even if such

prohibitions have an *indirect* affect on youth tobacco use—and there is not even any real evidence of that—by no means has the Government carried its burden of proving that they would "materially" reduce youth tobacco use.  Nor can the Government overcome this evidentiary void through the Act's *ipse dixit* finding that the speech prohibitions "will directly and materially … reduce[e] the number of children and adolescents who use … tobacco" products, § 2(31), without rendering the First Amendment's free speech guarantees an empty promise.  "[A]ny conclusion that elimination of the[se] ban[s] would significantly increase [tobacco] consumption would require [this Court] to engage in the sort of 'speculation or conjecture' that is an unacceptable means" for the Government to meet its burden "of demonstrating that a restriction on commercial speech directly advances [its] asserted interest."  *44 Liquormart*, 517 U.S. at 507 (plurality opinion).

C.    **The Act's Commercial Speech Prohibitions Cannot Be Defended As A Means Of Preventing Consumer Confusion**

Because the Act's commercial speech prohibitions plainly cannot be defended as a means of reducing youth tobacco use, the Government may claim that they prevent consumers of tobacco products from being confused or misled.  However, for the reasons discussed above, the Act is not narrowly tailored to directly and materially advance that interest either.

*First*, the Act's myriad speech prohibitions are not even remotely narrowly tailored to any purported interest in preventing misleading speech.  Here, it cannot plausibly be argued that any of the speech prohibited—color or graphics in advertising, outdoor advertising, brand-name sponsorships and merchandise, tobacco sampling and continuity programs, co-marketing, and referencing the efficacy of FDA regulations—is "inherently misleading."  *Ibanez v. Fl. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 145 (1994).  And the Supreme Court has repeatedly held—including in the specific context of a ban on the use of illustrations in advertising—that "broad prophylactic" bans on speech "may not be … lightly justified" by an assertion that the speech "may, under some circumstances, be deceptive or manipulative."  *Zauderer*, 471 U.S. at 649.  Instead,

"[b]road prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  *Edenfield*, 507 U.S. at 777.  Consequently, the accuracy of commercial speech generally must be tested "on a case-by-case basis."  *Zauderer*, 471 U.S. at 649; *see also BellSouth,* 542 F.3d at 508-09 (consumer confusion inadequate justification for commercial speech restriction given obvious alternatives of enforcing consumer fraud laws and requiring disclosures).

Here, neither Congress nor the Government has produced any evidence whatsoever that the Act's numerous sweeping speech prohibitions are somehow necessary prophylactics to protect consumers from being confused about the health attributes of tobacco products.  That is because no such evidence exists.  Whatever risk exists that the speech prohibited by the Act can be misleading—and, as discussed immediately below, there is none—it is perfectly clear that conventional as-applied enforcement of the fraud laws, appropriately tailored disclosures, and other non-speech-restrictive regulations are more than sufficient to protect consumers.[6]

*Second*, the Act's blanket speech prohibitions also do not directly and materially advance any purported interest in preventing misleading speech.  The Supreme Court has admonished that, "[i]f the protections afforded commercial speech are to retain their force, we cannot allow rote invocation of the words 'potentially misleading' to supplant the [Government]'s burden to demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."  *Ibanez*, 512 U.S. at 146 (citation and internal quotation marks omitted).  Thus, in *Ibanez*, in light of "[t]he failure of the Board to point to any harm [of consumer confusion] that

---

[6] To be sure, at the preliminary injunction stage, this Court tentatively credited the findings in the Act that *the MRTP prior restraint scheme* is necessary given the alleged inadequacy of disclaimers.  PI Order at 18-19.  But—setting aside Plaintiffs' disagreement with that decision—this Court's deference was based on an MRTP-specific finding that, according to the FTC, in some unspecified context, "'consumers have misinterpreted advertisements in which one product is claimed to be less harmful than a comparable product, even in the presence of disclosures and advisories intended to provide clarification.'"  *Id.* (quoting § 2(41)).  This Congressional finding concerning the need for a *prior restraint*, however, is obviously inapplicable to the *outright prohibitions* on speech that Plaintiffs challenge here.

[was] potentially real, not purely hypothetical," the Court invalidated not just a prophylactic ban on speech, but indeed, even *a mere disclaimer requirement*. *Id.*

Here, there is simply no basis at all, other than the Government's "speculation or conjecture," for concluding that the Act's *blanket prohibitions on speech* are targeting a "real" problem with potentially misleading speech. *Edenfield*, 507 U.S. at 770-71. The bans on outdoor advertising, on brand-name sponsorships and merchandise, on tobacco sampling and continuity programs, and on co-marketing have no conceivable relationship to consumer confusion. As for the ban on color or graphics in advertising, the Government has failed to adduce any evidence whatsoever that those advertising tools are misleading consumers by "subtl[y] … play[ing] on the emotions of [the] audience," *Zauderer*, 471 U.S. at 648-49, particularly where, as here, advertising is *always* accompanied by the Surgeon's General's Warning.

In sum, whether the substantial government interest here is to reduce youth tobacco use, prevent consumer confusion, or some combination thereof, the Act's speech bans are not narrowly tailored to directly and materially advance any conceivable interest and thus are unconstitutional.

## II.    THE ACT'S MANDATED "WARNINGS" ARE UNCONSTITUTIONAL

The Act's so-called "warnings" are likewise unconstitutional because they: (1) unjustifiably and unduly burden Plaintiffs' commercial speech; (2) unconstitutionally compel Plaintiffs to disseminate the Government's anti-tobacco message; and (3) constitute a *per se* taking.

### A.    The Mandated "Warnings" Unjustifiably And Unduly Burden Plaintiffs' Commercial Speech

Under the Supreme Court's decision in *Zauderer*, "disclosure requirements" in commercial speech must, at a minimum, be "reasonably related to the State's interest in preventing deception of consumers." 471 U.S. at 651. That standard is not satisfied if the mandated disclaimer at issue is an "unjustified or unduly burdensome" restriction on Plaintiffs' commercial speech. *Id.* In *Ibanez*, for example, the Supreme Court invalidated a far less onerous disclosure requirement. 512 U.S. at 146-

47. There, a state regulatory board sought to require accountants who wished to use any type of privately-accredited "specialist" designation to include a disclaimer explaining that the accrediting organization was not governmentally affiliated and setting forth the organization's accreditation requirements. *Id.* at 146. The Supreme Court held that, "[g]iven the … the failure of the Board to point to any harm that is potentially real, not purely hypothetical[,] … the Board's action is unjustified." *Id.* In addition, the Court faulted the proposed disclaimer for being unduly burdensome, because the detail it required "effectively rule[d] out notation of the 'specialist' designation on a business card or letterhead, or in a yellow pages listing." *Id.* at 146-47.

The Seventh Circuit reached a similar result in *Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006), where it invalidated a state law requiring video game retailers to display a single four square-inch sticker stating "18" on video games that fell within the law's definition of "sexually explicit." *Id.* at 652. Although the sticker took up only approximately 5% of the front-and-back panels of the game packaging, the Seventh Circuit deemed that "a substantial portion of the box." *See id.* at 652 & n.13. And so it held that the sticker "*literally* fail[ed] to be narrowly tailored," because "[t]he State ha[d] failed to even explain why a smaller sticker would not suffice." *Id.* at 652. Indeed, in an analogy of direct relevance here, the court explained that it "[c]ertainly … would not condone a health department's requirement that half of the space on a restaurant menu be consumed by the raw shellfish warning," and so it likewise would not "condone the State's unjustified requirement of the four square-inch … sticker." *Id.*

Here, the Act's so-called "warnings" are plainly unconstitutional under *Zauderer*, *Ibanez*, and *Entertainment Software Ass'n*. *First*, these so-called "warnings" are unjustified because, as in *Ibanez*, the Government cannot "point to any harm that is potentially real," 512 U.S. at 146, that these "warnings" are needed to remedy. The only conceivable harm is consumer ignorance about the health risks of smoking. But the record demonstrates that the public—both adults and youth—is

not only fully aware of those risks, but, in fact, substantially *overestimates* them.

As Dr. Viscusi explains, "[n]umerous national surveys demonstrate that over the last half century, the awareness of smoking-related risks is widespread." Viscusi Decl. ¶ 28. "For example, in a 1998 Gallup poll of youth aged 13-17, 99% of surveyed youth agreed that smoking can cause lung cancer." *Id.* ¶ 29. That is more than "are aware that George Washington was the first U.S. President, [or] that the Earth revolves around the Sun." *Id.* ¶ 20. Likewise, a recent survey "demonstrates overwhelming belief that smokeless tobacco use causes: gum disease (98% agree), tooth loss (97% agree), [and] oral cancer (98% agree)." *Id.* ¶ 67. Such widespread awareness exists for each and every one of the topics covered by the so-called "warnings" in the Act. *Id.* ¶¶ 59-68. Indeed, as a result of the pervasive onslaught of information concerning the health risks of tobacco use, Americans substantially *overestimate* those risks: for example, "the average perceived risk that a smoker will develop lung cancer is over 40%," whereas the "actual risk" is "about 10% of smokers"; the public's perception of the overall mortality risk from smoking "can be as much as three times higher" than the actual mortality risk; "surveys demonstrate that Americans perceive a significantly higher lost life expectancy due to smoking" than is warranted based on the Surgeon General's reports; and "young people overestimate the dangers of smoking to an even greater degree" than adults. *Id.* ¶¶ 36-37, 41-43. The Government has introduced *no* expert evidence contradicting Dr. Viscusi's conclusions concerning the state of consumer knowledge. It is thus indisputable that the *format*, *size*, and *placement* of the current warnings are more than adequate to warn the public of the hazards of tobacco use.

Accordingly, it is no surprise that "[i]ndependent studies have demonstrated that more information about the risks of smoking does not influence smoking rates or consumer behavior." *Id.* ¶ 31; *see also id.* ¶¶ 32-34. Nor does the Government have any evidence that the result will change if, as in the Act, consumers are told things they already know in large text and with

shocking color graphics. To the contrary, even the Surgeon General's 1994 report acknowledged that the "'assumption ... [that] young people had a deficit of information that could be addressed by presenting them with health messages in a manner that caught their attention and provided them with sufficient justification not to smoke'" was incorrect. *Id.* ¶ 34. Specifically, "'comprehensive reviews [have] concluded that smoking-prevention programs based on the information deficit approach were not effective.'" *Id.* Likewise, as Dr. Viscusi explains, "warnings can only change behavior through the effect on risk beliefs by providing relevant information of which an individual was previously *unaware*." *Id.* ¶ 71. "Warnings that instead attempt to simply browbeat individuals into changing their behavior will not be successful." *Id.* "The Act's mandated health messages are configured to 'shout' at tobacco consumers, so to speak, but there is no empirical evidence that 'shouting' works in lowering prevalence in this context. And that ... is perfectly consistent with common sense. It is illogical to assume that if you tell someone smoking is going to kill them on the side of a package, and they do not want to quit, that they will quit simply because you move that message—which they have already heard—to the front of the package." *Id.* In short, "[t]here is no evidence that the warnings mandated by the Act will result in a statistically significant reduction in smoking initiation among youth or overall use of tobacco." *Id.* ¶ 5.

Dr. Viscusi's "conclusion that the modified warnings contained in the Act will not reduce tobacco use is also based on [his] analysis of the impact (or more properly lack thereof) of similar warnings on cigarettes in other countries." *Id.* ¶ 72. As he demonstrates in great detail, with sample illustrations, Australia, Canada, and the United Kingdom have all utilized similar large-text and/or color-graphic "warnings" for many years. *Id.* ¶¶ 72-75. Yet, "[d]espite the presence of these large text warnings and/or large text and graphic warnings on cigarette packaging in Australia, Canada, and the U.K., there is no evidence that the presence of these warnings produced a reduction in smoking among adults or youth in those countries based on analysis of smoking prevalence in each

country." *Id.* ¶ 76; *see also id.* ¶ 77-78.  Indeed, regardless of whether "Canadian style warnings have proven more effective in terms of gaining attention," Krugman Decl. at 30, the unrefuted evidence establishes that, after such warnings were adopted in Canada, adult and youth smoking rates actually *increased*, Viscusi ¶¶ 76-78.

In sum, the Act's so-called "warnings" are not "justified" because they attack a "harm" that is not even "purely hypothetical," but non-existent.  *Ibanez*, 512 U.S. at 146.

*Second*, as in *Ibanez* and *Entertainment Software Ass'n*, these so-called "warnings" are also unduly burdensome, because they completely drown out Plaintiffs' speech in its advertising and packaging.  Instead, the only speech consumers are likely to receive from Plaintiffs' advertising and packaging is the Government's anti-tobacco "warning."

As explained above, Plaintiffs' advertisements must be limited to black-and-white-only-text. *See supra* at 4-6.  In contrast, the mandated "warnings" must cover 20% of all advertisements and, in the case of cigarette advertisements, contain shocking color graphics.  *See supra* at 9-11.  This one-two punch ensures that all of Plaintiffs' advertisements "will be dominated by the mandated warnings." Lindsley Aff. ¶ 71.  Likewise, on packaging, the only place where color or imagery may be used, the "warnings" confiscate the *top 50%* of *both* sides of cigarette packaging (including shocking color graphics), and *30%* of *both* sides of smokeless packaging.  *See supra* at 9-11.  The burden of these "warnings," moreover, is magnified by the fact that tobacco packaging is generally placed several feet behind a checkout counter, rendering any color or imagery on the bottom of that packaging virtually invisible to consumers.  *See supra* at 11.  Finally, to the extent that consumers are able to see Plaintiffs' messages *at all*, the amount of allowable commercial information is dramatically diminished because Plaintiffs must squeeze that information onto the small portion of the packaging that the Government has not seized for its own use.  *See supra* at 11.  Thus, as in *Ibanez*, the Act "effectively rules out" many of Plaintiffs' existing packages.  512 U.S at 146-47.

In short, the Act's so-called "warnings" are far more burdensome than:  the disclosure invalidated in *Ibanez*, *id.* at 146-47; the "18" label invalidated in *Entertainment Software* that covered just one-twentieth of the video game package, 469 F.3d at 652 & n.13; or the hypothetical and purely factual "raw shellfish warning" in *Entertainment Software* that would have covered "half of the space on a restaurant menu" and thus "[c]ertainly" exceeded anything the Constitution would allow, *id.* at 652.  Indeed, if the Act's "warnings" are not unduly burdensome, then it is impossible to imagine what types of "warnings" would be.

Consequently, the "warnings" are *both* an "unjustified" *and* "unduly burdensome" restriction on Plaintiffs' commercial speech.  *Zauderer*, 471 U.S. at 651.

## B.    The "Warnings" Unconstitutionally Compel Plaintiffs To Disseminate The Government's Anti-Tobacco Message

The so-called "warnings" also unconstitutionally compel Plaintiffs to disseminate the Government's subjective and controversial anti-tobacco message.  The First Amendment guarantees "both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."  *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988).  Accordingly, "[f]or corporations as for individuals, the choice to speak includes within it the choice of what not to say."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986).

Thus, although the Supreme Court in *Zauderer* applied the "unjustified or unduly burdensome" standard for simple "disclosure requirements," it emphasized that such relaxed scrutiny was appropriate *only* when the disclosure consisted of "purely factual and uncontroversial information."  471 U.S. at 651.  For exactly this reason, the Seventh Circuit held that strict scrutiny was warranted instead for the "18"-sticker involved in *Entertainment Software Ass'n*, which the court held required the video game retailers to "communicate[] [the] subjective and highly controversial message[] that the game's content is sexually explicit."  469 F.3d at 652.

- 49 -

Here, the new "warnings" do not simply require the dissemination of factual information about the risks of tobacco use, or even factual information about the Government's own conclusions about those risks.  That information has been disseminated to the public for decades through the ubiquitous Surgeon General's Warnings as well as by other means, all of which have not only *fully* informed the public of the health risks of tobacco use, but have *overinformed* them, such that the public now dramatically overestimates the health risks of tobacco use.  *See supra* at 46-47.  Instead, by appropriating a substantial percentage of Plaintiffs' packaging for oversized text and (for cigarettes) shocking color graphics, the Government is forcing Plaintiffs to become the mouthpieces for a Government marketing campaign designed, not to provide uncontroversial factual information, but to promote the Government's subjective desire that consumers stop using tobacco products altogether.  In Dr. Viscusi's expert opinion, "[g]iven that the new mandated warnings are conveying information that is already well known, it would appear that they are really no more than a generalized anti-tobacco message:  'don't buy this product.'"  Viscusi Decl. ¶ 68.  And *that* message, just like the "18" sticker that implicitly compelled the speaker in *Entertainment Software Ass'n* to disseminate the state's view concerning what was "sexually explicit," constitutes a "subjective and highly controversial message" that is wholly "unlike [the *existing*] surgeon general's warning of the carcinogenic properties of cigarettes."  469 F.3d at 652.

Accordingly, this compelled speech is subject to strict scrutiny review, under which the Act's "warnings" are plainly unconstitutional.  *First*, if the Government wants to disseminate an anti-tobacco message, it can do so itself; it has given no reason why it is necessary to force Plaintiffs to do so for it.  *See, e.g.*, *id.* (citing *Nat'l Fed'n of the Blind*, 487 U.S. at 800).  *Second*, at a minimum, the Government cannot compel Plaintiffs to carry the Government's anti-tobacco message in a manner that unnecessarily compromises Plaintiffs' *own* speech.  "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative

voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976). And here, for the reasons discussed above, there is no justification for the overwhelming size and content of the Government's anti-tobacco message.

### C.    The Mandated "Warnings" Violate The Takings Clause

As the Supreme Court has explained, the "paradigmatic taking" is a "direct government appropriation or physical invasion of personal property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). For example, in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Supreme Court held that a state law requiring a building owner to allow a small cable box to be affixed to the side of his building was a *per se* taking, because "a physical invasion is a government intrusion of an unusually serious character" since "the owner may have no control over the timing, extent, or nature of the invasion." *Id.* at 433, 436. The Court rejected the state's assertion that the law was merely an ordinary exercise of its "broad power to regulate" the use of property, explaining that the critical distinction was that the law "require[d] the landlord to suffer the physical occupation of a portion of his building by a third party." *Id.* at 440; *see also Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 323 (2002) (drawing the "longstanding distinction between acquisitions of property for public use … and regulations prohibiting private uses"). The Court further emphasized that, in the case of such *per se* takings, the "constitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied." *Loretto*, 458 U.S. at 436. As the Court recently reaffirmed, "[a] permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests." *Chevron*, 544 U.S. at 537.

Here, Plaintiffs have vested property rights in their trade dress, trademarked images and logos, packaging, and advertising. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992);

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251 (1916).  The mandated "warnings," however, permanently and physically invade Plaintiffs' packaging and advertising in order to disseminate the Government's own anti-tobacco message, going well beyond any legitimate regulatory interest the Government possesses in ensuring that Plaintiffs disclose sufficient factual information to inform consumers.  *See supra* at 45-49.  In essence, the Act is no different than if the Government confiscated half of every billboard for a message on any other issue of public policy.  It thus constitutes a "classic taking" in which "the government directly appropriates private property for its own use."  *Tahoe Sierra*, 535 U.S. at 324.

### III.    <u>THE MRTP REQUIREMENT IS UNCONSTITUTIONAL</u>

For the reasons Plaintiffs explained at the preliminary injunction stage, the MRTP requirement is: (1) an unconstitutional prior restraint; (2) an unconstitutional restriction on Plaintiffs' commercial speech; (3) an unconstitutional restriction on Plaintiffs' core speech; and (4) unconstitutionally vague.  *See* PI Br. at 22-29; PI Reply Br. at 1-14.  Plaintiffs will not repeat those arguments but, instead, will emphasize five points for consideration on summary judgment.

*First*, at the preliminary injunction stage, this Court correctly held that the MRTP requirement is an unconstitutional prior restraint because (1) it "[h]old[s] speech captive and effectively 'compel[s] [Plaintiffs'] silence' until the FDA completes its review" of an MRTP application, PI Order at 19, yet (2) lacks a "reasonable time limit" for FDA review, *id.* at 23.  That on its own entitles Plaintiffs to summary judgment.  *See, e.g.*, *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 222-23, 227-28 (2d Cir. 1998) (agreeing with district court's original grant of summary judgment on this ground).  Although the FDA recently proposed a 360-day time period for review, that proposal is not currently binding.[7]  Moreover, even if a year-long delay would be

---

[7] *See* Draft Guidance for Industry and FDA Staff: Preliminary Timetable for the Review of Applications for Modified Risk Tobacco Products under the [FDCA] (Nov. 25, 2009).

reasonable for statements on labels, *see id.* at 223 & n.4, 228 (540-day prior restraint applied to "dietary supplement labels" and not to "books, magazines, or non-label advertising"), it most assuredly is *not* reasonable for the Act's moratorium on "*any* action directed to consumers through the media or otherwise" that "may" cause consumers to perceive certain relative health benefits, such as the *60 Minutes* program discussed below. *See, e.g.*, *Teitel Film Corp. v. Cusack*, 390 U.S. 139, 141-42 (1968) (per curiam) (invalidating 57-day period for reviewing films).

    *Second*, when addressing the prior restraint issue, this Court should also consider the following issues not addressed in its Preliminary Injunction Order:

- Burden of Proof.  This Court cited *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 229 (1990), for the proposition that the Government need not bear its usual burden of proof.  The Government did not raise this issue in its briefs, presumably because the Supreme Court has recognized that *FW/PBS* is limited to prior restraints where the Government "does not seek to censor content." *City of Littleton v. Z.J. Gifts*, 541 U.S. 774, 784 (2004).  Here, the FDA must "censor content," because "it is solely the manufacturer's promotional claims about the product that 'triggers' FDA review," PI Order at 10, and the FDA may grant approval *only* if it concludes that those claims are true, § 101(b)(3) (adding 21 U.S.C § 387k(g)(1)(A)).

- Lack of Objective Standards.  Although this Court addressed some of Plaintiffs' statutory arguments, it overlooked Plaintiffs' challenges to the portions of the prior restraint scheme that cover (1) "any action directed to consumers" and (2) statements that reasonably might cause consumers to believe that a tobacco product "*may* present a lower risk of disease." § 101(b)(3) (adding 21 U.S.C. § 387k(b)(2)(A)(iii)) (emphasis added).  This is precisely the type of language that the Sixth Circuit and other courts have found too subjective under free speech analysis. *See United Food & Commercial Workers Union v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 360 (6th Cir. 1998) (invalidating speech restriction turning on the Government's assessment of what third-parties "'*may*'" do or think (emphasis added)).

    *Third*, on its face and by its very design, the MRTP prior restraint scheme bans truthful *and* non-misleading speech.  If the FDA finds that a manufacturer has proven that a particular product will "significantly reduce harm and the risk of tobacco-related disease to individual tobacco users," it is still *required* to prohibit Plaintiffs from truthfully so stating if the manufacturer fails *also* to prove that the product will "benefit the health of the population as a whole." § 101(b)(3) (adding 21 U.S.C. § 387k(g)(1)(A)-(B)).  By definition and design, this population-wide requirement prohibits truthful *non-misleading* speech because it applies *regardless* of whether or not Plaintiffs' truthful

statement about individual health benefits is misleading with respect to population-wide benefits (or anything else)—indeed, it applies even if Plaintiffs' speech *unambiguously disavows* any population-wide benefit, such that it could not possibly be misleading.

*Fourth*, the Supreme Court has squarely held that "[a] company has the full panoply of protections available to its *direct comments on public issues*"—that is, statements *not* "made in the context of commercial transactions." *Zauderer*, 471 U.S. at 637 n.7 (emphasis added); *see also Fox*, 492 U.S. at 482 ("[S]peech that *proposes* a commercial transaction … is what defines commercial speech.").   That is precisely why, despite being critical of certain cigarette manufacturers in many respects, the D.C. Circuit in *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009), *agreed* that "Defendants' past participation in the public controversy surrounding smoking and health may have been inextricably intertwined with their marketing efforts."   *Id.* at 1144.   Had it been relevant to the court's analysis, that conclusion would have mandated the application of strict scrutiny.   *See id.*; *see also Nat'l Fed'n of the Blind*, 487 U.S. at 796 (strict scrutiny applies when commercial speech is "inextricably intertwined with otherwise fully protected speech"); *BellSouth*, 542 F.3d at 505.   And here, on its face and as interpreted by the Government, the MRTP requirement clearly covers core political speech:

- On its face, the MRTP requirement applies to "any action directed to consumers through the media or otherwise, *other than by means of the tobacco product's label, labeling, or advertising*." § 101(b)(3) (adding 21 U.S.C. § 387k(b)(2)(A)(iii)) (emphasis added).

- The Government has made clear that, in its view, this language encompasses Plaintiffs' "press releases, booklets, and television appearances," PI Order at 11—which obviously would include the *60 Minutes* interview that Reynolds was forced to decline as a result of the Government's interpretation of the statute and this Court's preliminary injunction ruling. *See supra* at 13. And there is simply no way that Plaintiffs' participation in a *60 Minutes* interview—or in other aspects of the public health debate over reduced risk products— constitutes *commercial* as opposed to *core political* speech.

*Finally*, this Court should address the fact that the MRTP requirement constitutes "viewpoint discrimination," which is "censorship in its purest form." *R.A.V. v. City of St. Paul*, 505

U.S. 377, 430 (1992) (Stevens, J., concurring in the judgment).  Whereas government agencies, ideological anti-tobacco organizations, and companies commercially manufacturing tobacco-cessation products are all free to denigrate Plaintiffs' products, Plaintiffs cannot defend themselves without receiving FDA pre-approval.  This is an unconstitutional "license [for] one side of [the] debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."  *Id.* at 392 (majority opinion).  Thus, even if the MRTP requirement were limited to potentially misleading commercial speech and had sufficient procedural safeguards, its unconstitutional viewpoint discrimination is sufficient grounds to invalidate it.  *See id.* at 391-96 (applying strict scrutiny even to viewpoint-based regulations of *unprotected* categories of speech such as "fighting words").

## IV.    THE ACT'S AUTHORIZATION OF FURTHER RESTRICTIONS IS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER

Finally, notwithstanding the sweeping and burdensome restrictions that the Act itself imposes, the Act further authorizes federal agencies, state and local governments, and Indian tribes to enact even "more stringent" regulations.  § 101(b)(3) (adding 21 U.S.C. § 387p(a)(1)); § 203 (adding 15 U.S.C. § 1334(c)).  The Act's authorization, however, provides "literally no guidance" at all "for the exercise of discretion"—much less the constitutionally required "intelligible principle." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001)  Accordingly, "the authority provided to such entities" under the Act, § 105(b), is an unconstitutional delegation of legislative power.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment on Counts 1-12 and 14 of the Amended Complaint and enter the declaratory and injunctive relief requested therein.

ENGLISH, LUCAS, PRIEST & OWSLEY LLP
1101 College Street, P.O. Box 770
Bowling Green, KY 42102-0770
Telephone: (270) 781-6500
Fax: (270) 782-7782
Email: kames@elpolaw.com

*/s/ Charles E. English*
CHARLES E. ENGLISH
CHARLES E. ENGLISH, JR.
D. GAINES PENN
E. KENLY AMES

ATTORNEYS FOR PLAINTIFFS

- and -

Robert F. McDermott, Jr. *(pro hac vice)*
Donald B. Ayer *(pro hac vice)*
Geoffrey K. Beach *(pro hac vice)*
Noel J. Francisco *(pro hac vice)*
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3939

- and -

Leon F. DeJulius, Jr. *(pro hac vice)*
JONES DAY
500 Grant St., Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 391-3939

ATTORNEYS FOR PLAINTIFFS CONWOOD
COMPANY, LLC AND R.J. REYNOLDS
TOBACCO COMPANY

- and -

Floyd Abrams *(pro hac vice)*
Joel Kurtzberg *(pro hac vice)*
Kayvan Sadeghi *(pro hac vice)*
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005-1702
Telephone: (212) 701-3000

ATTORNEYS FOR PLAINTIFF LORILLARD
TOBACCO COMPANY

- and -

Philip J. Perry *(pro hac vice)*
LATHAM & WATKINS LLP
555 11th Street, NW, Suite 1000
Washington DC  20004-1304
Telephone:  (202) 637-2200

ATTORNEYS FOR PLAINTIFF
COMMONWEALTH BRANDS, INC.

- and -

LeAnne Moore *(pro hac vice)*
NATIONAL TOBACCO COMPANY, L.P.
3029 W. Muhammad Ali Boulevard
Louisville, KY  40212
Telephone:   (731) 364-5419, ext. 4155
E-mail:  lmoore@nationaltobacco.com

ATTORNEYS FOR PLAINTIFF
NATIONAL TOBACCO COMPANY, L.P.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2009, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Andrew E. Clark – andrew.clark@usdoj.gov

Michael D. Ekman – Michael.Ekman@usdoj.gov

William F. Campbell - Bill.Campbell@usdoj.gov

Alisa B. Klein – alisa.klein@usdoj.gov

Samantha L. Chaifetz - samantha.chaifetz@usdoj.gov

Daniel Tenny - daniel.tenny@usdoj.gov

Nicholas J. Bagley - nicholas.bagley@usdoj.gov

Sarang V. Damle - sarang.damle@usdoj.gov

Daniel K. Crane-Hirsch - daniel.crane-hirsch@usdoj.gov

James T. Nelson - james.nelson2@usdoj.gov

Jessica R. Gunder - jessica.r.gunder@usdoj.gov

Joel D. Schwartz - joel.schwartz@usdoj.gov

Karen Schifter - karen.schifter@fda.hhs.gov

Jennifer A. Moore - JMoore@gminjurylaw.com

Allison M. Zieve – azieve@citizen.org

Joe B. Campbell - campbelljoebill@bellsouth.net

*/s/ E. Kenly Ames*_____
E. KENLY AMES